**Paul RUIZ and Earl Van Denton**

v.

**Larry NORRIS, Director Arkansas Department of Correction.**

**No. PB–C–89–395.**

United States District Court, E.D. Arkansas, Western Division.

Aug. 2, 1994.

E. Alvin Schay, Arkansas Death Penalty Resource Center, Inc.; Ray E. Hartenstein; Herbert C. Rule, III, Rose Law Firm, Little Rock, AR, and Mark S. Cambiano, Cambiano Law Firm, Morrilton, AR, for plaintiffs.

Clint E. Miller, Atty. General's Office, Little Rock, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

### BACKGROUND

While this habeas proceeding has now been pending for five years, the underlying case is much older. As noted by the Arkansas Supreme Court in its last decision, "this capital murder case has followed a long and torturous path."

Early in 1977, petitioners Ruiz and Denton were imprisoned in the Oklahoma State Prison in McAlister—Ruiz for armed robbery and Denton for murder. On June 23, 1977, they disappeared from a work crew. They were seen near the town of Magazine in Logan County, Arkansas on the morning of June 29, in a car with Louisiana license plates. The Arkansas Supreme Court described what happened next:

> When the marshall of Magazine, Marvin Ritchie, and two employees of the Corp of Engineers, David Small and Opal James, who were working in Logan County, were found to be missing, a search party was organized and that afternoon two were found handcuffed together in the trunk of Ritchie's car. Marvin Ritchie was dead and David Small was critically wounded. Ritchie had been shot in the back of the head and Small through the chest. Small survived to provide essential testimony against the appellants at all three trials. Two days later, the body of Opal James was found in a remote section of Montgomery County.

On August 25, 1977, felony informations were filed in the Circuit Court of Logan

County, Arkansas, charging Ruiz and Denton with the capital murders of Marvin Ritchie and Opal James. Their trial in Logan County started on April 27, 1978. They were convicted and sentenced to death by electrocution. On appeal to the Arkansas Supreme Court, these convictions were reversed upon a holding that the trial court erred in denying a motion for a change of venue because of pervasive pre-trial publicity. *Ruiz and Denton v. State,* 265 Ark. 875, 582 S.W.2d 915 (1979).

After a change of venue to Conway County, Arkansas, the appellants were again tried by a jury, convicted and sentenced to death by electrocution. This sentence, imposed on October 3, 1979, was affirmed by the Arkansas Supreme Court and certiorari was denied by the U.S. Supreme Court. *Ruiz and Denton v. State,* 273 Ark. 94, 617 S.W.2d 6, *cert. denied* 454 U.S. 1093, 102 S.Ct. 659, 70 L.Ed.2d 631 (1981). State postconviction remedies were pursued and exhausted. *Ruiz and Denton v. State,* 275 Ark. 410, 630 S.W.2d 44 (1982), *cert. denied* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

After exhausting their remedies in state court, Ruiz and Denton filed a petition for federal habeas corpus relief in the U.S. District Court for the Eastern District of Arkansas. That petition was denied. Petitioners then appealed to the U.S. Court of Appeals for the Eighth Circuit where the judgment of the district court was reversed on the basis of that court's decision in *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985) which held that "death qualified" juries are unconstitutional. *Ruiz v. Lockhart* 754 F.2d 254 (8th Cir.1985). The state then appealed to the U.S. Supreme

Court which granted certiorari and vacated the decision of the Eighth Circuit on the basis of *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), which upheld the constitutionality of "death qualified juries." The case was remanded to the Eighth Circuit for reconsideration. The Eighth Circuit reconsidered and again reversed the U.S. District Court, this time upon the ground of "double counting" under *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.). The "double counting" issue had been reserved by petitioners but not dealt with earlier by the Eighth Circuit in view of its reversal on the *Grigsby* issue. The Eighth Circuit upheld the validity of petitioners' convictions but vacated their death sentences because of the use of pecuniary gain as an aggravating circumstance where robbery was an element of the underlying capital crime. The state concedes that its failure to appeal this decision to the Eighth Circuit was attributable to a miscalculation of the time permitted for such appeal.[1] The state was given a reasonable time to either retry the issue of punishment or reduce petitioners' sentences to life without parole. After remand, on March 5, 1987, the U.S. District Court for the Eastern District of Arkansas entered such a judgment.

On August 17, 1987, petitioners' new trial of the penalty phase of their capital murder convictions commenced.[2] The jury found in favor of the death penalty and on August 26, 1987, Ruiz and Denton were again sentenced to death. Petitioners appealed their convictions to the Arkansas Supreme Court asserting some nineteen errors. The Arkansas Supreme Court found no merit in those argu-

1. This is the basis for the Arkansas Supreme Court's observation: "One conclusion that might be drawn from the foregoing litigation is that appellants' second trial was error free and our affirmance of those convictions and sentences in 1981 is now effectively reinstated." This follows from the later decision of the Eighth Circuit that the U.S. Supreme Court's opinion in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) overruled the *Collins* "double counting" argument. See *Perry v. Lockhart,* 871 F.2d 1384 (8th Cir.1989). So, had the State appealed and the United States Supreme Court reversed the Eighth Circuit on the *Collins* issue that would have been the "end of the road" on petitioners' federal habeas action since the

Eighth Circuit rejected all other issues raised by petitioners when it remanded on the basis of *Collins.* So we are dealing with this habeas proceeding only because of the State's failure to timely file an appeal of the Eighth Circuit's decision based on the "double counting" argument. The Arkansas Supreme Court eschewed to treat this record as an affirmance of its 1981 opinion and so went on to address petitioners' appeal of this resentencing trial. We agree that that was the correct and proper course to follow under the circumstances.

2. Thus, the sentencing trial we are dealing with here is the third such trial conducted in this case.

ments and affirmed the death penalties imposed.

On July 20, 1989, Paul Ruiz filed a petition under 28 U.S.C. § 2254 for writ of habeas corpus. By letter dated July 14, 1989, Mr. Earl Van Denton joined in, and adopted, the petition filed by Mr. Ruiz. Thus began this habeas proceeding.

On August 17, 1989, petitioners Paul Ruiz and Earl Van Denton filed their "First Amended Petition for a Writ of Habeas Corpus on Behalf of Persons in State Custody, 28 U.S.C. § 2254 and Brief in Support Thereof." This 112 page pleading was filed by attorney Mark S. Cambiano on behalf of Mr. Ruiz and by attorney Ray Hartenstein on behalf of Mr. Earl Van Denton. The amended Petition raises twenty-one separate issues.

On July 23, 1990, after filing various related pleadings, the parties agreed to stipulate as to the factual issues and submit the legal issues by briefs. The original briefing continued into late 1991. On September 23, 1991, the petitioners filed a "motion for appointment of investigator."

Mr. Mark Cambiano represented Mr. Ruiz and Mr. Robert S. Irwin represented Mr. Denton in the state trial court and for the state appeals. After the Arkansas Supreme Court affirmed those sentences it allowed Mr. Irwin to withdraw as Mr. Denton's attorney.

When Mr. Ruiz filed his habeas petition he requested that Mr. Cambiano be appointed to represent him in connection with that matter. No objection was filed by the state or Mr. Denton. Mr. Denton then wrote asking to adopt the petition filed by Mr. Ruiz and specifically requested that the court appoint Mr. Ray Hartenstein to represent him in the habeas proceeding. The court granted the request of both Mr. Ruiz and Mr. Denton and, as a consequence, Mr. Cambiano and Mr. Hartenstein represented petitioners in this habeas proceeding until March, 1994.

On March 10, 1994, the Court had a telephone conference with the attorneys for the petitioners and the respondent. It noted that Mr. Denton's attorney, Mr. Hartenstein, had not represented him during the state court proceeding. However, it also noted that Mr. Ruiz continued in this habeas proceeding with the same attorney, Mr. Cambiano, who had represented him throughout the state court proceedings. And the Court further pointed out that one of the issues argued by both petitioners was the "ineffective assistance of counsel." Although the state had not raised the issue, the Court, after discussing the matter with all three attorneys (Mr. Cambiano, Mr. Hartenstein and Mr. Clint Miller of the Arkansas Attorney General's Office) concluded that it would be best if Mr. Cambiano were relieved and a new attorney appointed to represent Mr. Ruiz in this habeas proceeding. Mr. Cambiano readily agreed.

On March 11, 1994, Mr. Herbert Rule was appointed to represent Mr. Ruiz. A new briefing schedule was ordered. After several extensions of time at the separate requests of petitioners and the respondent, the Court set July 22, 1994 as the final date for the parties to submit additional briefing and argument.

No additional filings or briefing were filed by the July 22, 1994 deadline, or thereafter. Therefore, all issues are ready for final disposition.

The captions found below for the points argued by petitioners are, for the most part, taken verbatim from their petition and briefs. We use their language so that any reviewing court may correlate this Court's discussion and analysis with petitioners' own summary of the issue or issues raised and also with the most recent opinion of the Arkansas Supreme Court.

The Court will attempt to make its discussion of most of the issues as "self-contained" as possible. This will result in a great deal of repetition but will avoid to some extent the necessity for "back-referencing" in order to understand or follow the separate discussions.

## I.

THE RESENTENCING TRIAL OF THE PETITIONERS VIOLATED THE EX POST FACTO PROVISIONS OF THE UNITED STATES AND ARKANSAS CONSTITUTIONS AND DENIED PETITIONERS DUE PROCESS AND EQUAL PROTECTION OF THE LAWS

▇ Petitioners contend that the resentencing statute, codified at Ark.Stat.Ann.

§ 5–4–616, which limits the retrial of cases remanded solely for sentencing phase error to a retrial of the penalty phase only, was unconstitutionally applied to petitioners. Enacted in 1983, the statute in question specifically states that it is to apply retroactively to any defendant sentenced to death after January 1, 1974. Prior to the enactment of this statute, upon a finding of reversible error at the sentencing phase, petitioners would have been retried on both guilt and penalty issues. Petitioners contend that the retroactive application of the 1983 statute violates the *ex post facto* clause of the Constitution by depriving them of a remedy available under the law in effect at the time the criminal act was committed.

In Petitioner's Supplement to Brief in Support of Petition for Writ of Habeas Corpus, filed in 1989, Petitioners cite the Court to the case of *Youngblood v. Lynaugh,* 882 F.2d 956 (5th Cir.1989), which they contend is on point. In *Youngblood,* the petitioner had been convicted of aggravated sexual abuse. The jury sentenced him to life imprisonment and a fine of $10,000. The fine was not authorized by the applicable statute, and relying upon a Texas Court of Criminal Appeals decision which stated that a jury verdict which included a punishment unauthorized by law was void at its inception and must be set aside, petitioner sought a new trial. While that petition was pending, Texas passed a new statute, to apply retroactively to June 11, 1985, which allows an appellate court to reform an improper verdict assessing a punishment not authorized by law. The Fifth Circuit found that this retroactive application violated the *ex post facto* clause.

This Court agrees that the *Youngblood* case is on point. However, the Fifth Circuit opinion was reversed by the Supreme Court in 1990. *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). After the Supreme Court's reversal, petitioners attempt to distinguish *Youngblood.* This Court, however, finds that the *Youngblood* decision is controlling, and thus the statute in question here cannot be found to violate the ex post facto clause. *See also Pickens v. Lockhart,* 802 F.Supp. 208 (E.D.Ark.1992)

(applying *Collins v. Youngblood* to Ark.Stat. Ann. § 5–4–616).

## II.

## THE FAILURE TO GRANT PETITIONERS A SEVERANCE OF THEIR CAPITAL MURDER RESENTENCING TRIALS VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENT

■ Under this caption the defendants raise not only a severance issue and a *Batson*-type issue but they also question the failure of the trial court to grant additional peremptory challenges.

It is clear that both defendants advised the trial court that they did *not* want the cases against them severed for separate trials. At page 105–106 of the transcript we find the following colloquy:

MR. IRWIN: Your Honor, there's a few more little things in the way of mechanics of the trial that we need to mention. First of all, there was some discussion about the possibility of a severance in the trial of these two defendants. I would like for the Court to note on the record and in the presence of Mr. Earl Van Denton that he and I have discussed this case in the past so far as the possibility of a severance is concerned, and it's our position at this time—my position based on my competency (sic) with my client that we do not want a severance. If the Court desires to get some indication from Mr. Ruiz, I suggest that he simply affirm it by nodding his head or whatever direction the Court may want.

BY THE COURT: Well, there has been no motion for a severance, so there is nothing to act on there.

MR. IRWIN: Well, there was some discussion and we just want the record clear that we have discussed this with our clients, and I, particularly with Mr. Ruiz, and at this time he doesn't desire any severance.

BY THE COURT: What about your client, Mr. Cambiano?

MR. CAMBIANO: Your Honor, I prepared a Motion for Severance and dis-

cussed it with my client. He wishes not to sever the trials either.

BY THE COURT: Both clients are, of course, present and if that is not correct they should so indicate, and so far neither has so indicated.

(T.Tr. 105–106). However, the defendants argue that at a later date they were somehow misled on the severance question by the trial court in an on the record discussion of a request for additional peremptory challenges. That discussion was as follows:

BY THE COURT: Any other motions?

MR. CAMBIANO: No, your Honor, I have no other motions at this time.

Oh, I have one other motion, yes. I was going to wait and take this up in voir dire, but I might as well take it up now since we have some time. The defendants would ask for twelve (12) peremptory challenges for each defendant since this case is being tried jointly and we waived the severance. Had we severed the trials it would have been a great expense to the county and the State. Since we are saving the State some time, we do believe that we should have twelve (12) peremptory challenges each, since I may think a juror is good and Doc may think that it is not so good, and we may have a conflict there. In the event—

BY THE COURT: If we do, we will have to sever them.

MR. CAMBIANO: Sever the case?

BY THE COURT: Your motion is denied.

MR. CAMBIANO: My understanding of the Court's ruling then is if we do have a conflict we will sever the trials?

BY THE COURT: That's the law. Any other motions?

MR. CAMBIANO: No, your Honor; not at this time.

(T.Tr. 303–304).

The petitioners interpret the court's language as "ruling that severance would be automatic if any conflicts develop," Petitioners' Trial Brief, p. 13. It is their view that the court's ruling is tantamount "to an oral motion which was granted."

The issue concerning limits on the number of peremptory challenges was discussed dur-ing the voir dire of a prospective juror by the name of Karen Strickland. After questioning Ms. Strickland, a black person, the State indicated that the juror was good for it and the following colloquy occurred:

BY THE COURT: Your Honor, the juror is good for the state.

BY THE COURT: What says the defendant?

MR. CAMBIANO: Just a moment, your Honor.

BY THE COURT: Okay, go ahead; I'm not trying to rush you. I'm just asking.

MR. CAMBIANO: Yes.

MR. IRWIN: Your Honor, may we approach just a moment?

BY THE COURT: You may.

(Defense counsel approached the bench.)

MR. IRWIN: I don't want to get too close, since there are no jurors. We've got a little conflict here, one wants and one don't want.

BY THE COURT: Well, somebody is going to have to say something.

MR. CAMBIANO: Well, she's good for the State—I mean she's good for the State and also good for Ruiz.

MR. IRWIN: But I don't like her, I don't like the juror. What can we do now?

BY THE COURT: That's something the defense will have to resolve.

MR. CAMBIANO: As far as I'm concerned, your Honor, she's good for the defendant, Ruiz.

MR. IRWIN: We'll see, my problem is—

MR. CAMBIANO: Your Honor, could we have a short break? We might be able to resolve this.

BY THE COURT: You may, yes.

\* \* \* \* \* \*

(Defense counsel was given time to confer with their clients before proceeding.)

BY THE COURT: What does the defendant say?

MR. IRWIN: The defendant Earl Van Denton wishes to strike Juror Karen Strickland.

MR. CAMBIANO: Juror Paul Ruiz wishes to accept Juror Strickland.

BY THE COURT: "Ark.Stat. 43–1929, challenged by several defendants. When several defendants are tried together the challenge of any one of the defendants shall be the challenge of all." That's the extent of the statute, but I don't know what it means. It's easy to read, to apply is something else. I don't know if that means if one challenges then the other one has to accept that challenge. I'm looking for the other side of the coin, if one accepts does the other have to accept? I don't see the other side of the coin. The only annotation under it says, "When several defendants are being tried together, they are entitled to only eight (8) peremptory challenges." Of course, that was not a capital case. In this case that would mean they are entitled to a total of twelve (12) peremptory challenges, which we have already determined. I believe that's what it means. That puts us back to where we started. An obvious alternative is a severance, I mean one solution; the only one that I feel at this time, anyway, as I feel now, would solve the problem. There may be another solution. But I understand the defendants do not want a severance, am I correct?

MR. CAMBIANO: Your Honor, it is my understanding that the defendants prefer not to sever the case, but if it comes down to it, they would. That's my understanding, I haven't really talked to them on that specific point.

BY THE COURT: Well, I think maybe you should.

MR. IRWIN: The next question—

BY THE COURT: Go ahead if you have got something to say, Doc. What?

MR. IRWIN: In the event of a severance, which gets to be tried first?

BY THE COURT: Well, that problem would be easy to solve. At this point it is academic, but it wouldn't be difficult of a solution. Now, that's what I've been able to find out. Has the prosecution done anything? Maybe the Prosecutor Coordinator's Office might help you, Bill; might help us.

MR. BULLOCK: It might help to determine the question.

BY THE COURT: Yes.

MR. KIRK: I might see what I can find out, your Honor.

BY THE COURT: Why don't you do that. Off the record.

(At this time there was a recess, after which time proceedings were as follows:)

BY THE COURT: Are we ready to proceed?

MR. CAMBIANO: I think so, your Honor.

BY THE COURT: Did you find anything, Mark?

MR. CAMBIANO: Your honor, all I found is what is Rule 22.3B3. It used to be 3B2 before they amended the rules last month. It says if during a trial upon consent of the defendant to be severed it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants that should—the Court should grant severance.

BY THE COURT: What do we do when guilt or innocence has already been determined?

MR. CAMBIANO: I saw that in there too. I don't believe the people that prepared these rules foresaw that. I believe it means in sentencing also.

BY THE COURT: Well—

MR. CAMBIANO: A fair determination one way or another.

To be honest, I don't know Judge.

BY THE COURT: To say I don't know is to be honest many times. Arkansas Rules of Criminal Procedure 22, does give the trial Court discretion to grant or deny a severance. That has not always been the law, but it is now and has been since the adoption of the rules. I found Ark.Stat. 43–1929, which I read a while ago, and which is not really as clear as it should be. It's an old statute seldom interrupted, (sic), never questioned in the light in which we have it. I found McDaniel and Gookin, G-O-O-K-I-N, versus State 278–Ark. 631, a 1983 case, which talks about severance. Citing—well, I'm reading from page 638, the third full paragraph. "The issue of severance is to be determined on a case by case basis, considering the totality of the

circumstances with the following factors favoring severance: 1. Where defenses are antagonistic." We don't have that. "2. Where it is difficult to segregate the evidence. 3. Where there is a lack of substantial evidence implicating one defendant, except for the accusation of the other defendant. 4. Where one defendant could have deprived the other of all peremptory challenges. 5. Where if one defendant chooses to testify, the other is compelled to do so. 6. Where one defendant has no prior criminal record and the other has. 7. Where circumstantial evidence against one defendant appears stronger depriving the other of all peremptory challenges, that might give rise to a different situation, but we don't have that.

MR. CAMBIANO: Your Honor, if I could make just a short record on that.

BY THE COURT: You may.

MR. CAMBIANO: Defendant Ruiz feels that if this juror is struck that it will deprive him his 6th, 8th and 14th Amendment Rights under the United States Constitution, in that he will not have a full twelve (12) strikes as others similarly situated would; therefore he would also be denied equal protection under the law. We feel that she would make a good juror. My client is non-white, in the minority, and this person, although that's not the reason, it is one of the reasons, she is a non-white. We feel that she would be a good juror, and for those reasons we would object to the Court's ruling.

BY THE COURT: I need another book.

MR. KIRK: Your Honor, there has been no request for a severance, is that correct?

BY THE COURT: That's correct.

MR. KIRK: The defendant have not— okay.

BY THE COURT: Off the record.

(At this time there was a recess, after which time proceedings were as follows:)

BY THE COURT: I have this one thing to say with reference to Mr. Cambiano's constitutional argument a while ago. There is no absolute right to peremptory challenges under the constitution and I cite the case of Clines, C–L–I–N–E–S, versus State, 280

Ark. 77, a 1983 case. Peremptory challenges vary greatly from state to state, some states even have the same amount on each side. Arkansas is different, as many states are in that respect. We grant more to the defendants than we do to the State. All right, what have you decided?

MR. CAMBIANO: Your Honor, I want to make things clear first. As far as Rule 22.3B3 and Ark.Stat. 43–1929, the Court is not going to grant severance, although we would consent to a severance. I want to let the Court know that we would consent to a severance under 43–1929 and 22.3B3. It is my understanding that the Court is not going to grant severance?

BY THE COURT: No. No, huh-uh.

MR. CAMBIANO: Okay. In that case—

BY THE COURT: None has been asked for.

MR. CAMBIANO: Well, in that case defendant Ruiz would request a severance, since it appears that there is going to be numerous conflicts in this trial. We have been seeing it coming for a little while and trying to stave it off, but I just don't see any way around it. We would ask for a severance at this time.

BY THE COURT: Under the guidelines given in the case I read from a while ago, McDaniels, I see no grounds for a severance at this time.

MR. IRWIN: I'm compelled to make the same motion, your Honor.

BY THE COURT: I make the same ruling.

MR. IRWIN: Very well.

BY THE COURT: As I stated a while ago, before this rule came into effect, Arkansas Rules of Criminal Procedure, 22, the defendants in a capital case had the absolute right to a severance. They do not now.

MR. IRWIN: In the sentencing phase, is that what you mean?

BY THE COURT: Do you still want to challenge the juror, that is, the last one we questioned, Karen Strickland.

MR. IRWIN: Yes, sir; your Honor.

BY THE COURT: You do?

MR. IRWIN: Yes, sir.

BY THE COURT: All right.

MR. BULLOCK: I didn't understand Mr. Irwin, your Honor.

MR. IRWIN: I said, Yes sir; we wish to strike the juror.

* * * * * *

(Mr. Cambiano left the courtroom briefly.)

MR. IRWIN: Your Honor, with respect to that last juror.... In order to avoid that the defendants, both of them, in view of the Court's ruling, had to exercise a peremptory challenge.

BY THE COURT: You say both sides had to?

MR. IRWIN: Yes, sir; because the Court has ruled that the challenge of one defendant is the challenge of both.

BY THE COURT: That's the law.

MR. IRWIN: Yes, sir.

BY THE COURT: I have to follow the law.

MR. IRWIN: I understand that, but we were getting to that—so long getting to that point, that's the purpose of my motion, that the Court excuse her on its own instead of charging a peremptory.

BY THE COURT: The motion is denied. I see no prejudice there, I see no possibility of prejudice.

MR. IRWIN: Except that it looses [sic] a peremptory challenge.

BY THE COURT: Sir?

MR. IRWIN: The effect of that is to cause the loss of a peremptory challenge.

BY THE COURT: Any time you make one, you loose [sic] one.

MR. IRWIN: As to the other defendant.

BY THE COURT: And you made that challenge before any of this came up.

MR. IRWIN: Yes, sir.

(T.Tr. 572–582).

Later during jury selection identical situations occurred concerning prospective black jurors Athelene Hill (Trial Tr. 776–777) and Rita Abrams (Trial Tr. 849–850), with the same result. The peremptory challenge of Abrams by Denton was the final peremptory challenge allowed, the petitioners having exercised their cumulative total of twelve such

challenges. The rulings of the state trial court on these three prospective jurors form the predicate for the *Batson* issue.

Petitioners argue that individualized sentencing is required if the state seeks the death penalty. It is their view that this requirement cannot be met in a joint sentencing trial. Petitioners also argue that it is difficult for a juror to separate the evidence relating to one defendant from that relating to the other defendant.

■ The Court disagrees. A joint sentencing trial does not, *per se,* deprive any defendant of the right to individualized sentencing. Where the evidence relating to the separate defendants is readily identifiable, as here, and the jury is properly instructed, there is no problem. From voir dire through the instructions given to the jury at the end of the trial, the court emphasized the need for the jury to consider the evidence for or against Ruiz and Denton separately and that it was to render its verdict just as if Ruiz and Denton had been tried separately. At page 1476 of the Trial Transcript we find the court instructed the jury as follows:

> Although Paul Ruiz and Earl Van Denton are being tried jointly, you shall consider the evidence for or against each of them separately and render your verdicts as if each were being tried separately.

And at page 1479:

> The instructions that I will now give apply to each of the defendants individually. You will be given a complete set of forms for each defendant. Your verdict may or may not be the same for each defendant, but you must consider the case of each one separately. As to each defendant there are three forms for you to use in reaching your decision, and a verdict form for you to use when your verdict has been reached.

The Arkansas Supreme Court dealt with the severance and the peremptory challenge issues as follows:

> We do not interpret the record in quite the same way. It is clear that appellants waived their motion for severance and no condition was tied to the waiver. Counsel for Paul Ruiz then argued that because the state would benefit by one trial rather than

two, the defendants should each be allowed twelve peremptory challenges, rather than twelve between them, since they might disagree on which jurors would be good for the defense. That proposal was rejected, prompting defense counsel to ask if a conflict developed would a severance be granted. The trial court's response was, "that's the law."

We do not regard that exchange as a binding commitment by the trial judge to order a severance merely upon a purported disagreement between defense counsel over whether to strike or accept a prospective juror. We believe he was simply alluding generally to the law as reflected in A.R.Cr.P. Rule 22.3(b)(iii) and in the guidelines set out in *McDaniel and Gookin v. State*, 278 Ark. 631, 648 S.W.2d 57 (1983), indicating that the trial court should continue to be sensitive to the advisability of a severance as the trial evolves. Severances are to be determined by the trial court on a case by case basis in the light of all attendant circumstances. It is an exercise of judicial discretion. *Spillers v. State*, 268 Ark. 217, 595 S.W.2d 650 (1980). A.R.Cr.P. Rule 22.3. We have held that when more than one defendant is being tried for capital murder, the number of peremptory challenges allotted to a side remains at twelve. *Wilkins v. State*, 292 Ark. 596, 731 S.W.2d 775 (1987). Thus there was no error in refusing to enlarge the number of peremptory challenges nor any abuse of discretion in denying severance on that ground. *Hallman and Martin v. State*, 264 Ark. 900, [575] S.W.2d 688 (1979).

This Court agrees. It has carefully reviewed the arguments of the petitioners and the record herein, and finds nothing to support an argument that the failure of the trial court to grant the petitioner's oral motion for severance rendered the jointly conducted sentencing trial fundamentally unfair. As stated by Judge Henry Woods in *Orndorff v. Lockhart*, 707 F.Supp. 1062 (E.D.Ark.1988):

The petitioners take the position that the trial court's denial of their motions for separate trials was an abuse of discretion which resulted in a "smear effect" among

them ... In as much as this argument turns on alleged violations of Arkansas procedural rules it does not state a claim for *habeas* relief. Rather, the petitioners must show that the trial court's failure to grant their motions for severance rendered the joint proceeding fundamentally unfair so as to violate due process. *Johnson v. Dugger*, 817 F.2d 726 (11th Cir.1987); *Manning v. Warden, Louisiana State Penitentiary*, 786 F.2d 710 (5th Cir.1986); Cf. *Robinson v. Wyrick*, 735 F.2d 1091 (8th Cir.), *cert. denied*, 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984) (to obtain federal *habeas* relief for failure to sever offenses, the joinder must render the trial fundamentally unfair). Upon review of the record the court finds that the petitioners have failed to meet their burden of proof. At *voir dire* each of the jurors stated under oath that he or she could consider each defendant separately and they were instructed at the close of trial that they must so consider each defendant, rendering separate verdicts as if each had been tried separately.

*Id.* at 1070–71.

■■■ There is no constitutional right to peremptory challenges. A defendant is entitled to be tried by a fair and impartial jury. The Arkansas rules and procedures dealing with this issue meet the rational standard test. As stated by Judge Woods:

The trial court limited the petitioners to a total of twelve peremptory challenges pursuant to Ark.Stat.Ann. § 43–1929 (Repl. 1977) (now codified at Ark.Code Ann. § 15–33–307 (1987)), which provides that when several defendants are tried jointly a challenge by one shall be the challenge by all. The petitioners argue that, had they been tried separately, each would have been entitled to twelve peremptory challenges, and that because they were limited to a total of twelve in the joint proceeding they have been denied equal protection of the laws under the Fourteenth Amendment. This argument is without merit. First, there is no constitutional right to peremptory challenge. *[Stilson] v. United States*, 250 U.S. [583], 40 S.Ct. 28, 63 L.Ed. 1154 (1919). All that is guaranteed by the

constitution is the right to an impartial jury. *Id.;* U.S. const. amend. VI. This the petitioners received. Second since . . . there is not at issue a fundamental right guaranteed by the constitution, this court must analyze the petitioners' claim under the rational basis standard of review. *Harris v. [McRae],* 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980) (quoting *McGowan v. Maryland,* 366 U.S. 420 at 425, 81 S.Ct. 1101 at 1104, 6 L.Ed.2d 393 (1961)). Under that standard the petitioners' claim fails because the state's legitimate interest in expediting trials, thereby conserving judicial resources, is rationally related to the procedural rule enacted. For the same reason the petitioners argument that the state rule is arbitrary and irrational in violation of the due process clause of the Fourteenth Amendment must also fail.

*Id.* at 1072.

The *Batson* argument is made primarily by the petitioner Ruiz, who is Hispanic. He claims that three non-white jurors who had been accepted by the state and also by him were nevertheless excused when petitioner Denton used three of their "joint" peremptory challenges to remove them. Ruiz argues that the state trial court, by permitting these peremptory challenges, violated Ruiz's Sixth Amendment rights as explained in *Batson.* Ruiz recognizes that *Batson* involved the exercise of peremptory challenges *by the State* and not by a co-defendant. But he contends that the effect upon him is the same and that *Batson* has been, or should be, extended to this situation. He argues that the trial court's denial of a severance allowed the petitioner Denton to exclude minority jurors—an act which the state itself could not do under *Batson.*

■ The respondent answers by first pointing out that neither petitioner raised the *Batson* argument in support of their motions for severance and that they also failed to raise this argument on direct appeal to the Arkansas Supreme Court. Under Arkansas law such issues are not preserved for appellate review unless raised in the trial court by means of a specific contemporaneous objection. And, issues not raised on direct appeal

are considered abandoned. So, absent a showing of cause and prejudice the petitioners would be procedurally barred. Respondent also argues that the *Batson*/severance issue would be barred in any event—even if meritorious—because same would amount to a "new rule" and could not therefore be applied retroactively to them. *Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990). In this connection the state notes that petitioners' death sentence became "final" sixty days after the Arkansas Supreme Court's affirmance of their death sentence on direct appeal. *Walton v. Caspari,* 916 F.2d 1352 (8th Cir.1990). The Arkansas Supreme Court's decision came down on June 12, 1989, and became final on June 29, 1989, after the expiration of the 17 day period during which petitioners could request a rehearing. So, since the U.S. Supreme Court had not by that time extended the rationale of *Batson* to prohibit co-defendants from using race-based peremptory strikes, (in the context of this case), the State contends that such claim is barred by the "new rule" holding in *Sawyer.* The Court agrees.

During the voir dire discussion of the peremptory challenges made by the defendant Denton to prospective jurors Strickland, Hill and Abrams, *Batson* was not mentioned. And neither Ruiz's attorney, nor the State's attorney, nor the court, called upon Denton's attorney to give some neutral, non-discriminatory, reason or reasons for such strikes.

What is the current status of the law on this issue? In *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the U.S. Supreme Court was called upon to decide whether the Constitution prohibits criminal defendants from exercising racially discriminatory peremptory challenges. Before dealing with that issue, Justice Blackmun reviewed the issue historically:

> Over the last century, in an almost unbroken chain of decisions, this Court gradually has abolished race as a consideration for jury service.

> \* \* \* \* \* \*

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court was confronted with the question whether

an African–American defendant was denied equal protection by the State's exercise of peremptory challenges to exclude members of his race from the petit jury. *Id.,* at 209–210, 85 S.Ct., at 830. Although the Court rejected the defendant's attempt to establish an equal protection claim premised solely on the pattern of jury strikes in his own case, it acknowledged that proof of systematic exclusion of African–Americans through the use of peremptories over a period of time might establish such a violation. *Id.,* at 224–228, 85 S.Ct., at 838–840.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court discarded *Swain's* evidentiary formulation. The *Batson* Court held that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury based solely on the prosecutor's exercise of peremptory challenges at the defendant's trial. *Id.,* [476 U.S.] at 87, 106 S.Ct. at 1718. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.,* at 97, 106 S.Ct., at 1723.

Last Term this Court applied the *Batson* framework in two other contexts. In *Powers v. Ohio,* 499 U.S. [400], 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), it held that in the trial of a white criminal defendant, a prosecutor is prohibited from excluding African–American jurors on the basis of race. In *[Edmonson] v. Leesville Concrete Co.,* 500 U.S. [614], 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Court decided that in a civil case, private litigants cannot exercise their peremptory strikes in a racially discriminatory manner.

*Id.* — U.S. at —— ——, 112 S.Ct. at 2352–2353.

The Court then identified four questions that it had to answer in order to resolve the issue:

In deciding whether the Constitution prohibits criminal defendants from exercising racially discriminatory peremptory challenges, we must answer four questions. First, whether a criminal defendant's exercise of peremptory challenges in a racially discriminatory manner inflicts the harms addressed by *Batson.* Second, whether the exercise of peremptory challenges by a criminal defendant constitutes state action. Third, whether prosecutors have standing to raise this constitutional challenge. And fourth, whether the constitutional rights of a criminal defendant nonetheless preclude the extension of our precedents to this case.

*Id.* — U.S. at ——, 112 S.Ct. at 2353.

The court answered "yes" to the first three questions and "no" to the fourth. After a full discussion it stated its holding as follows:

We hold that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges. The judgment of the Supreme Court of Georgia is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*Id.* — U.S. at p. ——, 112 S.Ct. at p. 2359.

The *Ruiz–Denton* case is one step removed from the *McCollum* case. The *McCollum* standard, had it been in effect at the time, would have authorized the State to object to Denton's use of three peremptory challenges to strike blacks during voir dire. The State, however, did not object. Would *McCollum* also give standing to a co-defendant, such as Ruiz here, to object to the three strikes on *Batson* grounds? The answer should be, and probably is, "yes." The same reasoning employed by Justice Blackmun in *McCollum* would even more forcefully support a holding that a co-defendant would have standing to raise the issue. But the problem here is twofold: First, Ruiz did not specifically ask the Court to require Denton's attorney to state, if he could, a neutral, non-discriminatory, reason for each of the three strikes. Mr. Ruiz's attorney simply objected and emphasized his severance argument, to-wit: if the two defendants had been given separate trials the problem simply would not have arisen since the State did not use its peremptory challenges to strike any

of these three black prospective jurors. Second, even if Ruiz survived all other hurdles, the "new rule" doctrine would prevent him from raising this *Batson* argument at this time.

In *Williams v. Chrans*, 945 F.2d 926 (7th Cir.1991), the Seventh Circuit dealt with the issue of the retroactive application of *Batson* and the "new rule" principle:

> The purpose of federal habeas corpus is "to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine." *Sawyer v. Smith*, [497] U.S. [227], [234], 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990). Accordingly, the Supreme Court has held "that in both capital and non-capital cases, 'new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions.'"
>
> \* \* \* \* \* \*
>
> Under the first exception, "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Teague [v. Lane]*, 489 U.S. [288] at 307, 109 S.Ct. [1060] at 1073, [103 L.Ed.2d 334] [(1989)] ...
>
> \* \* \* \* \* \*
>
> Under the second exception, a rule may be applied retroactively "if it requires the observance of 'those procedures that ... are "implicit in the concept of ordered liberty."'" *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073.
>
> \* \* \* \* \* \*

We must now determine whether the holding of the Supreme Court in *Batson* constitutes a "new rule" for purposes of habeas review. If it does, we must proceed to determine whether the exceptions to the "new rule" principle apply.

The question of whether *Batson* established a "new rule" is susceptible of rather straightforward resolution. As the district court held, the Supreme Court's pre-*Teague* holding in *Allen v. Hardy*, 478 U.S. 255,

258, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986) controls on this issue. In *Allen*, the Court refused retroactive application of *Batson* to proceedings on collateral review. It reasoned that such retroactive application was inappropriate because *Batson* was "an explicit and substantial break with prior precedent" and because *Batson* served constitutional interests beyond the truth-finding function. On the basis of *Allen*, we believe it is now settled that *Batson* announced a "new rule" within the meaning of *Teague* and the cases that have followed it. We recognize that *Allen* was not a capital case. However, like our colleague in the district court, we can discern nothing in the reasoning of *Allen* to suggest that it is limited to non-capital juries.

We now examine whether either of the two exceptions of the "new rule" principle are applicable here. As we already have noted, the first exception is clearly inapplicable. *Batson* hardly places capital murder beyond the power of the criminal lawmaking authority to proscribe.

The second exception requires far more analysis. The Supreme Court has not ruled definitively on the question of whether the *Batson* holding is a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle [v. Parks]* [494 U.S. [484] 493–94], 110 S.Ct. [1257] at 1263, [108 L.Ed.2d 415] [(1990)]. Here, we must determine that issue in the special context of the capital sentencing procedure.

\* \* \* \* \* \*

This is an *intermediate* appellate court and its judges are bound to give respectful deference to the opinions of the Supreme Court. As we have noted already, the scope of review of federal habeas corpus proceedings has been a matter of great attention by the Court and its opinions delineate important considerations that must be weighed in our determination as to whether application of *Batson* in capital sentencing hearings falls within an exception to the "new rule" principle *Teague*.

At the outset, we must remember that, in *Allen*, the Court refused to give *Batson* retroactive application. Although *Allen*

did not utilize the retroactivity test adopted by the Supreme Court in *Teague*, the *Teague* test is (almost indisputably) more restrictive. As our colleagues in the Fifth Circuit have recognized, the Court's characterization of *Batson's* significance makes its retroactive application unlikely under that analytical framework of *Teague*—even in a capital case. In *Allen*, the Court held that *Batson* did not go "to the heart of the truthfinding function." 478 U.S. at 259, 106 S.Ct. at 2880 (quoting *Solem v. Stumes*, 465 U.S. 638, 645, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984)). The Court recognized that "the rule in *Batson* may have *some* bearing on the truthfinding function of a criminal trial ... [But] we cannot say that the new rule has such a fundamental impact on the integrity of factfinding as to compel retroactive application." *Id.* (emphasis supplied). The Supreme Court noted that "the new rule joins other procedures that protect a defendant's interest in a neutral factfinder. Those other mechanisms existed prior to ... *Batson*, creating a high probability that the individual jurors seated in a particular case were free from bias." *Id.* (footnote omitted). Therefore, the Court clearly did not believe that *Batson* implicated the fundamental fairness and accuracy of criminal proceedings in *Allen*. As we have noted already, sentencing in a capital case is an especially delicate task to entrust to jurors. Yet, as the Fifth Circuit pointed out, the same procedural devices available to ferret out or control passion and prejudice in an adjudication of guilt—voir dire and jury instructions—are available in the capital sentencing situation. *See Prejean v. Smith*, 889 F.2d 1391, 1397 (5th Cir.1989), *cert. denied* [494] U.S. [1090], 110 S.Ct. 1836, 108 L.Ed.2d 964 (1990). More fundamentally, *Batson* does not appear, in the parlance of *Teague*, to alter an understanding · of a "bedrock procedural element." *See Teague*, 489 U.S. at 311–15, 109 S.Ct. at 1075–78. *Batson* undoubtedly implicates important considerations; but it is not analytically the equivalent of the Court's proffered example of a "bedrock principle"—the right to be represented by an attorney in all criminal trials for serious offenses (recognized in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). Although it created a significant break with prior precedent by easing the evidentiary burden of a defendant who contested the state's use of peremptory challenges, *Batson* did not create the underlying constitutional principle that blacks may not be systematically excluded from jury service. This distinction goes to *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879), and *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

While the precise question before us has yet to be decided by the Supreme Court, we believe the existing case law requires us to hold the rule in *Batson* may not be applied retroactively. At this point in the development of the case law, if a deviation from the course we have discerned is to come, it must come from the Supreme Court.

*Williams v. Chrans*, 945 F.2d at pp. 942–946.

So we know how *Batson* itself is treated. But how about *McCollum?* Does it constitute a "new rule" for purposes of habeas review? Using the same analysis as that set out in *Williams v. Chrans*, supra, the Court concludes that *McCollum* was "an explicit and substantial break with prior precedent" and it is also clear that *McCollum* serves constitutional interests "beyond the truthfinding function." So *McCollum* announced a "new rule" within the meaning of *Teague*. And the Court further concludes that neither of the two exceptions to the "new rule" principle is applicable here. So *McCollum*, like *Batson*, may not be applied retroactively.

The defendants did not properly raise and preserve their Batson type issue. And, assuming *McCollum* establishes the probable merit of Batson challenges on this record, those challenges involve a new rule which may not be applied retroactively. That rule, although extremely important, did not deprive petitioners of a fair trial because it does not go to the heart of the truthfinding process.

■ The Court, *sua sponte*, raises and discusses another issue which the petitioners do not directly rely upon, although they make a passing reference to it in their brief. They mention that the final juror selected was one Elmer Guinn. They then state:

> At the conclusion of Mr. Guinn's voir dire, both petitioners requested an additional peremptory challenge to strike this juror. Having no peremptory challenges left, the juror was seated on the petit jury that heard the case and rendered the death sentence. (Tr.T. 945). As the record will reflect, Mr. Guinn's father had served on the jury that had previously tried this case and rendered a death sentence. (Tr.T. 941).

This Court reviewed the record to determine why no challenge for cause was made to the juror, Elmer Guinn. The Court quotes the pertinent portions of the voir dire of Mr. Guinn:

Q. Are you acquainted with the defense attorneys, Mark Cambiano and Doc Irwin, sitting here?

A. I am Mark.

Q. How are you acquainted with him?

A. He's done some work for me three or four years ago.

Q. Is he representing you now on anything?

A. No.

Q. Would the fact that he has represented you before have any bearing on your decision in this case?

A. No.

Q. Is he currently representing any members of your family?

A. Yes, sir.

Q. Who it that?

A. My brother.

Q. What's his name?

A. Joe Guinn.

Q. Okay. And what court is he—is that in the Conway County Circuit Court in Conway County?

A. It's in Van Buren, I reckon.

MR. CAMBIANO: Yeah, it's Van Buren County, your Honor.

BY MR. KIRK: (Cont.)

Q. What is your brother's name?

A. Joe Guinn.

Q. Okay. I believe he does have cases pending in Conway County too, doesn't he?

MR. CAMBIANO: Yes, he does; I'd forgotten about that.

MR. KIRK: Conway County Circuit.

MR. CAMBIANO: Yeah.

MR. KIRK: A criminal case?

MR. CAMBIANO: Yes, he does. He's got two cases, one in Van Buren and one in Conway County.

MR. KIRK: Your Honor, I believe that would excuse this witness for cause. Mr. Cambiano is representing him in a felony case in Conway County.

MR. IRWIN: His brother, his brother.

MR. KIRK: He's representing his brother, I'm sorry.

BY THE COURT: Is that Wendell Joe?

MR. GUINN: Yes, sir.

BY THE COURT: He does have a case pending in this court and was arraigned April 8th. I think I will excuse you.

MR. IRWIN: Your Honor, we're going to object to that, if the Court please.

BY THE COURT: You may question him.

MR. IRWIN: Okay. Are you through?

MR. KIRK: Well—

BY THE COURT: Finish your questioning if you're not through.

MR. KIRK: Okay, I thought he was going to ask him questions on this motion.

BY THE COURT: I'll withdraw my ruling.

MR. IRWIN: Okay, go ahead.

MR. KIRK: Okay.

BY MR. KIRK: (Cont.)

\* \* \* \* \* \*

Q. Have you heard of this case before?

A. Uh-huh.

Q. What all have you heard about it?

A. I guess just about like everybody else, through the newspaper the last time it was here. And, uh—

Q. You've heard a little bit on the newspaper and a little bit on the radio and T.V.?

A. Yeah. And I think, I don't know for sure, but I think the last time they was here my daddy sat on the jury, it seems like.

Q. That's right. Your father was on the jury that found them guilty the first time.

A. Uh-huh, I believe so.

Q. I forgot about that. Will that have any bearing on how you would decide this case?

A. No.

Q. Do you believe you could listen to all the evidence and the instructions from the Court and render—make a decision based just on what you hear in this courtroom?

A. Yes, sir; I do.

Q. You are saying then that anything you might have heard about this case before has not made you lean one way or another toward the sentence?

A. No.

Q. Thank you.

BY THE COURT: You may inquire.

EXAMINATION ON BEHALF OF THE DEFENDANTS

BY MR. CAMBIANO:

Q. Quinton, do you recall—your dad has talked to you about this case, I'm sure, about the last time when he was on the jury, after he was on the jury?

A. It's been too long ago, Mark.

Q. It's been quite a long time ago. Do you recall anything in particular that he said about this case?

A. No, not really; I don't.

Q. Do you know what they were convicted of?

A. Yeah, I do know that.

Q. What were they convicted of?

A. Capital Murder.

Q. Okay. Do you know what the sentence was when your father was on the jury?

A. Uh-huh.

Q. If you were to be of a different mind, if you sat on this jury, and your decision was that you thought in your own mind that it should be life without parole, would you have any problems going back and facing your daddy about that?

A. Not a bit. No sir.

Q. Okay. You wouldn't let him influence you in anyway then?

A. Huh-uh.

\* \* \* \* \* \*

MR. BULLOCK: Your Honor, the State will withdraw its motion for cause.

BY THE COURT: Let me ask you step outside the courtroom.

(Prospective juror left the courtroom.)

BY THE COURT: What says the State?

MR. BULLOCK: Good for the State.

BY THE COURT: The defense has no other strikes and I hear no motion to strike for cause.

MR. IRWIN: Your Honor, may I proffer into the record that if the defendant, Van Denton, had a pre-emptory challenge left, and if he had twelve, as the statutes provides, he would at this time exercise a pre-emptory challenge on this juror, and request permission to do so.

BY THE COURT: Your record is made.

MR. IRWIN: Denied?

BY THE COURT: Yes.

MR. IRWIN: Note my objection.

BY THE COURT: Correct.

MR. CAMBIANO: Your Honor, I would make the same record. After I got into talking, I saw I stepped into something I shouldn't have. If I'd had my other three strikes that I feel I'm entitled to, I think I would have struck this individual also.

BY THE COURT: All right, for what reason. Let's state some reasons.

MR. CAMBIANO: Well, I don't have any reason. I don't think that I should state them to the Court since my client probably would not let me do so. But I feel like I had three extra strikes since I've only exercised, myself, nine (9) strikes. Of course, the Court has imputed three of those strikes to me.

BY THE COURT: Well, let's be specific now. There has been a motion now, as I understand it, by the defendant to excuse for cause?

MR. IRWIN: No, no.

MR. CAMBIANO: Your Honor, no. That's not correct.

BY THE COURT: There hasn't?

MR. CAMBIANO: That's not correct.

BY THE COURT: All right, I just wanted to be sure we understood that. All right.

MR. IRWIN: We think, your Honor, we ought to be entitled to twelve (12) each, and we are just making a record on that—

BY THE COURT: I understand.

MR. IRWIN: —and making that request.

BY THE COURT: I've got it.

MR. IRWIN: All right, sir. Thank you.

BY THE COURT: We are going to draw two alternates, choose two alternates. We need a little recess before get into that.

MR. IRWIN: All right, sir.

(At this time a recess was taken, during which time the following record was made out of the presence of any prospective juror.)

BY THE COURT: The last juror chosen was Elmer Guinn. I just want to be sure our record is clear on this. Mr. Guinn's father was on a jury that once tried and convicted the defendants, is that correct?

MR. BULLOCK: I believe that's correct, your Honor.

BY THE COURT: Mr. Guinn's brother is represented by Mr. Cambiano at this time in two cases. Is that correct, Mr. Cambiano?

MR. CAMBIANO: Yes, your Honor; that's correct.

BY THE COURT: They are both criminal cases?

MR. CAMBIANO: Yes, your Honor.

BY THE COURT: What about the fact that his father once convicted these defendants, does that cause you any problems?

MR. CAMBIANO: That part doesn't cause me any problems, your Honor.

BY THE COURT: Mr. Irwin? (No response.)

BY THE COURT: What I'm getting at is this, I don't want complications to arise later on this point.

MR. CAMBIANO: Let me talk with my client, confer to make sure.

(Defense counsel conferred inaudibly with their clients.)

MR. IRWIN: Your Honor, on the surface it would appear that would be considerable problem, but I think the voir dire examination, plus whatever pre-trial and subsequent investigation we could do, we're willing to take the juror.

BY THE COURT: All right, it is settled. (Tr. 938–947)

Of course, every criminal defendant has the right to be tried by a fair and impartial jury. In order to ensure that juries are fair and impartial the law gives to the State and to each defendant the right to strike any prospective juror for good cause. Here there clearly was good cause. And, at one point, the court did excuse Mr. Guinn upon the motion of the State. It then reversed that ruling and permitted further voir dire. The voir dire revealed that one of the defense attorneys, Mr. Cambiano, had done some work for Mr. Guinn three or four years earlier and was clearly representing Mr. Guinn's brother in criminal proceedings then pending in both Van Buren County and Conway County. The voir dire also revealed that Mr. Guinn's father had sat on the jury that had found these very defendants, Mr. Ruiz and Mr. Denton, guilty of capital murder the first time they were tried and had fixed the penalty of death for each.

From the Court's point of view this is a strange record. Each of the defendants' attorneys, attempting to make a further record on the court's denial of additional peremptory challenges, stated on that record that if they had an additional peremptory challenge they would exercise it against Mr. Guinn. This is a patently ridiculous position. The trial judge was clearly inviting the state or either defendant to challenge Mr. Guinn for

cause. Nevertheless, the state found Mr. Guinn "good for it" and each of the defendants' attorneys, after conferring with their clients (according to a note entered by the court reporter) decided that they would not challenge Mr. Guinn for cause. Mr. Guinn therefore sat on the jury which subsequently imposed the death penalty against both petitioners.

The state and both defendants apparently believed that Mr. Guinn would be a "good juror" for their respective sides of the case. The close relationship between one of the defense attorneys and Mr. Guinn and his family may have been one of the reasons for the defense not to challenge him. And the state may have felt that it had some leverage on Mr. Guinn by virtue of the pending criminal charges against his brother. Whatever, the appearances, at least, are not good.

It is often said that only the Court wants a fair and impartial jury. Under our adversarial system the attorneys' first objective will be to seek jurors that are partial to their clients.

The Court is unaware of any state statute or rule which would have prevented the trial court from *sua sponte* excusing Mr. Guinn for cause. On the other hand, the Court is unaware of any constitutional challenge that either defendant could make on the basis of this record. The cloud over the impartiality of the jury was not the fault of Mr. Guinn or the trial judge. That cloud hangs over the jury because of the informed decisions made by the state and the two defendants.

It is this Court's view that society, in addition to the parties, has an interest in seeing to it that criminal trials are conducted before fair and impartial juries. Therefore, when, during the course of voir dire, it appears clear that good cause exists for excusing a prospective juror, the judge should on his or her own strike that juror even in the absence of a challenge by one or more of the parties. There appears, however, to be no law or constitutional provision that requires Arkansas trial judges to exercise their admitted discretion to strike prospective jurors for cause absent a challenge or motion by one or more of the parties. The Court concludes that the failure of the trial court to strike Mr.

Guinn does not create any basis for habeas relief.

## III.

ARKANSAS STATUTE ANNOTATED § 41–1301, ET SEQ. AND ARKANSAS STATUTE ANNOTATED § 41–1501 (1977 REPL.) ARE UNCONSTITUTIONAL BOTH ON THEIR FACE AND AS APPLIED TO THE FACTS OF THIS CASE

■ Petitioners challenge the constitutional validity of both Arkansas Code Ann. § 5–10–101 et seq. and § 5–4–602, the provisions under which they were charged and tried, contending that the statutes are unconstitutionally ambiguous, overbroad and vague, both facially and as applied.

Petitioners argue that (1) the death penalty statutes fail to adequately guide the jury in determining aggravating and migrating factors, which permits the arbitrary imposition of the death penalty; (2) the discretion afforded prosecuting attorneys to waive the death penalty if they so choose permits the arbitrary and capricious imposition of the death penalty and violates equal protection; (3) the statute fails to properly distinguish first degree murder and capital murder and the overlap between the two crimes is unconstitutional; and (4) the imposition of the death penalty violates the equal protection clause.

■ The Court finds the consideration and rejection of these arguments by the Arkansas Supreme Court in *Ruiz v. State*, 299 Ark. 144, 152–53, 772 S.W.2d 297 (1989) to be sound. Accordingly, the Court will not elaborate further on the Petitioners' constitutional challenge to Arkansas' death penalty statutes. With respect to the Petitioners' argument that Arkansas' capital felony murder and first degree felony murder statutes unconstitutionally overlap, the Court does note, however, the case of *Simmons v. Lockhart*, 709 F.Supp. 1457, 1461–63 (E.D.Ark.1989), wherein the court stated that "[i]f any issue has ever been put to rest by the Arkansas Supreme Court, it is the overlap issue" and "[the overlap issue] has been rejected outright at least 17 times by the Supreme Court

of Arkansas, and by two U.S. District Judges, and ha[s] been inferentially rejected by the Supreme Court of the United States." *Id.* at 1463.

## IV.

THIS THIRD TRIAL OF PETITIONERS, DUE SOLELY TO PROSECUTORIAL MISCONDUCT AND ERROR, VIOLATES FUNDAMENTAL FAIRNESS AND DUE PROCESS, AND IS IN DIRECT CONTRAVENTION OF BOTH THE SPIRIT AND APPLICATION OF THE FIFTH AMENDMENT'S PROHIBITION AGAINST DOUBLE JEOPARDY

 Petitioners' fourth argument for reversal asserts that their previous success in reversing their convictions and sentences bars the state from resentencing them to death for a third time pursuant to the former jeopardy clause of the Fifth and Fourteenth Amendment. Petitioners allege that the third trial, which was limited to punishment, was occasioned solely by prosecutorial misconduct and error. Petitioners conclude that the punishment trial violates fundamental fairness, due process, and double jeopardy.

The Supreme Court has long held that a successful appeal by a defendant, in most instances, is not a bar to retrial under the double jeopardy clause. *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Exceptions include reversals based upon insufficiency of the evidence and situations involving prosecutorial misconduct. *See Burks, supra; United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). There is no applicable exception in this case. The previous reversals in petitioners' trials have not involved insufficiency of the evidence. Petitioners' bald assertion of prosecutorial misconduct in the earlier trials is not supported by any evidence in the record. Under such circumstances, petitioners' retrial on punishment did not violate fundamental fairness, due process, or double jeopardy.

After petitioners' first trial was reversed for improper venue, petitioners were tried again. During the punishment phase of the second trial, the jury found the following aggravating factors for each petitioner:

1. At the time of the capital murder, [petitioner] was unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction.

2. [Petitioner] previously committed another felony, an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person.

3. In the commission of the capital murder, [petitioner] knowingly created a great risk of death to a person other than the victim.

4. The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody.

5. The capital murder was committed for pecuniary gain.

After performing the statutorily required balancing of aggravating and mitigating factors, the jury sentenced both petitioners to death.

The Eighth Circuit's reversal of petitioners' second sentencing phase trial was based upon a violation of the then existing law in this Circuit which prohibited the use of an aggravating circumstance (murder for pecuniary gain) which merely repeated an element of the underlying crime (murder in the course of a robbery). *Ruiz v. Lockhart,* 806 F.2d 158 (8th Cir.1986) (applying *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985)). Petitioners therefore received a new sentencing trial, at which the pecuniary gain aggravating circumstance was not charged.

Petitioners' Supplemental Brief argues that "had the pecuniary gain aggravator been excluded at the [second] punishment trial, the introduction of other aggravators would have been placed in doubt and the course of the punishment trial would have been different." It seems that petitioners are asserting that the Eighth Circuit's reversal of their conviction for including an impermissible (at the time) aggravator should have precluded a resentencing hearing and resulted in a sentence of life without the possibility of parole. This argument is not supported by the law in this Circuit or by holdings by the United

States Supreme Court. Because Arkansas statutory law does require a balancing of aggravating and mitigating factors, when one aggravating factor is declared invalid (even if other aggravating circumstances remain), the sentence of death is automatically reduced to life imprisonment unless the state chooses to retry the question of punishment. *Williams v. State,* 274 Ark. 9, 12, 621 S.W.2d 686, *cert. denied,* 459 U.S. 1042, 103 S.Ct. 460, 74 L.Ed.2d 611 (1981). Thus, unlike the statutory scheme analyzed in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), Arkansas balancing requirement prohibits harmless-error review. Moreover, *Collins* itself provides for retrial. *Collins,* 754 F.2d at 268.

Petitioner directs the Court's attention to the case of *Satter v. Leapley,* 977 F.2d 1259 (8th Cir.1992). Properly analyzed, that case supports the Court's finding that petitioners' argument on this point is meritless. Essentially, petitioners' second sentencing was set aside for admitting inadmissible evidence. No reviewing court has found that there was insufficient evidence to support the death sentence. Indeed, with the jury's findings of four additional aggravating factors, any of which could independently support a sentence of death, no court could so find.

The Court concludes that the holding of Petitioners' third sentencing trial did not violate fundamental fairness, due process, or the double jeopardy clause.

## V.

THE JURY INSTRUCTIONS ON THE STATUTORY AGGRAVATING CIRCUMSTANCES SUBMITTED IN THIS CASE WERE CONSTITUTIONALLY AMBIGUOUS, VAGUE AND OVERBROAD, AND VIOLATED PETITIONERS' FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

■ For each petitioner, the same three statutory aggravating circumstances were submitted to the jury for consideration[3]:

1) that the capital murder was committed by the [petitioner] while unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

2) that the [petitioner] previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person;

3) that the capital murder was committed for the purpose of avoiding or preventing an arrest.[4]

The jury unanimously found that all three aggravating factors existed as to petitioner Denton, and that the first and third aggravating factors existed as to petitioner Ruiz.

Petitioners submit several arguments regarding the aggravating factors submitted to the jury. First, they argue that the aggravating circumstances submitted to the jury in this case were unconstitutionally vague and overbroad. This argument has been considered and rejected on numerous occasions, and this Court finds it to be without merit.

■ Second, petitioners argue that there was insufficient evidence as a matter of law to submit these aggravating circumstances to the jury. This Court concludes that the testimony of David Small and the circumstances of the crime provided an adequate basis for submitting to the jury the aggravating circumstance that the murders were committed to avoid arrest. The evidence of a prior felony conviction for murder for Mr. Denton and armed robbery for Mr. Ruiz provided an adequate basis for submitting the aggravating circumstance of a previous felony involving the use or threat of violence. Finally, the Court finds that the evidence was sufficient to sustain the submission of the aggravating factor that the petitioners were unlawfully at liberty after being sentenced to im-

---

3. The state originally alleged a fourth aggravating circumstance, that the [petitioner] in the commission of the capital murder knowingly created a great risk of death to a person other than the victim. This aggravating circumstance was stricken by the court prior to trial.

4. Originally, this aggravating circumstance read "that the capital murder was committed for the purpose of avoiding or preventing an arrest *or effecting an escape from custody.*" The italicized portion was stricken by the court at the conclusion of the state's case.

prisonment as a result of a conviction for a felony.

■ Petitioners' third argument is considerably more complicated. They allege that the submission of an aggravating factor of murder for the purpose of avoiding or preventing arrest impermissibly overlaps with the underlying conviction for committing the murder in the commission of a robbery and/or kidnapping *or in the immediate flight therefrom.* Petitioners contend that murder in flight from robbery and/or kidnapping, in this case, was the same as murder to avoid arrest and that the use of the murder to avoid arrest aggravator created a "double counting" situation which did not sufficiently narrow the class of murderers subject to the death penalty.

Under Arkansas law at the time of Petitioners' second trial, robbery was defined as follows:

> "A person commits robbery if with the purpose of committing a theft **or resisting apprehension immediately thereafter,** he employs or threatens to employ physical force upon another."

Ark.Stat.Ann. § 41–2103 (1977 Repl.) (emphasis added).

■ Thus, it appears that the underlying crime of murder in the course of a robbery could encompass the "resisting arrest" aggravating factor and therefore constitute double counting. It is, however, far from clear that such double counting occurred in this case. The jury was not instructed that robbery included the use of force to resist apprehension. The robbery instruction read as follows:

> "To prove robbery, the State must prove beyond a reasonable doubt that, with the purpose of committing a theft, Paul Ruiz and Earl Van Denton employed or threatened to employ physical force upon another."

Thus, although the actual legal definition of robbery could have included the use of physical force to resist apprehension, the jury was not told that robbery included the use of physical force to resist apprehension. There is nothing in the record before the Court that would indicate that the jury had anything before it which would have allowed it to make such a finding. This Court is not prepared to assume that the jury made findings according to anything other than the instructions presented to it.

Based upon the instructions given to the jury in this case, the Court does not find that the conviction for murder in the course of a robbery and/or kidnapping or in the immediate flight therefrom overlaps with the aggravating factor of murder for the purpose of avoiding arrest. The "in the immediate flight therefrom" component of the conviction for murder in the course of a robbery and/or kidnapping or in the immediate flight therefrom is a temporal element. It proscribes the time frame during which the murder must have taken place in order to associate it with the felony in order to constitute felony murder. There is no purpose or intent element to "in the immediate flight therefrom." For example, a person could be charged with murder in the course of a robbery or the immediate flight therefrom if, fleeing the scene of a robbery in an automobile, he accidently struck and killed a passing pedestrian.

The aggravating factor of murder for the purpose of avoiding or preventing arrest, on the other hand, has a purpose or intent element. It is something beyond a killing during the course of a proscribed felony under circumstances manifesting extreme indifference to the value of human life. And because it does add an intent factor to the general felony murder, it does suffice to narrow the class of robber-murderers eligible for the death penalty. Thus this Court concludes that a conviction for murder in the course of a robbery and/or kidnapping, augmented by an aggravating factor of murder for the purpose of avoiding or preventing an arrest, does not constitute "double-counting."

Even if the Court did find that the two factors impermissibly overlapped, it would be foreclosed from granting relief on this basis.

In *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), the Eighth Circuit held that the aggravating factor of murder for pecuniary gain was, by definition, duplicitive of murder in the course of a rob-

bery and thus failed to perform the aggravating factor function of narrowing the class of murderers eligible for the death penalty. The decision was based upon the Arkansas statutory scheme, which allows a conviction for capital murder where the defendant committed murder during the course of a robbery or the immediate flight therefrom **under circumstances manifesting extreme indifference to the value of human life.** *Id.*

Subsequent to the *Collins* decision, the United States Supreme Court issued the decision of *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The Court analyzed a Louisiana statute which defined first degree murder as, among other things, the killing of a human being "[w]hen the offender **has specific intent to kill or to inflict great bodily harm** upon more than one person." *Id.* 484 U.S. at 242, 108 S.Ct. at 553 (emphasis added) (citations omitted). One of the statutory aggravating factors in the Louisiana scheme, and the only one found by the jury in *Lowenfield,* was that "the offender knowingly created a risk of death or great bodily harm to more than one person." *Id.* 484 U.S. at 243, 108 S.Ct. at 554 (citations omitted). The petitioner alleged that the parallel nature of these provisions required that his sentences be set aside.

The Court went through an extensive analysis of the role of aggravating circumstances. Reiterating the fact that, to pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," the Court found that the Louisiana capital sentencing scheme sufficiently narrowed the class of murderers at the guilt phase, by requiring specific intent to kill. *Id.* 484 U.S. at 243–47, 108 S.Ct. at 554–555. The Court found that the narrowing of the class of murderers eligible for the death penalty required by the Constitution need not occur through aggravating circumstances if the jury finding of guilt responds to this concern. *Id.* 484 U.S. at 245–47, 108 S.Ct. at 555.

"The fact that the sentencing jury is alias required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally inform. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more." *Id.* The Court clearly and explicitly relied upon the heightened intent standard in the Louisiana statutory scheme's definition of first degree murder in making its decision.

After *Lowenfield* was decided, the Eighth Circuit re-examined its holding in *Collins* [5]:

"*Collins* construed a state sentencing system indistinguishable in any significant detail from Louisiana's. Like Louisiana, Arkansas has defined a specific group of crimes as capital murder eligible for the death penalty ... A comparison of Arkansas's definition of capital murder and Louisiana's definition of first degree murder reveals that despite some variations they both perform the function of defining or limiting those crimes eligible for the death penalty. That the Louisiana statute requires the felony murder to be intentional, whereas the Arkansas statute requires only that the murder be the result of extreme indifference to human life, does not significantly distinguish the Arkansas statute from Louisiana's under the *Lowenfield* analysis, because both serve to narrow the class of death eligible murderers from all murderers."

*Perry v. Lockhart,* 871 F.2d 1384 (8th Cir. 1989). To date, the United States Supreme Court has not examined the double counting issue in a state statutory scheme which does not require intent to kill as a prerequisite for capital murder. In *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the respondent urged the Court to decide whether *Collins* was still good law in spite of *Lowenfield* as a threshold question.

**5.** The *Collins* decision is neither mentioned nor cited in the *Lowenfield* decision.

*Id.* —— U.S. at ——, 113 S.Ct. at 843. Because the premise that the overruling of *Collins* by *Perry* was proper was presumed by the question presented and in the granting of certiorari, the Court declined the invitation to address the belated argument. *Id.* at 1392 n. 4.

The Court did indicate that it was inclined to examine the issue when it granted certiorari in *Tennessee v. Middlebrooks,* —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993). The Tennessee Supreme Court reversed a conviction of a defendant found guilty of murder in the course of a robbery under circumstances manifesting indifference to human life and sentenced to death after the jury found an aggravating factor of murder for pecuniary gain. *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). The State court distinguished *Lowenfield* due to the failure of the Tennessee statute, which is virtually identical to the Arkansas statute, to narrow the class of death eligible offenders at the guilt stage. *Id.* After granting certiorari, the Court dismissed the case, stating only that certiorari had been "improvidently granted." *Tennessee v. Middlebrooks,* —— U.S. ——, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993). The United States Supreme Court thus allowed the Tennessee Supreme Court decision to stand.

This Court is inclined to agree with the Tennessee Supreme Court. It believes that this issue should be re-examined either by the Eighth Circuit or the United States Supreme Court. However, this Court is bound by the holdings of the Eighth Circuit, and, at this time, *Perry,* and not *Collins,* is the law in this Circuit. Thus, even if this Court had found that there was an overlap in the crime of conviction and one of the aggravating factors, it would be bound by the *Perry* decision.

**Multiplicitous Charging:**

 There is another issue, discovered in the preparation of issue V, that deserves attention. As the Court was under the impression that Petitioners had been convicted for the murder of two individuals during the same criminal episode, as well as of murder in the course of a robbery and/or kidnapping, and that the aggravating circumstance of murder with the purpose of avoiding or preventing arrest could operate for that crime separately and distinctly from a conviction for murder in the commission of a robbery and/or kidnapping or in the immediate flight therefrom, the Court failed to see prejudice. To be sure that the Court accurately understood the underlying conviction, it wrote the parties in March of this year to request certain information from the earlier trials. Among other things, it asked for the criminal Information, the jury instructions, and the verdict forms for the prior guilt/innocence proceedings. This material was submitted on July 15, 1994.

The Court was informed that the State went to trial on an Information which was last amended on November 18, 1977, in contrast to the August 24, 1977 amended Information cited in the trial transcript for this case. (T.Tr. 164). The November 18, 1977 Amended Information reads in pertinent part as follows:

"The said Paul Ruiz and Earl Van Denton in the County and State aforesaid on or about the 29th and 30th day of June, 1977, did unlawfully and willfully and with the premeditated and deliberated purpose of causing the death of a person, more specifically Magazine Marshall Marvin Ritchie, cause his death by means of a deadly weapon, and while in the course of the same criminal episode did thereafter cause the death of Opal James, all in violation of Arkansas Statute 41–1501 **AND OR** while acting together did commit the crimes of robbery **AND OR** kidnapping, and in the course of said felony or felonies or in the immediate flight therefrom, cause the death of a person **OR** persons namely, Marvin Ritchie and Opal James under circumstances manifesting extreme indifference to the value of human life, in violation of Arkansas Statute 41–1501(1)(a) **AND OR** with the premeditated and deliberate purpose of causing the death of a law enforcement officer acting in the line of duty, they did cause the death of a person namely, Marvin Ritchie, City Marshall, Magazine, Arkansas, in violation of Arkan-

sas Statute 41–1501(1)(b) against the peace and dignity of the State of Arkansas ..." [6] (Emphasis added). The Court's instructions to the jury read in pertinent part as follows:

"Paul Ruiz and Earl Van Denton are charged with the offense of capital murder. To sustain this charge, the State must prove the following things beyond a reasonable doubt: Count one, first. That Paul Ruiz and Earl Van Denton committed or attempted to commit the crimes of robbery **OR** kidnapping **OR** both. Two, that in the course of it and in fervor (sic) of that crime **OR** crimes or an (sic) immediate flight therefrom Paul Ruiz and Earl Van Denton caused the death of Marvin Richie (sic) **OR** Opel (sic) James under circumstances manifesting an extreme indifference to the value of human life **OR** count two, first, that with the premeditated and deliberate purpose of causing the death of any person, Paul Ruiz and Earl Van Denton caused the death of Marvin Richie (sic) and Opel (sic) James. Second, that those deaths were caused in the course of the same criminal episode.

\* \* \* \* \* \*

... As a part of count one of the charge of capital murder, the State contends that the death of Marvin Richie (sic) and Opel (sic) James occurred during the commission of or attempted commission of the crimes of robbery, kidnapping, **OR** both by Paul Ruiz and Earl Van Denton, or in immediate flight from the commission of **EITHER ONE OR BOTH** of these crimes.

To prove robbery, the State must prove beyond a reasonable doubt that, with the purpose of committing a theft, Paul Ruiz and Earl Van Denton employed or threatened to employ physical force upon another.

And physical force means any bodily impact, restraint, or confinement. Purpose, a person acts with purpose with respect to his conduct when it is his conscious object (sic) to engage in the conduct. To prove kidnapping the State must prove beyond a reasonable doubt first, that Paul Ruiz and Earl Van Denton did without consent of Marvin Richie (sic), Opel (sic) James, and David Small or any of them restrained all or any of them so as to interfere substantially with his liberty. And second, that Paul Ruiz and Earl Van Denton restrained Marvin Richie (sic) and Opel (sic) James and David Small or any of them with the purpose of A., using either of them as a shield or hostage; B., facilitating the commission of robbery or flight therefrom—thereafter; C., inflicting physical injury on any of them; D., terrorizing any of them." (Emphasis added).

After retiring and deliberating, the jury came back with the following verdicts:

"We the jury find Paul Ruiz guilty of capital murder."

and

"We the jury find Earl Van Denton guilty of capital murder."

Reading the Amended Information and the Jury Instructions together, it appears that the jury could have found either petitioner guilty of capital murder on any of at least five theories:

1. Double murder of Marvin Ritchie and Opal James during the same criminal episode; and/or

2. Murder of Marvin Ritchie in the course of a robbery or immediate flight therefrom; and/or

3. Murder of Marvin Ritchie in the course of a kidnapping or immediate flight therefrom; and/or

4. Murder of Opal James in the course of a robbery or immediate flight therefrom; and/or

5. Murder of Opal James in the course of a kidnapping or immediate flight therefrom.

With the generalized verdict returned, there is no way to determine which, if any, of these theories garnered the required unanimous support. In other words, four jurors could have determined that the killings, 12 to 14 hours apart and in two different counties, did not occur during the same criminal epi-

---

**6.** The latter part of the charge, concerning the death of a law enforcement officer acting in the line of duty, was not presented at trial, nor was it considered by the jury.

sode. They may have felt that there was not enough evidence to determine that petitioners murdered Opal James, but still found that Mr. Ritchie was murdered in the course of a robbery. Four different jurors could have determined that the murders were not really in the course of a robbery or **immediate** flight therefrom, but were simply separate crimes against the same victims; this is rendered a very real possibility with regard to Mr. James, who was not murdered until at least twelve hours after the taking of the wallet. These four jurors may have found instead that the murders were committed during the same overall criminal episode. Still four more jurors may have determined that they were not sure about the "same criminal episode" and that they were not sure about the link between the robbery and the murders, but still found that at least one murder was committed in the course of kidnapping. This is just one possible scenario, demonstrating that the jury could have returned a verdict of guilty of Capital Murder with no unanimity as to the actual crime.

The United States Supreme Court has addressed this issue in a similar case. In *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), the Court was faced with a petitioner convicted of the single crime of first degree murder based upon alternative theories of premeditated murder or murder in the perpetration of a robbery. The state's evidence included proof that approximately one month after the discovery of the victim's body, Petitioner Schad was found driving the victim's car, which still contained personal belongings of the victim. *Id.* 501 U.S. at 627–29, 111 S.Ct. at 2495. Furthermore, Petitioner's wallet contained two of the victim's credit cards, which Petitioner had begun using the day after the victim was strangled to death. *Id.*

The jury was instructed that "[f]irst degree murder is murder which is the result of premeditation ... Murder which is committed in the attempt to commit robbery is also first degree murder ... All 12 of you must agree on a verdict. All 12 of you must agree whether the verdict is guilty or not guilty." *Id.* 501 U.S. at 629, 111 S.Ct. at 2495. Petitioner argued that his conviction under in-

structions that did not require the jury to agree on one of the alternative theories of premeditated and felony murder did not comport with the Constitutional requirements of a unanimous jury verdict. *Id.* 501 U.S. at 629–31, 111 S.Ct. at 2496. Justice Souter, joined by Chief Justice Renquist, Justice O'Connor and Justice Kennedy, wrote the plurality opinion, holding that the jury was unanimous in reaching the **verdict,** and that if a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, the federal courts are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law. *Id.* 501 U.S. at 635–37, 111 S.Ct. at 2499. Approving the Arizona court's holding that attempt to commit robbery is "the legal equivalent of ... deliberation, premeditation, and design", the plurality accepted the state law determination that under state law, premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single *mens rea* element. *Id.* 501 U.S. at 635–39, 111 S.Ct. at 2499–2500. Justice Souter focused extensively on the moral equivalence of murder by deliberation and felony murder in its discussion. *See id.* 501 U.S. at 637–46, 111 S.Ct. at 2500–2504. He noted that the equating of the two mental states "as species of the blameworthy state of mind required to prove a single offense of first-degree murder finds substantial historical and contemporary echoes." *Id.* 501 U.S. at 640, 111 S.Ct. at 2501.

Justice Scalia concurred in the judgment on this issue. *Id.* 501 U.S. at 646–48, 111 S.Ct. at 2505. Focusing almost exclusively on the historical underpinnings allowing alternative theories, he noted that if he did not find historical support, he "might well be with the dissenters in this case":

"Certainly the plurality provides no satisfactory explanation of why (apart from the endorsement of history) it is permissible to combine in one count killing in the course of robbery and killing by premeditation. The only point it makes is that the depravity of mind required for the two may be considered morally equivalent ... But the

petitioner here does not complain about lack of moral equivalence: he complains that, as far as we know, only six jurors *believed* he was participating in a robbery, and only six *believed* he intended to kill. Perhaps moral equivalence is a *necessary* condition for allowing such a verdict to stand, but surely the plurality does not pretend that it is *sufficient*. (We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the "moral equivalence" of those two acts.)"

*Id.* 501 U.S. at 650–52, 111 S.Ct. at 2507 (emphasis in original).

Other courts have had the opportunity to analyze the *Schad* opinion. In *United States v. Holley*, 942 F.2d 916 (5th Cir.1991), the Fifth Circuit reversed a conviction for perjury which was submitted to the jury as two separate counts, each of which alleged numerous false statements. The Court held that the refusal of the trial court to instruct the jury that it must agree unanimously as to at least one statement in each count of the indictment in order to find Holley guilty was reversible error. The Court specifically distinguished *Holley* from *Schad*:

"Holley's case, however, is somewhat different from *Schad*. In *Schad*, there was a single killing of one individual, and Justice Souter, stressing that under Arizona law first degree murder was "a single crime," concluded that there was no more need for jury unanimity as to alternative mental states each satisfying the mens rea element of the offense than there was for the jurors to all agree on the precise means employed to cause death … This differs, however, from the situation where a single count as submitted to the jury embraces two or more separate offenses, though each be a violation of the same statute."

*Id.* at 927 (citations omitted).

The Fifth Circuit more recently summed up the question of jury unanimity as follows:

"In sum, juror disagreement as to the critical facts of the offense might reflect a 'reasonable doubt' that the defendant actually engaged in criminal activity. The duty of the court is to determine which 'fact[s]

[are] necessary to constitute the crime,' and to require consensus on these 'facts.' Essentially, the inquiry is how much disagreement between individual jurors as to the factual predicate for an offense can be tolerated without undermining the integrity of the guilty verdict."

*United States v. Correa–Ventura*, 6 F.3d 1070 (5th Cir.1993). The Court also noted that the plurality decision in *Schad* advocated "a distillate of the concept of due process with its demands for fundamental fairness … and for the rationality that is an essential component of that fairness." *Schad*, 501 U.S. at 637, 111 S.Ct. at 2500. The Court determined that a case-by-case analysis, emphasizing history and general practice in determining whether the demands of fundamental fairness are met, was the only appropriate method of ensuring that the jury "not be permitted to evaluate separate and distinct offenses about which they may disagree in rendering a patchwork guilty verdict." *Correa–Ventura*, 6 F.3d at 1081.

Had there only been one victim in this case, the *Schad* opinion would clearly be controlling. However, there were two victims in this case, and the jury was instructed in an "and/or" manner with regard to the victims, as well as to the theory of capital murder. This is distressingly similar to Justice Scalia's statement that "[w]e would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the 'moral equivalence' of those two acts." *Schad*, 501 U.S. at 651, 111 S.Ct. at 2507 (Scalia, J., concurring). Petitioners in this case could have been found guilty of either killing Marvin Ritchie in the course of a robbery on the morning of June 29, 1977 or of killing Opal James in the course of a kidnapping on the evening of June 29, 1977. As far as this Court is aware, historically the jury is required to agree on an alleged victim of a crime. It does seem to this Court that the failure to instruct the jury to reach a unanimous verdict, at least with respect to the victim, *in this case*, was error. However, as set forth below, the Court believes that it is foreclosed from reaching this issue, because the issue is either procedurally barred

for failure to timely raise the issue, or, if the issue is deemed to have been raised, it has already been decided adversely to petitioners in a previous habeas by a higher court.

The November 18, 1977 Amended Information was used in both the first and second trial, and the jury was instructed in substantially the same manner. In addressing the verdict after the first trial, the Arkansas Supreme Court held as follows:

"We fail to understand why appellants would seriously ask us to declare that the evidence in this case was insufficient to support the verdict rendered by the jury. The fact that Marvin Ritchie was killed on the morning of June 29, 1977, and that Opal James was killed 12 to 14 hours later, in Montgomery County or Scott County, does no prove that these two men were not killed in the same criminal episode. Even if we were to consider the two homicides as separate crimes, it would not change the results as each was involved in both.

We must consider all of the circumstances and in so doing we cannot say that there was not evidence to show this was a part of one continuing criminal episode. The fact that the victims were robbed during the time they were held captive does not prove that robbery was not the motive for the entire episode. This fact is a matter that is clearly within the domain of the jury when considering all the evidence. The information itself stated that Paul Ruiz and Earl Van Denton were charged with the premeditated and deliberated murder of Marvin Ritchie and Opal James and with the crimes of robbery and kidnapping. From the beginning the state contended this was one continuing episode. We must consider the matter in the light most favorable to the state and we hold that all of the evidence objected to was properly admitted."

*Ruiz v. State*, 265 Ark. 875, 582 S.W.2d 915, 925–926 (1979). There was no discussion of the fact that one verdict could represent a conglomerate of at least five theories in this case. The issue was not further addressed by the courts, because the Arkansas Supreme Court reversed the matter on other grounds and the petitioners were afforded a new trial.

The same Amended Information was used for the second trial. The instructions are quoted above. Again, the State proceeded to trial with numerous theories of capital murder. The State explicitly told the jury that they need not agree to one theory of the crime during its closing argument:

"As the Court read to you, Paul Ruiz and Earl Van Denton are charged with the offense of capital murder. To sustain this charge, the State must prove the following things beyond a reasonable doubt: First, that Paul Ruiz and Earl Van Denton committed or attempted to commit the crime of robbery or kidnapping or both. Second, that in the course and furtherance of that crime or crimes or in immediate flight therefrom, Paul Ruiz and Earl Van Denton caused the death of Marvin Richie (sic) or Opel (sic) James under circumstances manifesting extreme indifference to the value of human life.

\* \* \* \* \* \*

In addition, did they not only commit robbery, but they committed kidnapping.

\* \* \* \* \* \*

Now then, the Court has gave you another instruction titled it as Count Two. First, with the premeditated deliberated purpose of causing the death of any person, Paul Ruiz and Earl Van Denton caused the death of Marvin Richie (sic) and Opel (sic) James. Second, that those deaths were caused in the course of the same criminal episode . . .

\* \* \* \* \* \*

I submit to you that it is the same criminal episode. Be that as it may, the State of Arkansas only has to prove one of these counts that I have read to you for you to find these defendants guilty of capital felony murder. I submit to you they're guilty of both counts.

\* \* \* \* \* \*

The jury verdict form only requires you to find them guilty of capital murder regardless of which one of these you use or both."

Again the issue was presented to the Arkansas Supreme Court.

"Appellants first argue that the offenses should have been severed. They were charged under Ark.Stat.Ann. § 41–1501(1)(a) and 41–1501(1)(c) (Repl.1977) with the deaths of two persons while committing robbery and kidnapping; they contend that there is insufficient evidence that these offenses occurred during the same criminal episode. They concede a similar point was raised in the first appeal but they submit the issue was presented differently then, i.e., whether the evidence was sufficient to support the contention that both murders occurred during the course of a single criminal episode. Whereas, the issue raised now is whether the offenses should have been severed for purposes of trial, there being no common plan or scheme. Granted, the new wording is altered slightly, and if the issue is no presented in a different context, it leaves the substance of the argument essentially unchanged. In either case, if the evidence supports a determination that both homicides occurred as a part of the same criminal episode, or were parts of a series of connected acts, then it was not incumbent on the trial court to grant a severance, and certainly not mandatory. The trial court had that discretion and its discretion was not abused."

*Ruiz and Van Denton v. State,* 273 Ark. 94, 97–98, 617 S.W.2d 6 (1981). The Court went on to hold that the Arkansas Rules of Criminal Procedure allow the joinder of offenses in the same Information if they are part of the same criminal episode. *Id.* at 99, 617 S.W.2d 6. The issue of joining offenses for one verdict was not discussed.

Petitioner's state habeas did not address this issue. *See, Ruiz & Denton v. State,* 275 Ark. 410, 630 S.W.2d 44 (1982). The first time the Eighth Circuit reviewed this second trial, it reversed on *Grigsby* grounds, and in a footnote stated that it did not reach the other legal challenges asserted by Ruiz and Van Denton and expressed no view on the merits of these points. *Ruiz v. Lockhart,* 754 F.2d 254, 256 n. 1 (8th Cir.1985). On remand from the United States Supreme Court, the Eighth Circuit stated that in the fulfillment of its duty to examine the other arguments Ruiz and Denton make against their conviction and sentence which were not addressed on the prior appeal, it had concluded that "all of the arguments urged as invalidating the convictions themselves are without merit." *Ruiz v. Lockhart,* 806 F.2d 158, 159 (8th Cir.1986). It appears from the record that petitioners did raise the severance of the offenses issue before the district court, although it is unclear whether the issue was raised before the Eighth Circuit. The issue was not framed precisely as a duplicitive charge issue.

It appears that this issue is procedurally barred if it was not presented during the appeals from and collateral attack upon the second trial. If it was presented, it appears that the Eighth Circuit has rejected the argument. Thus, this Court may not grant relief on the basis of this issue.

## VI.

### THE TRIAL COURT'S FAILURE TO LIMIT PREJUDICIAL PRETRIAL PUBLICITY AND SUBSEQUENT FAILURE TO SEQUESTER THE JURY VIOLATED THE PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND DENIED THEM DUE PROCESS OF LAW

On July 28, 1987, petitioner Ruiz filed a "motion to control pre-trial prejudicial publicity." In that motion he cited "massive pre-trial publicity" including T.V. and radio broadcasts and newspaper articles. He alleged that the sheriff and the chief deputy prosecuting attorney had given interviews concerning the case and commented on issues which the jury would have to decide. In order to ensure his right to a trial by an impartial jury he asked the court to either exclude the media or alternatively, to enter a "gag" order directing all attorneys, witnesses, court officials and law enforcement personnel to refrain from "extra-judicially releasing any information concerning this matter." Additionally, Mr. Ruiz requested that the jurors, once selected, be sequestered during the trial to insulate them from adverse publicity.

A hearing on pre-trial motions was held on August 3, 1987. The first motion which was discussed was petitioner Ruiz's motion of July 28. In support of the motion, his attorney introduced Defendants' Exhibit 1 which contains a file with photo copies of newspaper articles concerning the case and also circulation figures for the various publications involved. The petitioner also played a video tape of a T.V. news report. Tr. 121–126. There were statements in the reports that the petitioners "had escaped or had tried to escape from just about every place they had ever been." One witness stated that "she wouldn't rest until they [petitioners] got what they deserved—execution." There was an erroneous report that the petitioners had been convicted of the deaths of seven people in three states. In an interview the deputy prosecuting attorney stated that the purpose of the trial was to "go over aggravating circumstances and whatever mitigating circumstances the defense was going to invent." During the hearing, the prosecutor, responded to these descriptions of pre-trial publicity as follows:

This case is different from an ordinary criminal trial in that we are not going to have to have a jury panel that knows nothing about the case so that they in—have it in their minds that these defendants are innocent when we start. We are going to start this trial, the defendants are already going to be guilty of capital murder. So, basically all we need is a jury panel who will be able to consider any aggravating and mitigating circumstances and weigh them, and basically death qualifying the jury. I think everything that has been said that is in the news reports is a matter of common knowledge. This case has been around for ten years."

With respect to the "inventing mitigating circumstances" statement, the prosecutor said, "it was simply what the defense said in the last hearing with the Post Incarceration Stress Syndrome. It's never been acknowledged by any court of law or by any psychiatric association, and they have invented it for this trial."

The court reserved action on the petitioners' motion. It noted that it had never "put a gag on the 1st Amendment." The court stated that, "We will see how voir dire goes and we will be able to see more about it at that time." He urged everyone to use common sense in the matter. When pressed for a ruling, the court stated that it was denying the petitioners' motion "to gag the press, lawyers, court officials and law enforcement."

During voir dire, the petitioners introduced additional newspaper reports of the trial, Defendants' Exhibits 3 and 4, Tr. 602–606. The court commented:

BY THE COURT: At this point I see no prejudice in the matter that you mentioned. If at any time it appears there possibly would be, I could change that, but at this point I will not sequester the jurors.

At one point, the voir dire was interrupted and the petitioners put Mr. Gene Stewart, a news reporter for KARK television channel 4, on the stand. Mr. Stewart was conducting "the man on the street" interviews "to get some of the public opinion about what is going on in regard to the trial." Tr. 779. Apparently a couple of the people interviewed said that they believed that the death penalty should be imposed. Mr. Stewart's plan was to run the interview on the 6 p.m. evening news broadcast. This testimony was preceded by another motion by petitioners to sequester the jury. During the trial the petitioners secured a copy of the T.V. video news cast and introduced it along with two additional newspaper articles in support of their motion for sequestration. Def.Ex. 5 and 6, Tr. 1109.

During the trial additional newspaper articles were introduced. See Def.Ex. 36 and 37. Tr. 1372. Near the end of the trial petitioners introduced three more newspaper articles. See Def.Ex. 38, 39 and 40; Tr. 1452–1460. Immediately after this the court observed, "I want to state, though, that I have asked the jury if they have seen any articles and specifically the Democrat–Gazette and the Headlight today, and all stated they have not." Tr. 1452.

So, the court never sequestered the jury or entered a gag order. What the trial judge did do, however, was to repeatedly admonish the jury not to discuss the case and not to read any newspaper or view any television

reports about the case. For instance, at page 634 of the Transcript we find the following:

BY THE COURT: We are going to recess for the day, until 9:00 o'clock tomorrow morning. I'm repeating this because of it's [sic] importance. The fact that I do repeat it, I hope doesn't make it lose it's importance. You know, you hear something over and over, you get to where you don't pay any attention. Well, this is right the opposite, we say it over and over; one, we are required to by law; two, it's very important. Do not discuss the case, do not read about it, do not watch television accounts of it, do not let anyone discuss it in your presence. Simply dismiss it from your minds until 9:00 o'clock tomorrow morning. With that we will bid you a good evening. When you come tomorrow go right on into the jury room. All right. I might add, some of you I asked four questions while ago. It's very possible I will ask those again about what I just told you. Have you watched the news accounts, have you read, et cetera, or have you talked about it. All right, good night.

*See also* the court's remarks at pages 811–812, and at Tr. 813–815:

BY THE COURT: I have these questions I mentioned to you yesterday. Did you happen to inadvertently see or hear any newspaper, television or radio accounts of this case yesterday, any of you?

(No hands were raised.)

BY THE COURT: Did you watch the newscast at 5:30, 5:00 or 10:00 p.m., and if so, what channel and what did you inadvertently see concerning the case?

I see no hands?

Did you read the Gazette or Democrat this morning?

PROSPECTIVE JUROR: I read the Gazette, but I didn't read anything about the case.

BY THE COURT: All right, sir. That's what I wanted to know if you did read anything about the case. There is nothing wrong with reading the newspaper, we just kind of want to stay away from the case is all. That's all right.

Has anyone inadvertently discussed or attempted to discuss with you either this case or your selection as a juror in this case?

(No hands were raised.)

BY THE COURT: All right. What we are trying to do is maintain the integrity of the trial. You are officers of the court, the same as I am and the lawyers, and we all have an obligation to do just that. You know, we are under restraints too. We can't go around talking about certain aspects of the case. In fact, I can't talk about any aspects of it with anybody expect the lawyers. The lawyers can't talk about certain aspects of the case with anybody except each other and me and their clients. You are under the same restraints, I say "restraints" for lack of a better word. It's simply a matter of fulfilling our obligation to maintain the integrity of the trial, that's all it is. We all, as officers of the court, have that obligation and duty. You know, as jurors you are taking an active part in the administration of State Government. You are no longer an innocent bystander or a tax payer. I started to say "just" a tax payer, that wouldn't be exactly the right terminology either, but you are an active member in the State government. It is the States obligation to administer the courts and justice, and that's what you are doing.

And see the court's remarks at Tr. 1032–1033, Tr. 1106–1107 and Tr. 1300. After the jury was empaneled and sworn the petitioners again moved the court to sequester the jury. This motion was denied, the Court explaining as follows:

BY THE COURT: This series of trials, I guess you could call it, perhaps are the most publicized in the history of the State, but what has been publicized in the past would have nothing to do with sequestering the jury at this time. We would be concerned now only with publicity from here on out. I don't see that it's receiving all that much publicity. Yes, it's in the news. I am impressed with jurors willingness to follow the admonitions, requests of the Court in not watching news accounts of it, or talking about the case, or listening to

radio broadcasts, or reading newspaper accounts of it. I have questioned them closely about it and they have not given me any answers, or they have not in any way indicated that they have somehow been influenced by the present publicity. Now, that's my ruling, and that's the extent of it.

The Supreme Court of Arkansas disposed of this issue as follows:

Appellants maintain as a sixth point of error that the trial court should have granted a motion by the appellants to impose a gag order on the news media, attorneys, court officials and law officers and also, should have granted a request that the jury be sequestered during the trial. These are matters which are necessarily left to the sound discretion of the trial court. *Henderson v. State*, 279 Ark. 414, 652 S.W.2d 26 (1983). That decision will not be disturbed on appeal in the absence of a clear showing of prejudice. *Perry v. State*, 277 Ark. 357, [642] S.W.2d 865 (1982).

Undoubtedly, few trials have generated the interest of the public and news media to equal this one. That fact was amply illustrated by the reversal of the first trial by a unanimous court due to a pervasive climate which prevented a fair trial. But undoubtedly that environment has been altered by the lapse of twelve years and the removal of the trial to a locale well away from the county where the offenses occurred. We need not examine every item in weighing for or against sequestering the jury or for imposing a gag order; suffice it to say the evidence appellants point to gives little, if any, support for their motion and they have not demonstrated either prejudice or an abuse of the trial court's discretion.

This Court has carefully reviewed all of the voir dire, the proof, information, and argu-

ments of the parties with respect to this issue and finds itself in agreement with the Arkansas Supreme Court. The publicity before and during this sentencing trial, although significant, was nothing like it had been at the first trial years before. Nor is there anything to suggest that any of the individual jurors was affected by it or that they failed to follow the persistent and repeated instructions and directions of the trial court. Petitioners have not shown that they were prejudiced by the publicity. Nor have they shown that the trial court abused its discretion by failing to enter a "gag" or other orders, or by failing to sequester the jury. See *United States v. Kimberlin*, 805 F.2d 210, 224 (7th Cir., 1986). This is not to condone certain of the statements made by the prosecutors to the media as described above. However, nothing in the circumstance described rendered the sentencing proceeding fundamentally unfair so as to violate petitioners' due process rights.

### VII.

**THE TRIAL COURT ERRED IN ITS SUA SPONTE EXCUSAL OF ALMOST ONE HALF OF THE PETIT JURY PANEL AND ITS SUBSEQUENT FAILURE TO PROVIDE INDIGENT DEFENDANTS WITH FUNDS TO INVESTIGATE THE QUASHING OF SAID PANEL**

█ The Petitioners' seventh ground for habeas corpus relief is that the trial court erred in its *sua sponte* dismissal pursuant to Ark.Code Ann. § 16–31–103 (1987) of almost one half of the petit jury panel prior to trial. Apparently, a panel of four hundred and three (403) venire persons was drawn for the resentencing trial of the petitioners. Prior to trial, the trial court excused one hundred and ninety eight (198) of these potential jurors for various reasons as permitted by Ark.Code Ann. § 16–31–103.[7] Petitioners

---

7. Ark.Code Ann. § 16–31–103 (1987) excluded individuals in certain occupations and categories from jury service if they objected to serving prior to being sworn and, in addition, provided that:
 (a) [a]ny person may be excused from serving as a grand or petit juror or a jury commissioner for such period as the court deems necessary when the state of his health or that of his family reasonably requires his absence; or

when, for any reason, his own interests or those of the public will, in the opinion of the court, be materially injured by his attendance. (b)(1) The following persons will not be required to serve as grand or petit jurors if they object to serving and make their objections known to the court prior to being sworn.

moved to quash the panel and requested that the trial court provide them with funds to investigate the panel for "potential unconstitutional composition." The trial court refused this request. Petitioners also challenge this refusal to provide investigatory funds, arguing that as indigents without funds to determine whether potential jurors were systematically excluded, they were denied due process and equal protection. For the reasons stated below, the Court rejects the petitioners' arguments.

On August 17, 1987, when the sentencing trial of the petitioners began, a number of the jurors who were not excused simply failed to show up. Other jurors were excused by the trial judge. After these adjustments were made, a panel of approximately 90 potential jurors were present to begin voir dire. At the petitioners' request, the Court agreed to attempt to contact overnight all the potential jurors who failed to show up and attempt to bring them in the following morning. Thereafter, the petitioners withdrew their request to delay voir dire until the missing individuals could be contacted, and voir dire began.

 Under the Sixth Amendment, which applies to the states via the Fourteenth Amendment, criminal defendants have a right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const., amend. VI. This requirement has been interpreted to mean that a criminal defendant has a right to a petit jury selected from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To prevail on their fair cross section challenge to the jury panel, petitioners must make a prima facie case of discrimination in the selection of the jury panel by showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

Petitioners have not alleged that any distinct or specific group in the community was excluded or that any systematic exclusion of a given group occurred. Petitioners attempt to justify this insufficiency by arguing that since the trial court denied their request for funds, they were prevented from making the requisite showing. For the reasons explained below, the trial court acted within its lawful discretion in refusing to give the petitioners investigatory funds. Further, Petitioners argue that the "excusal of such a large percentage of prospective jurors constitutes a prima facie showing that abuse existed and that they should have been given the funds to investigate same." Pet.Br. at p. 55. The Court disagrees. The Court finds itself

(A) Practicing physicians, osteopaths, chiropractors, nurses, dentists, dental hygienists, optometrists, and pharmacists;

(B) Persons whose principal activity is that of a clergyman;

(C) Practicing attorneys and officers of a court;

(D) Persons sixty-five (65) years of age and older whose physical and mental condition is such that it would not be in their best interest or the court's that they serve;

(E) Persons actively employed as undertakers or embalmers;

(F) Active members of any fire department or fire company;

(G) Persons serving on active duty in the military service of the United States or the National Guard;

(H) Active members of any law enforcement agency;

(I) Members of the General Assembly, elected county officers, and elected township officers;

(J) Full-time, listed Christian Science practitioners and Christian Science readers.

The term "full-time, listed Christian Science practitioner" shall mean a Christian Science practitioner listed in the Christian Science Journal. The term "Christian Science reader" shall mean a person duly elected to serve as first or second reader in a branch of the Church of Christ, Scientist, and certified as such by the clerk of the branch church.

(2) A licensed veterinarian shall be exempt from any law requiring service as a juror in any court action.

Ark.Code Ann. § 16–31–103 (1987). In 1991, (B) was deleted. 1991 Arkansas Acts 379.

in agreement with the Arkansas Supreme Court that the record regarding the composition of the pool of jurors is unremarkable. It is not extraordinary that 198 of the 403 persons selected for the jury panel either fell into one of the ten categories of persons that the Arkansas statute excludes from jury service upon request or had health problems or other conflicts that precluded them from serving. Based on the foregoing, petitioners' challenge to the jury panel as not representing a fair cross section of the community must be rejected.

■ Petitioners are also attempting to raise an equal protection argument, but this too must fail. To make out a prima facie case of discrimination under the equal protection clause, "the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Petitioners have failed to make this requisite showing.

■ Petitioners' argument that the trial court should have granted their request for funds to investigate the jury panel is based on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The due process clause of the Fourteenth Amendment mandates that a state must take certain steps to ensure that an indigent criminal defendant has a fair opportunity to prepare a defense. In *Ake,* the Court considered whether a state acted constitutionally when it refused to provide a court-appointed psychiatrist to an indigent criminal defendant. The Court stated that "when an indigent defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.,* 470 U.S. at 74, 105 S.Ct. at 1091–92. In this case, petitioners did not begin to make the requisite showing that the jury panel's composition or selection raised any significant issue. In the absence of any allegation or evidence that any attempt was made to influence the composition of the jury panel, in the absence of

any proof or assertion that any distinct group was excluded, and in the absence of any proof of systematic exclusion, Petitioners' conjecture and bare assertions will not suffice to create a "significant issue." Accordingly, the trial court did not err in refusing to provide the petitioners with funds to investigate the composition of the jury panel.

■ Petitioners make the additional argument that the trial court erred in applying Ark.Code Ann. § 16–31–103 (1987) to exclude prospective jurors. Petitioners state that a court's power to excuse jurors "can only be exercised for good cause shown." Pet.Br. at p. 56. This declaration misstates the law. The statute vests in the trial judge the discretion to excuse any juror "when, for any reason, his own interests or those of the public will, in the opinion of the Court, be materially injured by his attendance." Ark. Code Ann. § 16–31–103(a) (1987). *See Collins v. State,* 271 Ark. 825, 611 S.W.2d 182 (1981), *cert. denied,* 452 U.S. 973, 101 S.Ct. 3127, 69 L.Ed.2d 984 (1981). The record is completely devoid of any indication that the trial judge abused his discretion in this case to excuse potential jurors from the panel. Accordingly, this argument must fail.

## VIII.

THE TRIAL COURT'S FAILURE TO GRANT PETITIONERS' REPEATED REQUESTS FOR MISTRIALS BASED ON THE PROSECUTOR'S INADMISSIBLE AND PREJUDICIAL REMARKS THROUGHOUT TRIAL DENIED PETITIONERS THEIR EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

In considering this issue it must be remembered that the state jury in this case did not deal with the guilt or the innocence of the defendants. Both defendants had already been found guilty of capital murder and those convictions had withstood a full state appeal and a full federal habeas corpus review. The only issue presented to the jury was whether the defendant should be sentenced to life without parole or to death.

The aggravating circumstances alleged by the State were:

1) The murders were committed by the defendant while they were unlawfully at liberty after having been sentenced and imprisoned for felony convictions;

2) Each of the defendants had previously committed other felonies, an element of which was the use of, or threat of, violence to other persons, or creating a substantial risk of death or serious physical injury to another person, and,

3) The murders were committed for the purpose of avoiding or preventing an arrest or for the purpose of effecting an escape.[8]

The petitioners argued from the beginning that evidence of the facts and circumstances of the murders would be irrelevant at the sentencing trial. Their position was that the jury should be advised that the defendants stood convicted of capital murder and the state should then be limited to putting on evidence of the alleged statutory aggravating circumstances. The defendants would then be permitted to put on evidence of mitigating circumstances. Finally, the state could attempt to rebut such evidence.

The prosecutor took the position that the state should be permitted to put on some evidence outlining the circumstances of the capital murders both as general background and because such evidence, to some extent, supported the state's position with respect to one or more of the three aggravating circumstances alleged. The state pointed out that under the usual procedures for the trial of capital murder cases, the same jury would try both the issue of guilt and, if convicted, the penalty issue. Because of its procedural history, this particular case is an exception to that general rule. In 1983, the state of Arkansas passed a statute (now codified as Ark.Stat.Ann. § 5–4–616) which permitted trials limited to the penalty issue under just such circumstances as we find here. Prior to the enactment of that statute, a complete new trial would have been required under the law even if the only reversible error arose out of the penalty phase. *See* discussion under Point I above.

It is important to identify the petitioners' principal contentions here. They point to statements and remarks made by the prosecutors and certain of the state's witnesses in the presence of the jury which they contend were "highly prejudicial and totally irrelevant." The petitioners rely not only on the individualized effect of the separate statements and remarks but also upon the cumulative effect of such comments.

■ Petitioners start by challenging certain remarks made by the prosecutor during his opening statement to the jury. The prosecutor noted that the defendants had escaped from the Oklahoma State Penitentiary at McAlister. He then stated: "At that point the nightmare in this case began and continues through this day." Tr. 1066. When petitioners objected, the trial court directed the prosecutor to "stay away from anything that would appear to be inflammatory or argumentative." Next, the prosecutor made a statement of the facts of the case leading up to the two murders. The petitioners continually objected that all of this was irrelevant at the sentencing phase. Towards the end of this factual recital, the prosecutor stated:

> It's been ten years since these deaths, or since this—yes, since these murders occurred. The State has been battling constantly since that time to have this case disposed of. Hopefully, this will be the last go-around.

Tr. 1073. Upon objection by petitioners, the trial court observed:

> "that is a gratuitous statement. I would stick to a statement of what you intend for the proof to be."

Tr. 1074. At this point, the prosecutor identified the aggravating circumstances the State would attempt to prove as follows:

> The State will prove, or make an effort to prove, that the capital murders of Opal James and Marvin Ritchie were committed by the defendants, who were unlawfully at liberty after being sentenced to imprisonment as a result of felony convictions. We

---

**8.** The language "or for the purpose of effecting an escape" was stricken at the close of the state's case.

are going to try to prove to you that these two defendants had been convicted of, one, that Denton had been convicted of murder, was serving a life sentence for murder, and that Ruiz had been convicted of armed robbery and was serving a life sentence for armed robbery at the time they escaped from the Oklahoma Penitentiary.

We are going to try to prove, two, this aggravating circumstance; that the defendants had previously committed other felonies, an element of which was the use or threat of violence to other persons, or creating a substantial risk of death or serious physical injury to another person. The same thing, the murder and the robbery, that we spoke of.

And three, that the capital murders of Opal James and Marvin Ritchie were committed for the purpose of avoiding or preventing an arrest, or effecting an escape from custody.

Tr. 1074–1075.

The argument that it was error to permit the State to put on some evidence concerning the circumstances of the murders is dealt with in great detail under point IX below. At this point, suffice it to say that this evidence was not error under the circumstances of this case.

The Court also agrees with the Arkansas Supreme Court that the trial court did not abuse its discretion in denying a mistrial on the basis of the prosecutor's comments during the State's opening statement.

■ The petitioners complain that during the cross-examination of Dr. Stevens and Mr. Frank King, the prosecutors brought out the fact that the petitioners were on "death row." Petitioners argue that that unconstitutionally lessened the jury's sense of responsibility in deciding petitioners' fate. The state trial court saw no harm since "it would be hard to envision a member of the jury that doesn't know that already." With respect to this issue the Arkansas Supreme Court stated:

> Appellants also complain of a reference to both appellants being on "death row" which should, they maintain, have prompted a mistrial. There is no merit to this argument. The reference to death row by the prosecutor was an off-hand reference in a question to a witness, and the intimations were not entirely clear. But in any case, there was no objection when the reference was made and the defense in fact then examined the same witness, and twice made the same death row reference in its own examination. It was only when defense counsel was through examining the witness that an objection to the prosecutor's reference was made. By failing to object at the first opportunity, and joining in the same alleged error, appellants waived any objection.

*Ruiz v. State,* 299 Ark. 144, 158, 772 S.W.2d 297 (1989).

Additionally, it is difficult to understand how the petitioners can complain of the "death row" (or prior sentence) reference when they accepted during voir dire the juror Mr. Elmer Quinn, the son of a juror who had sat in judgment of the petitioners at the previous trial in which petitioners were also sentenced to death. Mr. Quinn admitted on voir dire that he knew of the sentence imposed. *See* discussion under Point II, *supra.* Since the petitioners failed to challenge Mr. Quinn for cause, they made it quite certain that the jurors would inevitably come to know that petitioners had previously been sentenced to death. In any event, this Court agrees with the state trial court and the Arkansas Supreme Court on this particular point. Moreover, the recent case of *Romano v. Oklahoma,* —— U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), seriously undercuts petitioners' argument. The *Romano* court was faced with a petitioner who had previously been convicted of capital murder and sentenced to death in a different case. *Id.* The evidence of his previously existing death sentence was admitted during his second capital murder case. *Id.* Subsequently, the petitioner's first death sentence was overturned on appeal. *Id.* The petitioner contended that "the evidence of his death sentence in the [first] case impermissibly reduced the [second] sentencing jury's sense of responsibility for its decision :.." *Id.* —— U.S. at ——, 114 S.Ct. at 2008. The Court stated:

We do not believe that the admission of evidence regarding petitioner's prior death sentence affirmatively misled the jury regarding its role in the sentencing process so as to diminish its sense of responsibility.

\*　　\*　　\*　　\*　　\*　　\*

Petitioner's argument, pared down, seems to be a request that we fashion general evidentiary rules, under the guise of interpreting the Eighth Amendment, which would govern the admissibility of evidence at capital sentencing proceedings. We have not done so in the past, however, and we will not do so today. The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings.

*Id.* ⸺ U.S. at ⸺, 114 S.Ct. at 2011 (citations omitted).

It is true that *Romano* dealt with the admission of a prior death sentence in a different case, while the instant case deals with the admission of a prior death sentence under the same factual scenario. The language employed in *Romano,* in this Court's opinion, makes the distinction insignificant. Again, this Court agrees with the Arkansas Supreme Court on this issue, and thus finds that there is no merit in petitioners' argument on this point.

■　A more serious issue is raised by the petitioners' attack on the prosecutors' comments made during closing arguments. The Arkansas Supreme Court's opinion did not refer to, or deal with, the specific statements, challenged by petitioners, which were made by the prosecutors during their closing arguments. The petitioners' claim that the following statements separately, or in their cumulative effect, unconstitutionally permitted the jury to consider non-statutory aggravating circumstances which were not alleged, unconstitutionally diverted the jurors' attention from the true issues, lessened the jury's sense of responsibility, and inflamed the passions and prejudices of the jury, thereby depriving them of the individualized, discretionary sentencing to which they were, and are, entitled, to-wit:

MR. BULLOCK: This is a really important case. It's the longest case that I've ever been through in my twenty-five years of practicing law. But the reason that it's taken so long is because of it's extreme importance.

\*　　\*　　\*　　\*　　\*　　\*

One, that these men need to be punished for one reason. They have committed cold blooded murder of two people, and for that they need to be punished. You have heard the testimony of Dr. Moneypenny that says the punishment that these men have received does no good. That type of punishment does no good for these people. The second reason is that their execution, or sentence to death will be a true deterrent to other criminals who—

\*　　\*　　\*　　\*　　\*　　\*

One, is that it is a deterrent to other criminals who are predisposed to murder people. They think a lot about what the penalties are that they are likely to receive if they are caught, and this is a real deterrent.

\*　　\*　　\*　　\*　　\*　　\*

The third, and most important reason that I have to give here is this, that it's going to prevent these defendants from further crimes of the magnitude in which they have carried out against Opal James and Marvin Ritchie. In other words, ladies and gentlemen, it's going to keep them from killing and murdering other people. I do believe that that is the only thing, the only sentence that is going to keep them from doing that.

\*　　\*　　\*　　\*　　\*　　\*

He says that he strikes first and asks questions later, that he is extremely dangerous when he is cornered. And did you know, ladies and gentlemen, that he's cornered all the time in prison. Do you know, ladies and gentlemen, that if he breaks out of that prison that he's going to get cornered again. Do you know what is going to happen when he gets cornered again, he is going to kill again.

\*　　\*　　\*　　\*　　\*　　\*

Now, I want to take you through their history since the murders of Opal James and Marvin Ritchie. Well, let's see, in 1978, I believe, September—yes, September the 16th of 1978, Earl Denton took some kind of wire pliers and opened his cell door in the maximum security unit of Cummings prison and then opened the door to the prison unit, climbed over the fence and got within a half mile of Gould, Arkansas before the dogs caught him and he gave up. Can you imagine what would have happened had he reached somebody, or ran across some person or gotten to Gould, Arkansas maybe and broke in on a young family? I can imagine it, because something similar to that happened when he got hold of Marvin Ritchie and Opal James, their lives nothing to him at all—nothing at all.

\* \* \* \* \* \*

Dr. Moneypenny told you that these men are extremely dangerous and will always be that way. They will be a threat to society as long as they live. If you put these people back in the general prison population, which is where they are going to go—

MR. IRWIN: Now, your Honor, I'm going to have to object to that particular thing. There is no testimony about where they are going to go. That's highly speculative.

BY THE COURT: Overruled, go ahead.

MR. IRWIN: All right.

BY MR. BULLOCK: (Cont.) They are going to be permitted to work, they are going to be permitted to get out when everybody else gets out—

MR. CAMBIANO: Your Honor, that is absolutely not true. I've been sitting here—

MR. IRWIN: Now, we—

MR. CAMBIANO: This is arguing things that are not—

MR. IRVIN: It's not in the record.

MR. CAMBIANO: —in the record, and they are not even true, let alone being in the record. He's been—

BY THE COURT: The first statement, perhaps, is supportable by the record. I wouldn't go any further into that.

MR. BULLOCK: All right. I'm not going any further into it your Honor. I'll withdraw it.

BY THE COURT: It could be conjecture. The objection is sustained at this point.

MR. BULLOCK: Okay.

BY MR. BULLOCK: (Cont.) But if you look at the history of these men, two escapes; Denton has escaped twice, attempted again and Ruiz has escaped once, and attempted again. You can mark it down in writing that they will escape and they will kill.

MR. CAMBIANO: Your Honor, I'm going to object again. This is not in evidence. He is arguing things that he has no basis and [sic] fact. He is just trying to inflame the jury and this is against the 8th Amendment rights, requirement that they should be individually sentenced. He's just inflaming the jury.

BY THE COURT: Again, counsel can argue anything from which we have evidence, and anything to be reasonably inferred therefrom. It's up to the jury as to whether or not actually there is any evidence on that particular point, and if their memory differs from counsel, they will rely upon their own memories. I wouldn't stray too far from that, Mr. Bullock.

MR. BULLOCK: Thank you, your Honor. I'm relying upon the testimony of Dr. Moneypenny, as well as the testimony of Dr. Stevens. But at any rate I will let that go.

\* \* \* \* \* \*

(Out of the hearing of the jury).

MR. BULLOCK: All right. My third reason is to ask this jury to impose the death penalty for the prevention of these defendants committing further crimes.

MR. KIRK: Your Honor, the Supreme Court has held that appeals to the jury for enforcement of the law is permissible in most criminal cases.

MR. CAMBIANO: Your Honor, Brooks v. Kemp it is not. We would object to it. Number one, it is—

BY THE COURT: Well, I would stay away from it. You can ask them to invoke the death penalty.

MR. BULLOCK: All right.

BY THE COURT: You can do that, but I would let it go at that.

MR. BULLOCK: All right, your Honor. I've got three more words to say.

(Proceedings returned to the hearing of the jury.)

BY MR. BULLOCK: The third reason that I'm asking you to impose the death penalty is to prevent these defendants from doing any similar acts as to what they did to Opal James and Marvin Ritchie. Thank you, ladies and gentlemen.

\* \* \* \* \* \*

BY MR. KIRK: ... Ladies and gentlemen, I would just tell you that I think there is one aggravating circumstance without anything else. If they had five hundred mitigating circumstances on the other side it wouldn't make any difference, because that one aggravating circumstance is far more powerful than anything else that could be come up with, and that is that they were already serving life sentences in prison and they escaped, they came over here to Arkansas and they killed again. They killed Marvin Ritchie—

MR. CAMBIANO: Your Honor, I'm going to object at this time. The murders themselves are not aggravating circumstances.

\* \* \* \* \* \*

BY THE COURT: I think the jury understands it.

\* \* \* \* \* \*

They both said that Paul Ruiz was poetic and he was very artistic. They both showed you some of his artwork. I would just state to you that the most telling thing about Paul Ruiz, and this is about Earl Van Denton as well, as far as their handiwork goes, is to look at the pictures of the crime scene, the pictures of the body of Marvin Ritchie that was left in that car.

MR. CAMBIANO: Your honor, I'm going to object at this point. That is purely victim impact, it has nothing to do with this case. That is only to go to the guilt or innocence and it is getting away from the 8th Amendment right to have these two individuals, requirement of individual discretionary punishment. I think it's highly improper for him to try to inflame the jury like this. Again, we would ask for a mistrial, or at least ask that this be struck, this testimony; disregard it.

\* \* \* \* \* \*

MR. KIRK: I think Mr. Cambiano in his argument has already brought up similar issues as far as making references to sympathy for the victims. He even brought up the statement of victim impact. I'm not getting into that, I'm simply stating, referring or commenting on a photograph that is in evidence.

MR. CAMBIANO: Your Honor, it has nothing to do with the sentencing phase.

BY THE COURT: Counsel may refer to anything in evidence and make any arguments about that or the law that we have gone over in the instructions, or any inferences to be drawn from it.

MR. KIRK: Thank you, your Honor.

\* \* \* \* \* \*

I would like to just give you a couple of my selections, I'm able to read to. From the Ten Commandments is, "Thou shalt not kill." Now, does that mean that no one should, like someone on a jury. Well, no, of course not, because in the next chapter we find that, "he that smiteth a man so that he die, he surely shall be put to death." There was one more, and I'll go on. From Genesis the 9th Chapter, the Sixth Verse. "whosoever shedeth mans blood, by man shall his blood be shed." Now, as Mr. Cambiano mentioned and as I would like to mention too, we are not after revenge, we are after justice. Now, you can talk about mercy and compassion all you want to. I like to think that I'm as compassionate as the next person, but there comes a time when you have to stand up for what's right and send a message to people like Paul Ruiz and Earl Van Denton, and others like them that we come in—

MR. CAMBIANO: Your Honor, I'm going to object again. This has nothing to do with these two individuals, what people on the outside are going to do. It violates the 8th Amendments requirement of individualized, discretionary sentencing under Brooks v. Kent. I would ask for a mistrial, or at least ask the prosecutor to stop using this type of inflammatory material.

MR. KIRK: Your Honor, if I may—?

BY THE COURT: Go ahead.

MR. KIRK: I am entitled under the law to argue the enforcement of the law to the jury.

BY THE COURT: A portion of the law?

MR. KIRK: Enforcement of the law.

BY THE COURT: Go ahead.

MR. KIRK: Thank you.

MR. IRWIN: Please direct the prosecutor, your Honor, to stick to rebuttal arguments.

BY THE COURT: That objection will be sustained. I would stick to rebutting any argument made by the defendants.

MR. KIRK: Thank you, your Honor, I'm almost finished. As we said, I would like to ask you send a message to these defendants and to others like them that these types of murders are no longer going to be tolerated. I would like for you to send a message to other people that if you come in here and murder our citizens, you are going—better be ready to pay for it, because that's what you are going to do. I think then, and only then, are we going to have respect for ourselves and for our community, and respect for our state that we are entitled to have.

Thank you very much.

(T.Tr. at 1496–1549).

The above quotations from the two prosecutors' closing arguments identifies the precise language as to which petitioners object, or examples thereof (since some of the remarks were repeated several times).

Immediately after the jury retired, Mr. Cambiano summed up his objections to the prosecutors' closing arguments as follows:

MR. CAMBIANO: Your Honor, I have got some motions for a mistrial I would like to read into the record.

BY THE COURT: All right.

MR. CAMBIANO: Your Honor, the State's argument has just been replete with improper arguments that have no basis and (sic) fact and it should not be argued. One of them, they are misleading the jury without regard to the law under *Caldwell v. Mississippi.*

BY THE COURT: You have already made those, and if you haven't, it's too late to make them.

MR. CAMBIANO: Your Honor, it isn't. In the Federal Courts I've got—I made individual objections and asked for a mistrial and now I make a collective objection, and a collective motion for a mistrial for the entire case, not just for specific parts. If I may go ahead, it will not take too long, but I do need to make my record.

BY THE COURT: Any motions not already made, would be untimely, but go ahead and make them for the record.

MR. CAMBIANO: Thank you. Also, your Honor, they are inflaming the impassions (sic) and prejudice of the jury under *Viereck v. United States,* 318 US 236 [63 S.Ct. 561, 87 L.Ed. 734] (1943). They constantly were arguing facts not in evidence, which is in contravention of *Donnelly v. DeChristoforo,* 416 U.S. 637 [94 S.Ct. 1868, 40 L.Ed.2d 431] (1974), a Supreme Court case. They are expressing personal opinions, and that is specifically precluded under the Code of Professional Responsibility, and also *United States v. Young.* They were arguing matters not in issue. That is a violation of the Code of Professional Responsibility, and also *United States v. Williams.*

This part is very important. They have diminished the jury's perception of its role as to the sentencing of these two individuals. Instead of sentencing, the people are to send a message out to other people in the community. Also, they were arguing the prosecutor's expertise in deciding when to seek the death penalty. They were saying how important this was, and we are doing all we can do on this case. Also,

they are asserting—having the jury asserting—indicating they should assert a duty to give the death penalty, which violates the 8th Amendment's requirements of individualized, discretionary sentencing.

The victim impact, we have already alluded to under *McGautha v. California.* That is clearly improper. Last, and most important, is the "send a message to the community argument," which has been specifically prohibited by the Arkansas Supreme Court. For these reasons we feel like a mistrial should be had.

BY THE COURT: It was discussed very recently.

MR. IRWIN: It certainly was. Mr. Denton joins in the motion for the same reason on the same grounds.

BY THE COURT: Denied.

(T.Tr. at 1550–1552).

At a subsequent hearing on a Motion for a New Trial, the following dialogue took place:

MR. CAMBIANO: Your Honor, my next one would be arguing facts not in evidence. There's just one particular point that I put in the brief, or the motion, such as imposing the death penalty to prevent the defendants from killing again. I don't think that that is proper, because that is not what we are here for. That is not in evidence, there was no evidence to the fact that our clients would kill someone in the future. That is arguing facts outside the evidence, and we would ask for a motion for a new trial on that particular point, also.

\* \* \* \* \* \*

MR. BULLOCK: Okay, sir. We did not argue those facts, however, that they would kill in the future. We just simply said that there, of course, was a possibility, pointed out what the psychologists had said about them in their testimony.

BY THE COURT: Counsel may argue in closing anything that is in evidence and any reasonable inferences to be inferred from the evidence. I see no infraction of that rule and would not grant a new trial on the basis of that argument.

It is important to categorize the statements and arguments of the prosecutors made during their closing arguments as to which petitioners complain. In sum they relate to:

1) Victim impact (e.g. the photograph of the body of one of the victims);

2) Future dangerousness (e.g. if not executed petitioners "will escape and will kill again"); *See* discussion Point XII, *infra.*

3) Facts not in evidence (e.g. the conditions under which petitioners would be restrained and the effectiveness of prison security);

4) Non-legal standards for imposing the death penalty (e.g. the quotations from the Bible and that petitioners should be executed "to send a message to others"); and

5) Statements intended to inflame the passions of the jurors (e.g. the description of the murders and the use of the photographs of the deceased victim).

■ What standard must we apply in evaluating petitioners' attacks on the prosecutors' closing arguments? As stated by the Eighth Circuit in *Newlon v. Armontrout:*

In analyzing the prosecutor's closing remarks, we must apply the standard articulated by this court in *Hamilton v. Nix,* 809 F.2d 463 (8th Cir.) (en banc), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). As this court has recognized, in a section 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow. *Id.* at 470. Not every trial error that might result in reversal of a federal conviction on direct appeal would mandate the same result in a section 2254 review of a state court conviction, where we may consider only errors of constitutional magnitude. *See Darden v. Wainwright,* 477 U.S. 168, 182–83, [106] S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986). The petitioner must show that the alleged improprieties were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Moore v. Wyrick,* 760 F.2d 884, 886 (8th Cir.1985). Under this standard, a petitioner must show that there is a "reasonable probability that the error complained of affected the outcome of the trial-i.e.,

that absent the alleged impropriety, the verdict probably would have been different." *Hamilton,* 809 F.2d at 470; *see Tucker v. Kemp,* 802 F.2d 1293, 1295–96 (11th Cir.1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987).

We cannot agree with the State's argument that the district court's use of both eighth amendment and fourteenth amendment analysis somehow renders its decision improper. Rather, we find that the eighth amendment analysis bolstered the district court' finding of a due process violation. As the Tenth Circuit has stated, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, *see Brooks v. Kemp,* 762 F.2d 1383, 1406 (11th Cir.19850 (en banc), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law, *see Darden,* [477] U.S. [at 182–83], 106 S.Ct. at 2472." *Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987).

885 F.2d 1328, 1336 (8th Cir.1989).

It is probably true that most lay persons, being unfamiliar with our "death penalty" jurisprudence, would not find the prosecutors' arguments out of line. In fact, they might find them restrained and mild given the circumstances of the capital murders involved. But prosecutors in capital cases must be acutely aware of the circumstances and conditions under which, according to Supreme Court precedent, the death penalty may be imposed. Without detailing the history of the development of that jurisprudence, it can be stated that the Arkansas Capital Murder Statute was drafted in an effort to comply with the limitations and restrictions imposed by the United States Supreme Court.

9. The quoted provision was in effect at the time of petitioners' sentencing phase trial in 1987.

The case of *Brooks v. Kemp,* 762 F.2d 1383 (1985), probably has the most elaborate discussion to be found on the scope of permissible prosecutorial argument at the sentencing phase. It is important here because it contrasts what is permitted under the Georgia statutes with that which is permitted in those states having "balancing" statutes like the Arkansas statute.

In Georgia, the sentencing jury in the penalty phase is *not* required to limit its consideration to statutory aggravating circumstances. On the contrary, once the jury has found at least one statutory aggravating circumstance, "the case enters the area of the fact-finders' discretion in which *all* the facts and circumstances" are taken into consideration. *Zant v. Stephens,* 250 Ga. 97, 297 S.E.2d 1, 4 (1982) (emphasis added). The U.S. Supreme Court, in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), approved this procedure. Thus, Georgia law does not limit prosecutors to arguments relating to the specific statutory aggravating circumstances. This is pointed out in a footnote in *Brooks v. Kemp,* wherein the Eleventh Circuit Court of Appeals goes on to compare the Georgia practice with that in Florida:

> Cf. *Barclay v. Florida,* 463 [U.S.] 939, [951–53] 103 S.Ct. 3418, 3426 [77 L.Ed.2d 1134] (1983) ("unlike the Georgia statute, however, Florida law requires the sentencer to balance statutory aggravating circumstances against all mitigating circumstances and does not permit non-statutory aggravating circumstances to enter into this weighing process.)

*Brooks v. Kemp,* 762 F.2d 1383, 1405 n. 35 (11th Cir.1985). Section 5–4–602(4) of the Arkansas statute states in pertinent part as follows:

> (4) In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in § 5–4–604 or any mitigating circumstances ... The state and the defendant or his counsel shall be permitted to present argument respecting sentencing.[9]

Subsequently, the pertinent portion of § 5–4–602(4) has been amended to read as follows:

§ 5–4–603 of the Arkansas statutes in effect at the time of petitioners' sentencing phase trial read as follows:

§ 5–4–603. Findings required for death sentence—Unanimity.

(a) The jury shall impose a sentence of death if it unanimously returns written findings that:

(1) Aggravating circumstances exist beyond a reasonable doubt; and

(2) Aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and

(3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

(b) The jury shall impose a sentence of life imprisonment without parole if it finds that:

(1) Aggravating circumstances do not exist beyond a reasonable doubt; or

(2) Aggravating circumstances do not outweigh beyond a reasonable doubt all mitigating circumstances found to exist; or

(3) Aggravating circumstances do not justify a sentence of death beyond a reasonable doubt.

(c) If the jury does not make all findings required by subsection (a), the court shall impose a sentence of life imprisonment without parole.

Consequently, it appears that, under the Arkansas scheme in effect at the time of petitioners' penalty phase trial, only evidence "relating to the aggravating circumstances enumerated in § 5–4–604," and "any mitigating circumstances" could properly be presented to the jury for the purpose of determining the sentence. Indeed, it would be error under Arkansas law to receive evidence of non-statutory aggravating circumstances.

*Ford v. State,* 276 Ark. 98, 633 S.W.2d 3 (1982); *Williams v. State,* 274 Ark. 9, 621 S.W.2d 686 (1981).

Arkansas Code Annotated Section 5–4–604 sets out the aggravating circumstances as follows:

Aggravating circumstances shall be limited to the following:

(1) The capital murder was committed by a person imprisoned as a result of a felony conviction;

(2) The capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

(3) The person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person;

(4) The person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim;

(5) The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

(6) The capital murder was committed for pecuniary gain; or

(7) The capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any governmental or political function.

(8) The capital murder was committed in an especially heinous, atrocious, or cruel manner.

It must be noted that aggravating circumstances under the Arkansas statute "shall be limited to" those set forth in Section 5–4–604.

---

(4) In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in § 5–4–604, any mitigating circumstances, or any other matter relevant to punishment, including, but not limited to, victim impact evidence, provided that the defendant and the state are accorded an opportunity to rebut such evidence ... mitigation evidence must be relevant to the issue of punishment, including, but not limited to, the nature and circumstances of the crime, and the defendant's char-

acter, background, history, and mental and physical condition as set forth in § 5–4–605 ... Any evidence admitted at the trial relevant to punishment may be considered by the jury without the necessity of reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument respecting sentencing. The state shall open the argument. The defendant shall be permitted to reply. The state shall then be permitted to reply in rebuttal.

The three aggravating circumstances relied upon by the prosecutor in petitioners' sentencing phase trial were those set forth in subparagraph (2), (3), and (5). Contrast this to the Georgia scheme which permits the jury to "consider reliable aggravating evidence even though it is not relevant to any statutory aggravating circumstances." *Brooks v. Kemp,* 762 F.2d at 1406. Also, under the Georgia scheme the jury was permitted to consider the future dangerousness of a particular defendant. *Brooks v. Kemp,* 762 F.2d at 1406; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *California v. Ramos,* 463 U.S. 992, 1002 n. 16, 103 S.Ct. 3446, 3454 n. 16, 77 L.Ed.2d 1171 (1983). But the Arkansas statute in effect at the time of petitioners' sentencing phase trial made no reference to "future dangerousness." Furthermore, the Arkansas statute then in effect did not permit evidence of "victim impact", although the present Arkansas statute specifically permits such evidence.

To deal adequately with the issue, we will look first at the Arkansas law and then at the federal "habeas" law.

In the case of *Lovell v. State of Arkansas,* 1989 WL 151122, 1989 Ark.App. LEXIS 627 (1989), the Arkansas court of Appeals discussed the appropriate limits under Arkansas law on closing arguments by prosecutors:

> Closing arguments of counsel must be confined to the questions in issue, the evidence introduced at trial, and all reasonable inferences and deductions which can be drawn therefrom. *Conti v. State,* 10 Ark.App. 352, 664 S.W.2d 502 (1984). The trial judge has wide discretion in the control of arguments to the jury, but there is a limit to the discretion. *Williams v. State,* 294 Ark. 345, 742 S.W.2d 932 (1988). The supreme court has said it will always reverse a case where counsel goes beyond the record and states facts that are prejudicial to the opposing party unless the trial court by its action has removed such prejudice. *Williams v. State, supra.* The prosecuting attorney acts in a quasi-judicial capacity and it is his duty to use all fair, honorable, reasonable, and lawful means to secure a conviction of the guilty in a fair and impartial trial, but the desire to obtain a conviction is never a proper inducement to include in closing arguments anything except the evidence in the case and legitimately deducible conclusions from the applicable law. *Mays v. State,* 264 Ark. 353, 571 S.W.2d 429 (1978). One consideration for the trial court is whether the jury may have been misled. *Peters v. State,* 248 Ark. 134, 450 S.W.2d 276 (1970). Improper closing statements are considered on a case by case basis. *See Williams v. State,* 294 Ark. at 351 [742 S.W.2d 932.]

*Id.*

The latest Arkansas Supreme Court case to address this issue, *Davis v. State,* 314 Ark. 257, 863 S.W.2d 259 (1993), discusses the issue as follows:

> This final issue arises from comments that the prosecuting attorney made to the jury during his closing arguments in the penalty phase of the trial:
>
>> I would suggest to you that the murder, the crime that the Defendant did in this case—his actions represent one of civilized society's worst nightmares, a situation in which in broad light of day, in the middle of the day, in a peaceful neighborhood here in Northwest Arkansas, with a housewife/grandmother coming home to fix her lunch, feeling totally safe in the sanctuary of home that she instead was faced with an armed and bold, calculating and ruthless criminal who saw her cross the street and decided this was a chance for some quick easy money and grabbed up his gun and drove over there and went in specifically looking for her. This wasn't one of those deals where they were trying to burglarize a house and accidentally stumbled upon somebody that's in there, or even that they came home, which is another reason to consider the seriousness of the burglary of Mike and Sharon [Haley]. What if Sharon had come home? What then?
>
> The trial judge's control of such remarks during closing arguments is discretionary and will not be reversed in the absence of an abuse of discretion. For example, in

*Wilson v. State*, 295 Ark. 682, 751 S.W.2d 734 (1988), the prosecutor asked the jurors to impose the death penalty and to "tell Ron Wilson he will never commit another murder." *Wilson*, 295 Ark. at 690, 751 S.W.2d at 739. The trial court refused to do anything about the remark, and this court agreed with its decision explaining that "The Court's ruling ... about the remark was discretionary, and in the absence of an abuse of discretion, will not be reversed." *Id.* We found no abuse of discretion, having determined that the request was made in the context of urging the jurors to "act as a group in imposing the sentence. In context, it did not suggest that there was evidence from which it could be determined that Wilson would kill again." *Wilson*, 295 Ark. at 690, 751 S.W.2d at 739. This analysis applies to the facts at hand, for the prosecutor's remarks about Davis are similar to the prosecutor's statements·in *Wilson*.

Other jurisdictions have held that, in the penalty phase of a capital murder case, both parties should be given wide latitude in arguing the matter of punishment. *State v. Feltrop*, 803 S.W.2d 1 (Mo. banc 1991); *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983). Although this court has never specifically adopted this rule, we have held that counsel should be allowed some leeway with respect to opening and closing remarks. *Abraham v. State*, 274 Ark. 506, 625 S.W.2d 518 (1981). The trial court has wide latitude of discretion in controlling the arguments of counsel, and its ruling in this regard will not be overturned in the absence of abuse. *Cobbs v. State*, 292 Ark. 188, 728 S.W.2d 957; *Shaw v. State*, 271 Ark. 926, 611 S.W.2d 522 (1981). We have also held that improper statements by a prosecutor in his opening argument are cured by an instruction to the jury that remarks of counsel are not evidence and, unless supported by evidence, should be disregarded. *Miller v. State*, 309 Ark. 117, 827 S.W.2d 149 (1992).

Under the circumstances, we hold that the trial court did not abuse its discretion. *Id.* 314 Ark. at 270, 863 S.W.2d 259.

The statute in effect during the *Davis* trial, although not discussed in the opinion, is not the same as the one that was in effect during the sentencing phase trial of petitioners. See footnote 9, *supra*, for the language of Section 5–4–602(4) which was in effect during the *Davis* trial. In determining sentence under the later statute, not only evidence relating to the statutory aggravating circumstances and any mitigating circumstances could be introduced but also "any other matter relevant to punishment, including but not limited to victim impact evidence." That section also provides that "any evidence admitted at the trial relevant to punishment may be considered by the jury without the necessity of reintroducing it at the sentencing proceeding." This is to be contrasted with the provisions of the same sections which were in effect in 1987 at petitioners' sentencing trial. The section at that time limited the evidence which could be presented "in determining sentence" to "any matters relating to aggravating circumstances enumerated in Section 5–4–604 or any mitigating circumstances."

It is clear that under the law which was in effect during the *Davis* trial, arguments such as those made by the prosecutors here would be permitted within the trial court's discretion. This is understandable because the federal precedents, see below, had effectively immunized such statements by prosecutors from constitutional challenges where relevant under approved state statutes, and the 1993 amendments to Section 5–4–602(4) open the door to such arguments under Arkansas state law.

So, petitioners are left with the argument that a different result should follow under the language of the Arkansas act in effect during their sentencing trial.

■ We find no Arkansas precedent dealing specifically with the difference in the two versions of the statute or suggesting that the results would be different depending upon which version was in effect at the time.[10] As

---

**10.** While we have discussed in detail the differences in § 5–4–602(4) as it existed in 1987 at the time of petitioners' trial and as it exists now as a result of amendments in 1993, we have not in that discussion taken into consideration the effects of the enactment of § 5–4–616 in 1983. It

mentioned above, the Arkansas Supreme Court upon the direct appeal of this case did not specifically deal with petitioners' arguments concerning the prosecutors' closing arguments. Can the Arkansas Supreme Court's silence and affirmance in this case be read as approving an interpretation of the version of Section 5–4–602(4) (which was in effect in 1987) which would permit the prosecutors' closing arguments? Before trying to answer this question, we should first see if the prosecutors' arguments violate any provision of our federal constitution.

The United States Supreme Court in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) held that the use of victim impact information by the prosecution during the penalty phase trial of capital murder cases violated the Eighth Amendment. However, in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) it overruled *Booth* stating:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth,* 482 U.S., at 517, 107 S.Ct. at 2540 (WHITE, J., dissenting) (citation omitted). By turning the victim into a "faceless stranger at the penalty phase of a

capital trial," *Gathers,* 490 U.S., at 821, 109 S.Ct. at 2216 (*O'CONNOR,* J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

\* \* \* \* \* \*

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

501 U.S. at 827, 111 S.Ct. at 2608–2609.

Justice O'Connor in a concurring opinion states it thusly:

> Given that victim impact evidence is potentially relevant, nothing in the Eighth Amendment commands that States treat it differently than other kinds of relevant evidence. "The Eighth Amendment stands as a shield against those practices and punishments which are either inherently cruel or which so offend the moral consensus of this society as to be deemed 'cruel and unusual.'" *South Carolina v. Gathers,* 490 U.S. 805, 821, 109 S.Ct. 2207, 2216, 104 L.Ed.2d 876 (1989) (O'CONNOR, J., dissenting). Certainly there is no strong societal consensus that a jury may not take into account the loss suffered by a victim's family or that a murder victim

---

will be recalled that the latter statute is the one which permitted retrials limited to the sentencing phase where the error which necessitated same occurred only in that phase of the previous trial. But § 5–4–616 does more than simply permit such sentencing phase retrial. While § 5–4–616(a)(3) specifically states that "Resentencing proceedings shall be governed by the provisions of §§ 5–4–602(4) and 5–4–603—5–4–605," it also provides at subsection (a)(4):

> All exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding; additional relevant evidence may be admitted including

testimony of witnesses who testified at the previous trial;

Does the quoted provision enlarge what may be offered under § 5–4–602(4)? I think the answer is "no." The just quoted provision does not deal with the issues of relevant evidence. It simply provides that relevant evidence from the prior trial may be admitted without any further foundation. It is §§ 5–4–602(4) and 5–4–603 through 5–4–605 which quote "shall govern" at retrial. And more particularly it is § 5–4–602(4) that sets forth what evidence may be presented to the jury in the sentencing phase retrial. It is for this reason that I have omitted mentioning § 5–4–616(a)(4) in the above discussion.

must remain a faceless stranger at the penalty phase of a capital trial. Just the opposite is true. Most States have enacted legislation enabling judges and juries to consider victim impact evidence. [501 U.S. at·820–22, 111 S.Ct.] at 2606. The possibility that this evidence may in some cases be unduly inflammatory does not justify a prophylactic, constitutionally based rule that this evidence may never be admitted. Trial courts routinely exclude evidence that is unduly inflammatory; where inflammatory evidence is improperly admitted, appellate courts carefully review the record to determine whether the error was prejudicial.

We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." [501 U.S. at 827, 111 S.Ct.] at 2609. If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

\* \* \* \* \* \*

I agree with the Court that *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *Gathers, supra,* were wrongly decided. The Eighth Amendment does not prohibit a State from choosing to admit evidence concerning a murder victim's personal characteristics or the impact of the crime on the victim's family and community.

*Id.* 501 U.S. at 832–33, 111 S.Ct. at 2611–2612 (O'Connor, J. concurring).

And the case of *Brooks v. Kemp,* 762 F.2d 1383 (1985), dealt with the issue of future dangerousness as follows:

Arguing against the wisdom of imposing a life sentence on Brooks, Whisnant focused on the future dangerousness of the defendant. He suggested that Brooks might kill a guard or a fellow prisoner. He even noted the possibility that he might escape and asked "Whose daughter will it be next time?" Similar remarks were part of an argument found fundamentally unfair by this court in *Hance v. Zant,* 696 F.2d 940 (11th Cir.1983). Although these arguments were dramatic, they were directly relevant to the consideration of whether Brooks would remain a threat to society. Our discussion above demonstrates that such consideration is a proper element in the sentencing jury's decision. *See e.g., Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). A legitimate future dangerousness argument is not rendered improper merely because the prosecutor refers to possible victims. In this case, the arguments about Brooks' future dangerousness were appropriate inferences from the record before the jury.

*Id.* at 1411. *Brooks,* indeed, deals with a compendium of challenges to the propriety of prosecutorial arguments in addition to "future dangerousness." Its analysis of arguments relating to "victim impact" is instructive:

Whisnant discussed the victim by emphasizing her youth, attractiveness, and kind disposition. Brooks argues that these remarks were wholly irrelevant and highly prejudicial.

It would be clearly improper for a prosecutor to urge the imposition of death because of the race, religion, sex, or social status of the victim. Any reference to such potentially prejudicial characteristics must be undertaken only with the greatest of care and only when the reference is relevant to some legitimate issue in the case. Excessive focus on the characteristics of the victim, even if no explicit link is drawn between those factors and the punishment sought, may also be improper when the effect is to inject irrelevant considerations into the sentencing decision. *See, e.g., Vela v. Estelle,* 708 F.2d 954 (5th Cir.1983) (two witnesses, a well-known football player and the victim's widow, testified in great detail that murder victim was kind, inoffensive, a star athlete, a church usher and choir member, a social worker with underprivileged children of all races, a college student holding down two jobs, and the father of a three year old child—when all such evidence was irrelevant to any issue

and legally inadmissible; the failure of counsel to object contributed to a finding of ineffective assistance), *cert. denied,* [464] U.S. [1053], 104 S.Ct. 736, 79 L.Ed.2d 195 (1984). While argument focusing on the victim can be dangerous not all prosecutorial references to the victim are improper. The fact that there is a victim, and facts about the victim properly developed during the course of the trial, are not so far outside the realm of "circumstances of the crime" that mere mention will always be problematic. It is not necessary that the sentencing decision be made in a context in which the victim is a mere abstraction. Here, Whisnant asked the jury to remember "the person who is not here ... Carol Jeannine Galloway." He then ticked off some personal attributes shown by the evidence, i.e., that she was a pretty, 23 year old, unmarried woman living with her parents and that she was a considerate person of high morals. These comments did personalize the victim, but they were brief enough that we cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision.

Whasnant also mentioned the Galloway family. By way of rebutting an attempted defense argument based on sympathy for Brooks' family, the prosecutor reminded the jury of the Galloway's tragedy and noted that "next week when it's Thanksgiving and they are sitting around the table, Carol Jeannine won't be there, and never will be there again." This true statement was no more than a compelling statement of the victim's death and its significance, relevant to the retributive function of the death penalty. It was proper.

*Brooks v. Kemp,* 762 F.2d at 1409–1410.

And *Brooks* discussed the "war on crime" type argument and the analogy of the death penalty to killing by soldiers during war:

> Whisnant's lengthy discussion of the "war on crime" and his analogy of jurors to soldiers contains both proper and improper elements.
> Discussion of crime in the Columbus community, well within the common knowledge of the jury, was appropriate as part of

Whisnant's argument about the need for deterrence. The point of this discussion was driven home at the close of the "war on crime" speech when Whisnant returned to the following conclusion:

> You can bring back the death penalty and you can tell William Brooks, and you can tell every other criminal like him, that if you come to Columbus and Muscogee County, and you commit a crime, and it's one of those crimes that's punishable by death, and if the aggravating circumstances are there, you're going to get the electric chair ...

Arguments about general or special deterrence may be considered by the jury.

The reminder to the jury that "the buck stops with you today" was an appropriate reference to the fact that the jury must make the ultimate decision.

Finally, the analogy of the death penalty to killing in a war was appropriate insofar as it implied that imposing death, while difficult, is at times sanctioned by the state because of compelling reasons (national security or deterring crime). While the phrase "enemy of society" was harsh, we do not seriously fault its application to one whose crime is "so grievous an affront to humanity that the only adequate response may be the penalty of death.' *Gregg v. Georgia,* 428 U.S. [153] at 184, 96 S.Ct. [2909] at 2931, [49 L.Ed.2d 859] [(1976)]. Our acceptance of part of this argument cannot blind us to its obvious faults. The principal fault of the analogy is that a capital sentencing jury under the Georgia statutory scheme is bound to exercise broad discretion in its determination of a just punishment. This discretion is simply not analogous to the role of a soldier who is ordered to kill the enemy. Using the soldier metaphor, and coupling it with a challenge to the jurors' patriotism—"When [the soldiers] did a good job of killing ... We decorated them and gave them citations"; "if we can send a 17 year old young man overseas to kill an enemy soldier, *is it asking too much* to ask you to go back and vote for the death penalty in this case against William Brooks"—misrepresents the task the jury is charged by law to carry out. *See, e.g., Viereck v. United*

*States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943). The main thrust of death penalty jurisprudence since *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), has been the need for guided discretion in the sentencing body's individualized consideration of the capital defendant. *See, e.g., Zant v. Stephens, supra.* Conceiving of the jurors as soldiers undermines the crucial discretionary element required by the Eighth Amendment. Discussing the broad "criminal element" and then seeking death for Brooks because "he's a member of the criminal element" undermines the requirement that sentencing consideration be individualized by introducing the improper suggestion that Brooks be killed merely because he is a criminal. In these respects, the "war on crime" argument was improper. In Part V, we will consider factors that mitigated the argument and carefully weigh its impact on the jury.

*Id.* at 1412–1413.

Out of the 12 attacks made upon the prosecutor's arguments in *Brooks* the court found four to be "troubling":

> In the preceding section we identified four troubling segments of Whisnant's argument—his expressions of personal belief in capital punishment, the discussion of the prosecutor's policy of rarely seeking the death penalty (the "prosecutorial expertise" argument), the claim that Brooks' death would save taxpayers money, and the "war on crime" speech.

*Id.* at 1413.

And after analyzing the effect of these arguments, the *Brooks* court concluded:

> Considered in light of all facts and circumstances of the case, the improper arguments, most of which were mitigated by other arguments and instructions by the court, were not sufficient to undermine confidence in the outcome. We are satisfied that the death verdict here was imposed because of valid sentencing considerations, and we thus conclude that there is no reasonable probability that the prosecutorial misconduct changed the outcome.

Brooks' sentencing phase was not fundamentally unfair.

*Id.* at 1416.

However, the *Brooks* decision was rendered in the context of the Georgia statute which, as we have seen, is very different from the Arkansas Statute in effect when petitioners were tried.

■ So what do we learn from the above analysis? Assuming that we are dealing with a constitutionally approved state death penalty statute, prosecutorial arguments will not ordinarily be a basis for constitutional attack under the Eighth Amendment unless they are so egregious that they fatally infect the proceedings and render the entire trial fundamentally unfair. *See Moore v. Wyrick,* 760 F.2d 884, 886 (Eighth Cir.1985). Under this standard, petitioners must show that there is a reasonable probability that the error complained of affected the outcome of the trial. *See Hamilton v. Nix,* 809 F.2d 463 (8th Cir.1987). Nevertheless, these broad tests appear to apply only where the state statutes make such arguments relevant. For instance, when *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) overruled *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), it legitimized the admission of victim impact evidence during penalty phase trials *provided that* the state chose to permit the admission of such evidence. Recall that the majority in *Payne* stated:

> We thus hold that if the state chose to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be proposed. There is no reason to treat such evidence differently than other *relevant evidence* is treated.

501 U.S. at 827, 111 S.Ct. at 2609 (emphasis supplied). It is assumed that the Supreme Court would take the same position with respect to other such aggravating circumstances including "future dangerousness."

Justice O'Connor's concurring opinion in *Payne* makes the same point:

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." [501 U.S. at 827, 111 S.Ct.] at 2609. If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

> \* \* \* \* \* \*

> I agree with the Court that *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *Gathers, supra,* were wrongly decided. The Eighth Amendment does not prohibit a State from choosing to admit evidence concerning a murder victim's personal characteristics or the impact of the crime on the victim's family and community.

*Id.,* 501 U.S. at 832, 111 S.Ct. at 2612 (O'Connor, J., concurring).

After the *Payne* decision in 1991, the Arkansas Legislature amended § 5–4–602(4) to state that evidence may be presented to the jury in a sentencing phase trial "relating to aggravating circumstances enumerated in § 5–4–604, any mitigating circumstances, *or any other matter relevant to punishment including, but not limited to, victim impact evidence ...*" (Emphasis supplied). So, under the 1993 act it can be reasonably contended that future dangerousness, as well as victim impact evidence and other matters "relevant to punishment", could be introduced by the state in addition to the evidence of the statutory aggravating circumstances.

But, would it, nevertheless, be reversible error to permit such evidence or such prosecutorial arguments under the version of the statute which was in effect when petitioners were tried? That version of the statute (in effect in 1987) did not contain the additional language underlined and quoted above. And

Section 5–4–604 provided that "Aggravating circumstances shall be limited to ..." those specifically set forth. Thus, it appears that before 1993 Arkansas would not permit victim impact evidence or evidence of future dangerousness or evidence of any other aggravating circumstances not listed in § 5–4–604. Still, the Arkansas Supreme Court has, albeit sub silentio, approved arguments concerning future dangerousness *in this case.*

■ We are dealing here with the interpretation of state law. Ordinarily, we accept the state's highest court's decision interpreting state law. But where a state statute is absolutely clear, may that state's highest court interpret it otherwise?

The court in *Payne* stated that the *Booth* decision was wrong in stating that, *where the state law permitted proof of victim impact,* the Eighth Amendment of the Constitution would, nevertheless, bar such evidence. But the *Payne* court did *not* state that the prosecution may put on such victim impact evidence, and argue same to the jury, where the state law did not permit the admission of such evidence.

■ Here, the Arkansas Supreme Court affirmed petitioners' death sentence in the face of arguments made that evidence and prosecutorial arguments were permitted dealing with future dangerousness and other aggravating circumstances not specified in § 5–4–604, that is, even though the statute in effect at that time did not permit such evidence. The Arkansas Supreme Court did not deal with this issue in its opinion, so we cannot be sure that it even considered the question. Nevertheless, it did affirm the sentences in the face of these arguments by petitioners. So it must be said that, sub silentio, that Court interpreted the then existing Arkansas death penalty statutes as permitting such evidence and such comment. This Court is convinced that if the Arkansas state law had actually permitted such evidence and such arguments in 1987 when petitioners were tried, then there would be no federal constitutional problem here.[11]

---

11. As discussed under Point V, *supra,* and as argued by petitioners here, where state law

broadly defines capital murder, as is the case in Arkansas, the constitutionally required narrow-

Is there a due process federal constitutional requirement that, in death penalty cases, states must follow their own law where that law is clear and unambiguous? My conclusion is "perhaps." Nevertheless, I am skeptical that such a principle would come into play here. I say this because I think that most courts would conclude that the Arkansas Supreme Court, by its affirmance of petitioners death sentence, has determined that the version of § 5–4–602(4) in effect in 1987 would permit the evidence and arguments of the prosecutor made here and that such an interpretation, although strained, would be permissible. If I were an Arkansas State Supreme Court Justice confronted with that issue as one of first impression, I would most likely conclude otherwise. But as a federal judge, I must accept the state's interpretation of its own law. And if that law, as so interpreted, meets federal constitutional muster, as it does, then my inquiry should cease.

I conclude that this is a close issue, but one on which the respondent must prevail.

ing function can occur only in the penalty phase of the trial. This is accomplished in Arkansas through the "weighing" and "justification" requirements of its statute. In this situation, it can be argued that if evidence and argument concerning non-statutory aggravating circumstances are permitted, the narrowing function will be distorted. Petitioners further point out that an appellate court could not, under these circumstances, discern whether a nonstatutory factor exerted a decisive influence in the weighing and justification stages so as to produce the death sentence. However, the potency of such arguments has been undercut.

In *Henry v. Wainwright,* 661 F.2d 56 (1981) the Fifth Circuit held that it was error as a matter of constitutional law to allow a jury in a capital case to consider non-statutory aggravating factors in deciding whether the death penalty should be imposed. That decision was later reversed by the U.S. Supreme Court relying upon its decision in *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). In *Barclay* the Supreme Court stated:

Apparently believing that the Federal Constitution so required, the Florida Supreme Court has adopted a rule that the "aggravating circumstances specified in the statute are exclusive, and no others may be used for that purpose." *Purdy v. State,* 343 So.2d 4, 6 (1977); *Miller v. State,* 373 So.2d 882, 885 (1979); see *Cooper v. State,* 336 So.2d 1133, 1139 (1976); *Provence v. State,* 337 So.2d 783, 786 (1976). Not only has it held that nonstatutory aggravating circumstances do not satisfy the first

## IX.

### THE TRIAL COURT'S ALLOWING IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE AND TESTIMONY CONCERNING ONLY THE GUILT OF PETITIONERS AT THIS RESENTENCING TRIAL VIOLATED THEIR SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

## X.

### THE TRIAL COURT'S ALLOWING THE INTRODUCTION OF IRRELEVANT AND HIGHLY PREJUDICIAL PHOTOGRAPHS (PLAINTIFF'S EXHIBITS 12 AND 13) VIOLATED PETITIONERS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

These two points concern the admission of certain testimony and of two photographs into evidence during petitioners' resentencing proceeding. As the two issues

threshold criterion—whether statutory aggravating circumstances exist. It has also held that evidence supporting nonstatutory aggravating factors simply may not be introduced into evidence at any stage in the sentencing proceeding. See *Elledge v. State,* 346 So.2d 998, 1002. Under Florida law, the introduction of such evidence is error, although under some circumstances, the Florida Supreme Court treats it as harmless error.

The Florida rule that statutory aggravating factors must be exclusive affords greater protection than the Federal Constitution requires. Although a death sentence may not rest *solely* on a nonstatutory aggravating factor, see *Zant v. Stephens,* 462 U.S. at 876–878, 103 S.Ct., at 2742–2743, the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime. *Zant, supra,* at 878–879, 103 S.Ct., at 2743–2744; *Gregg v. Georgia,* 428 U.S. at 164, 196–197, 206, 96 S.Ct. at 2920–2921, 2936, 2940–2941; *Proffitt v. Florida,* 428 U.S. 242, 248, 256–257, n. 14, 96 S.Ct. 2960, 2964–2965, 2968–2969, n. 14, 49 L.Ed.2d 913 (1976). As we recently wrote in *Zant,* "[w]hat is important at the sentencing stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." 462 U.S. at 879, 103 S.Ct. at 2743–2744.

involve the same basic principles, they will be addressed together. Essentially, petitioners argue that evidence which was not directly relevant to the three statutory aggravating circumstances submitted to the jury should not have been admitted during this sentencing proceeding.

The testimony to which petitioners object consists primarily of the narrative testimony of David Small, Bill Kimbriel, and Bill Nelson setting forth the details of the underlying crime.

Mr. Small's crime time line began when petitioners blocked the road with Mr. Ritchie's car and ordered him (Mr. Small) and Mr. James into the police car. He told how he was placed in the trunk with Mr. Ritchie. Mr. Small heard Mr. Ruiz state, "You know what we've got to do," and Denton respond, "Yes, I do." This was followed by two shots, and then the trunk was shut. He explained how petitioners hid the police car. He told how Mr. Kimbriel found him in the trunk that afternoon. Finally, he told the officers that the petitioners had left with Mr. James.

Petitioners also objected to the testimony of Mr. Kimbriel, who found Mr. Small and the body of Mr. Ritchie and described the search for petitioners. Petitioners objected to Mr. Nelson's testimony that he heard a single gunshot on the evening of the crime in the area where the body of Mr. James was later found. Mr. Nelson also told of the discovery of the hidden Corps of Engineers truck and the discovery of Mr. James' body nearby.

Petitioners also objected to the admission of two photographs, designated as Plaintiff's Exhibits No. 12 and No. 13. Plaintiff's Exhibit No. 12 shows the body of Marvin Ritchie as it was found in the trunk of an automobile, face down and handcuffed. Plaintiff's Exhibit No. 13 is a close up photograph showing the bullet wound in the back of Marvin Ritchie's head. Photographs of Opal James, which were described as being far more gruesome, were not offered into evidence.

The procedural posture of this case makes the admission of the above referenced evidence an interesting question. At the guilt phase, the testimony was clearly relevant. The photographs could be relevant to the mental state required by the capital murder statute at the guilt phase. Ordinarily, the same jury which decides guilt also decides punishment, and thus would have had in mind at sentencing all of the evidence presented at the guilt phase. Here, however, the same jury did not decide guilt and punishment, and the circumstances of the crime were not fully before it.

The statute under which petitioners were resentenced, Ark.Code Ann. § 5–4–616(a)(3) (1987), provides that the resentencing proceedings shall be governed by the provisions of Ark.Code Ann. § 5–4–602(4) with regard to the evidence that may be presented to the jury. Under Arkansas law, the sentencing proceeding is supposed to focus on statutory aggravating and mitigating factors to determine whether a defendant should be sentenced to death or life without the possibility of parole.[12] Under Arkansas law in effect at the time of petitioners' sentencing trial, only those statutory aggravating circumstances which had evidentiary support were to be submitted to the jury for consideration. *Miller v. State*, 269 Ark. 341, 605 S.W.2d 430 (1980). In 1993, this statute was amended to allow the state to present additional evidence in aggravation beyond the enumerated statutory factors by providing for the introduction of "any other matter relevant to punishment", including, but not limited to, victim-impact evidence. Ark.Code Ann. § 5–4–602(4) (1993). That amended statute also provides that "(a)ny evidence admitted at the trial relevant to punishment may be considered by the jury without the necessity of reintroducing it at the sentencing proceed-

---

**12.** Ark.Stat.Ann. § 5–4–602(4) provides: "In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in § 5–4–604 or any mitigating circumstances. Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of evidence relevant to the aggravating circumstances set forth in § 5–4–604 shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant or his counsel shall be permitted to present argument respecting sentencing."

ing." *Id.* But, at the time of petitioners' resentencing proceeding, such "other" aggravating evidence or argument was not allowed. *See* discussion under Point VIII, *supra.*

The testimony of David Small established that the petitioners went to some effort to conceal the police car. His testimony about the petitioners' comments indicated their concern with being caught. The testimony of Bill Kimbriel further demonstrated an effort to conceal the crime. Bill Nelson told how the truck was hidden. It could be argued that all of this testimony was relevant to proving the aggravating circumstance of committing the murder "for the purpose of avoiding or preventing an arrest or effecting an escape from custody." Ark.Code Ann. § 5–4–604(5).

Indeed, this Court has previously analyzed the circumstances under which this aggravating factor could be properly applied, and the above-referenced testimony would pull this crime into the constitutionally applied realm. In *Woodard v. Sargent,* 567 F.Supp. 1548 (E.D.Ark.1983), this Court agreed with the reasoning in *Pickens v. Lockhart,* 542 F.Supp. 585 (E.D.Ark.1982). In *Pickens,* eight people were killed execution-style after a robbery and rape. None of the murders were committed while the felons were actually in the act of fleeing from, or escaping from, police custody. 542 F.Supp. 585. *Pickens* noted that the Arkansas Supreme Court has consistently held that the aggravating circumstance of preventing an arrest or escaping from custody applies where "a robber makes the cold-blooded calculation that by annihilating his victim he thereby eradicates an eyewitness to his crime." *Pickens v. State,* 261 Ark. 756, 551 S.W.2d 212 (1977).

The above-referenced testimony demonstrates that an overriding concern of the petitioners in this case was the continued concealment of their crimes. As escapees who feared returning to custody, the threat of being identified, tracked down, and apprehended was enough to cause the death of these victims. The Eighth Circuit has also recognized that "although a consequence of every murder is the elimination of the victim as a potential witness, avoiding arrest is not necessarily an invariable motivation for killing, so this aggravating circumstance does not as a matter of logic necessarily duplicate an element of the underlying capital crime." *Woodard v. Sargent,* 806 F.2d 153 (8th Cir. 1986). Therefore, it seems that most of this testimony was in fact relevant to an aggravating circumstance, and thus relevant to this proceeding.

It could be argued that the photograph of Marvin Ritchie in the trunk of the automobile was relevant to the aggravating circumstance of whether the murder was committed to avoid arrest. The same argument can be made with respect to the photograph of the back of Marvin Ritchie's head. The deliberate, execution style shooting is relevant to the aggravating factor of whether the murder was committed to avoid arrest, as discussed in the Court's analysis of the admission of the testimony of Messrs. Small, Kimbriel, and Nelson. Thus, again, this Court concludes that the evidence in question was relevant to one of the aggravating circumstances alleged in this case, and properly admitted. There is no showing of manifest abuse of the trial judge's discretion in the admission of this evidence. *Bennett v. State,* 297 Ark. 115, 759 S.W.2d 799 (1988).

In this case, the photographs were relevant to showing the defendant's state of mind. The photographs are black and white, and Mr. Ritchie's face is not shown. Considering photographs frequently admitted in such cases, these are not unusually gruesome. Indeed, the more gruesome photographs, including a photograph of Mr. James with maggots on the face, were not even offered into evidence.

This Court thus finds that the trial court did not err in admitting either the above-referenced testimony or Plaintiff's Exhibits 12 and 13.

## XI.

THE TRIAL COURT'S ALLOWING THE INTRODUCTION OF UNAUTHENTICATED PRISON RECORDS AND SUBSEQUENTLY INSTRUCTING THE JURY AS TO AGGRAVATING CIRCUMSTANCES BASED SOLELY ON THOSE RECORDS, VIOLATED PETITIONERS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

 The same three aggravating circumstances were submitted to the jury with re-

spect to each Petitioner. Those aggravating circumstances were: (1) at the time of the capital murder the Petitioners were unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction; (2) the Petitioners had previously committed another felony, an element of which was the use or threat of violence to another person, or creating a substantial risk of death or serious physical injury to another person; and (3) the capital murder was committed for the purpose of avoiding or preventing an arrest. *See* Tr. at 1481 (Denton), Tr. at 1489 (Ruiz). As to petitioner Denton, the jury found that all three aggravating circumstances existed, but as to petitioner Ruiz, the jury found that only the first and third aggravating circumstances existed.

Evidence of the prior felony convictions was obtained from Ms. Bobby Burns, who was employed at that time as the records manager at the Oklahoma State Penitentiary in McAlister, Oklahoma. (Tr. T. at 1152). Ms. Burns testified that these documents accompanied petitioners to the prison and were a part of their prison file, of which she was custodian.

The papers admitted into evidence against Mr. Ruiz included a copy of a judgment of the District Court of Custer County, Oklahoma, stating that on August 9, 1976, Mr. Ruiz pled guilty to the crime of robbery with a firearm with a sentence of life at hard labor. The judgment bears the signature of Charles M. Wilson, District Judge and the "Filed" stamp of Court Clerk Irene Pruitt. Irene Pruitt also signed a certificate, dated April 12, 1978, stating that the judgment remained in full force, and a certificate attesting to the fact that Charles M. Wilson is a District Judge and that his signature on Ruiz's judgment appears genuine. Also admitted was a certificate signed by Charles W. Wilson stating that Irene Pruitt is the acting Court Clerk of Custer County and that her signature on the relevant documents appears genuine.

The documents admitted into evidence against Mr. Denton included a judgment of the District Court of Oklahoma County, Oklahoma, stating that on April 13, 1971, Mr. Denton entered a plea of guilty to the crime of murder, for which a sentence of life imprisonment was imposed. The judgment is signed by District Judge Harold C. Theis and attested to by Dan Gray, Court Clerk, by Mary Evelyn Moncrief, Deputy Clerk. A certificate signed by Tom Petusky, Court Clerk, dated July 8, 1987, states that the judgment is a true and correct copy of the original instrument appearing in the district court of Oklahoma County, Oklahoma.

Petitioners objected to the introduction into evidence of the Judgment and Conviction on both petitioners. Petitioners argue that the actual clerk of court from the court of conviction must provide the foundation for admission and that the records admitted in this proceeding were neither authentic nor properly authenticated.

In *Reeves v. State*, 263 Ark. 227, 564 S.W.2d 503 (1978), the Arkansas Supreme Court upheld the State's proof of two previous convictions based upon the circuit clerk's testimony based upon docket entries. *Id.* at 231, 564 S.W.2d 503. There, as here, there is no suggestion whatever that the docket entries did not correctly reflect the court's judgments in the earlier cases. There, as here, the challenge to the proof is without merit.

## XII.

THE TESTIMONY OF A STATE PSYCHOLOGIST AS TO THE PRIOR CRIMINAL HISTORY AND POTENTIAL FUTURE DANGEROUSNESS OF PETITIONERS, WHERE SUCH TESTIMONY WAS BASED ON ADMISSIONS CONTAINED IN STATE PSYCHIATRIC HOSPITAL RECORDS, VIOLATED PETITIONERS FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

At the close of petitioners' case in chief, the state called Dr. James Moneypenny, a clinical psychologist, as its first rebuttal witness. Tr. 1380. The purpose of this psychologist's testimony was to rebut the defense testimony of Dr. Douglas Stevens' testimony and to establish the "future dangerousness" of the petitioners. Dr. Moneypenny testified that he had never talked with or examined the petitioners and that medical

histories and records were the sole basis for his opinions in the case. (T.Tr. 1381). Specifically, Dr. Moneypenny stated that:

"I reviewed the histories that were reported in their other evaluations from—I jotted down some of the documents, including evaluations by the psychologist and psychiatrists at the Arkansas State Hospital, documents from juvenile homes, and school records for Mr. Ruiz, also psychological evaluations and appraisals from the California Board of Corrections at Bockerville, and some tests dated from the Oklahoma Corrections Board."

(Tr. 1381). Petitioners objected on several grounds. First, they asserted that no meaningful assessment could be given without a personal interview. Second, they asserted that the statements were obtained in violation of their rights under *Miranda*. Third, they argued that the testimony violated Arkansas Rules of Evidence 404B by demonstrating prior bad acts to prove the character of a person to show that he acted in conformity therewith.

The state responded by arguing that the review of the histories was adequate to form a medical opinion; that the defendants were examined at the State Hospital at the request of their own attorneys to determine if there was any mental impairment and thus waived any asserted rights; and that the prior bad acts served as rebuttal testimony to Dr. Douglas Stevens' testimony that the defendants had recovered to a certain degree and that they were aging and mellowing.

Dr. Stevens testified for the petitioners at this proceeding. He interviewed both Mr. Ruiz and Mr. Denton for several hours in close proximity timewise to the sentencing proceeding. He also reviewed reports made at the Arkansas State Hospital back in 1977. Tr. 1244. He stated that he read the entire report, but he did not necessarily agree with the opinions or editorial comments throughout the report. Tr. 1246. He found the objective testing to be important. Tr. 1246. He stated that he "did rely on it as a typical history taken by a clinician, and adequate history, but I would not necessarily know whether they were correct, realizing that any of us are fallible in our history taking and

often make mistakes. I don't know the accuracy of the history without checking it with Mr. Ruiz." Tr. 1250. He later stated that he did not technically "rely" upon the report. Tr. 1251. The Court did not admit the report into evidence. Tr. 1251.

Dr. Stevens testified about Paul Ruiz's "cold, hard facade." Tr. 1205. He stated that Mr. Ruiz "can be very warm and sensitive and on the other hand he can be cold, callous, disassociated, that is, his feelings disassociated from the situation." Tr. 1230. He stated that "anytime [Ruiz] perceives himself with authority out there closing in, he becomes dangerous." Tr. 1232. Indeed, he stated that Mr. Ruiz had "thirty-nine (39) years of behaving in a reflexive manner when he perceives himself in danger. And I think were he to perceive himself in danger he would still react reflexively." Tr. 1270. He also testified that Mr. Ruiz had adjusted very well in a prison setting because of the high degree of structure and absence of ambiguity. Tr. 1232. Specifically, he stated that Mr. Ruiz is "very functional in the prison setting. He's spent his life there, he's (sic) knows the rules, he can adjust to that situation, and he can be productive in that type of a situation." Tr. 1233–34. As for Mr. Denton, Dr. Stevens testified that he was a fit candidate for life imprisonment without parole:

"in the sense that in the structure of the prison system, he functions much better than he does outside in the free world. He does have some emotional problems. He's had emotional problems for a number of years. These are characterized by some thought disorder, some confusion, at times disorientation, he has had delusions, and hallucinations. He tends to be very suspicious, have delusions of persecution, but in a prison setting, which is one of those settings that has the highest degree of structure possible, these symptoms fade away in large part. He can do much better in the prison than he can outside."

Tr. 1235–36. Dr. Stevens also noted that there had been some change over the years, and this is the testimony that spawned Dr. Moneypenny's "rebuttal" testimony:

"There has been change over the years. [Denton] himself says that he thinks back to his experiences in his early twenties, and he says that seems like a lifetime ago, and how much different he is now. That's part of the mellowing that goes on with age.

Q. Does the passing of time—what does the passing of time do to an individual in his circumstances?

A. It tends to mellow us, all of us. People who—you can see this even in professional football players. They will sometimes comment on the air how in their playing days they were vicious, defensive tackles, or whatever, growled through the week waiting for the next Sunday to come, and then twenty years later they tend to be big warm teddy bears on our T.V. screens.

Q. Is this type of mellowing, does that apply to all of us?

A. Yes, to some extent in different ways for each of us, but we do mellow with age."

Tr. 1236–37. Later, when commenting upon an incident at the prison where Mr. Ruiz and Mr. Denton remained in the prison when other inmates escaped, Dr. Stevens said:

"I don't know what the factors were. All I know, on that date the two of them had the opportunity [to escape] and decided not to. Independently of that I also know that people, as they mature and get older, tend to mellow and not do as many impulsive things as they did when they were young. Whether those two facts came together on that particular day, I can't tell you."

Tr. 1284. Dr. Stevens further testified that he thought that either petitioner was still capable of murder. Tr. 1293.

Thus, the gist of Dr. Stevens testimony, after interviewing both petitioners in 1987 and reviewing their prior records, was that both petitioners were dangerous, but that they, like the majority of all people, have a tendency to mellow somewhat with age. A fair inference from his testimony is that the petitioners are less dangerous now then they were when the murders were committed.

In "rebuttal", the state presented Dr. Moneypenny, who had never interviewed either petitioner. The primary source of his information were records from the Arkansas State Hospital obtained back in 1977. He was allowed to testify as to the history of the petitioners from unauthenticated documents containing hearsay such as, referring to Mr. Ruiz, "He would run away from home and was incorrigible." Tr. 1388. The report in question stemmed from the examination of the petitioners on September 26, 1977. Tr. 1390. After an in-chambers conference, the Court instructed the jury to disregard the "specific items mentioned in the report." Tr. 1396.

After being instructed to testify in a more "abstract" manner, Dr. Moneypenny testified as follows:

"(I)t was my feeling that the conveyance offered [by Dr. Stevens] was to suggest that the personality traits and characteristics that led him to behave in the way he did are things that just sort of gradually ease out of existence and don't happen anymore. That's not the way a personality functions. I agree that we change over the course of a life time, we grow and develop, and of course mellowing is one of those factors. I think it's as much a part of having less energy and strength than when we were young, but the same basic attitudes, beliefs, impulses, the anger, the hostility, the bitterness, those same survival skills that were learned as a child do not get forgotten. Those things do remain. I think it's important not to try and cast this as an all or none sort of issue, that of course you don't have to totally ignore one part of a person in order to appreciate the whole person. I don't have any doubts that all of us, Mr. Ruiz included, has a sensitive side, or that there may be some warmth there. But the issue here, and this is what is specific about a person with an anti-social personality disorder, is that that person—the warmth and sensitivity that most normal people use to sort of even out our anger and hostility, doesn't have an effect like that in people with such a disorder. They do not learn from their experience, they do not change their behavior as a result of punishment, even very adverse punishment. In fact, we believe

that such people what we call a constitutional insensitivity to punishment, that you can punish them forever and they won't—they won't change their basic orientation. And this finding here is one of those things that's really very equivocal, that while some of the energy level may reduce, and some of the more flagrant sorts of things may become less evident, the same basic personality patterns, beliefs, attitudes, and so forth, that existed before are going to continue on a life long basis.

Tr. 1398–99. Thereafter, although Dr. Stevens did not testify as to rehabilitation, Dr. Moneypenny's rebuttal testimony was allowed to encompass his opinion that neither petitioner had been rehabilitated. Tr. 1399. He stated that "what came to light as a result of reviewing these records was the fact that these men do have personality disorders, that the die is cast, in effect, and that these sorts of behavior patterns are extremely resistant to change." Tr. 1412. He stated that "the diagnosis—that particular diagnosis made ten years ago is as applicable today in describing basic personality traits and characteristics as it was then." Tr. 1415. All of the psychological reports upon which he relied were made in 1977. Tr. 1421.

The redirect by the state is strikingly brief, and clarifies the purpose Dr. Moneypenny's testimony.

"Q. Dr. Moneypenny, you also used the testimony of Dr. Stevens this morning—you heard all of his testimony and that's a part of your history that he gave this morning?"

A. Yes.

Q. Okay. You just disagree with his evaluation of these two individuals, is that correct?

A. Yes.

Q. In essence, **you feel that they are still dangerous, very dangerous people?**

A. **I do.**

Q. **And that's not going to change, is it?**

A. **Not in my opinion.**

Q. Okay, thank you.

Tr. 1422 (emphasis added).

In sum, after Dr. Stevens testified that both petitioners could still be dangerous under some circumstances, but that they both had mellowed and would likely mellow more with age, Dr. Moneypenny was permitted to "rebut" that testimony based primarily upon reports taken some ten years earlier and to assert future dangerousness, a non-statutory aggravating factor. In closing argument the state emphasized this factor yet again: "Dr. Moneypenny told you that these men are extremely dangerous and will always be that way. They will be a threat to society as long as they live." Tr. 1504.

The testimony of Dr. Moneypenny generates several concerns. The first is simply whether the testimony was proper rebuttal. Dr. Stevens never testified that the petitioners were not dangerous. He spoke in general terms of the mellowing process that most individuals go through with age and indicated that he saw some signs of that with the petitioners. Dr. Moneypenny did not disagree with this general observation but felt that petitioners' personalities were such that there was little likelihood of any significant change in their dangerousness. The Court is convinced that, on this record, Dr. Stevens did "open the door" to testimony about future dangerousness. Still it recognizes that this is a close question, particularly so if one compares the testimony of Dr. Stevens with respect to petitioner Ruiz separately from that relating to petitioner Denton. Of course, had petitioners not opened the door it would be a close question whether the admission of such testimony would be error because "future dangerousness" was not, and is not, one of the aggravating factors under Arkansas law. *See* discussion under Point VIII, *supra.*

### XIII.

THE TESTIMONY CONCERNING POST–CONVICTION BAD ACTS RELEVANT ONLY TO ONE PETITIONER, AT A JOINT TRIAL OF PETITIONERS, VIOLATED THEIR SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

Petitioners argue that testimony concerning the post-conviction bad acts of

one petitioner at a joint trial of petitioners unfairly prejudiced the petitioner as to whom the testimony was not relevant.

Each petitioner was charged with the aggravating circumstance that he had "previously been convicted of other felonies, an element of which was the use of violence." There was evidence that Mr. Ruiz had been convicted of robbery, but no evidence of violence was presented. There was evidence that Mr. Denton had been convicted of murder, which necessarily involves violence. The jury found the existence of the above aggravator with regard to Mr. Denton, but not to Mr. Ruiz. The jury found two mitigators for Mr. Denton and seven mitigators for Mr. Ruiz. The jury sentenced both petitioners to death.

At the sentencing proceeding, evidence was admitted that both petitioners were involved in an escape attempt on January 1, 1979. Testimony of Elvis Brown, a prison guard, indicated that Mr. Ruiz had made various threats and had held a weapon against Mr. Brown's neck during the uprising. Mr. Brown also testified that Mr. Denton said that he didn't want any part of any more killings and went back to his cell.

Mr. Norris testified to Mr. Denton's escape on September 16, 1978. He testified that Mr. Denton and another inmate escaped and that Mr. Denton was captured approximately three miles from the prison and about half a mile from the town of Gould, Arkansas. Mr. Ruiz was not implicated in this incident.

Petitioners argue that the post-conviction acts of one petitioner may have been impermissibly considered by the jury as to the other petitioner. Petitioners argue that severance was the only proper remedy for this situation, noting also that neither petitioner could force the other to testify concerning those incidents in which the former was not involved. Citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), petitioners argue that since one defendant could not force the other to testify concerning an incident, the former was denied his right of confrontation and cross-examination of his accusers.

There was no testimony that Mr. Ruiz was involved in Mr. Denton's 1978 escape. There was no testimony that Mr. Denton had any further involvement in the 1979 uprising than that indicated by Mr. Brown. Either petitioner could have called other witnesses, including other prisoners, to testify if the testimony adduced was contrary to their recollection of the event. There is nothing to indicate that the events were other than as described.

Furthermore, the jury's parceling out of both the aggravating and mitigating circumstances as to each petitioner in this case belies the argument of impermissible prejudice or juror confusion. There is every indication in this record that the jury carefully considered the evidence as it related to each individual petitioner. In short, there is no merit to petitioners' arguments on this point.

XIV.

THE TRIAL COURT'S REFUSAL TO GIVE PETITIONERS' PROFFERED JURY INSTRUCTIONS NOS. 43 AND 44 CREATED A MANDATORY DEATH PENALTY IN VIOLATION OF PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

At the conclusion of the trial, the petitioners proffered jury instructions Nos. 43 and 44, each of which would have amended Instruction 1509 of the Arkansas Model Criminal Instructions (AMCI). The Court denied petitioners' request and instead gave AMCI 1509 and AMCI 1509–Form 3 without any changes.

AMCI 1509 provides in pertinent part as follows:

"After making the determinations required to complete Form 1 and Form 2, if applicable, you will then complete Form 3.

"In no event will you return a verdict imposing the death penalty unless you unanimously make three particular written findings on Form 3. These are:

"First: That one or more aggravating circumstances existed beyond a reasonable doubt;

"Second: That such aggravating circumstances outweigh beyond a reasonable

doubt any mitigating circumstances found to exist; and

"Third: That the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

"If you make those findings you will impose the death penalty. Otherwise, you will sentence the defendant to life imprisonment." (Emphasis added).

AMCI 1509–Form 3 provides in pertinent part as follows:

"WE THE JURY CONCLUDE:

"(a) ( ) One or more aggravating circumstances did exist beyond a reasonable doubt, at the time of the commission of the capital murder.

"(If you do not unanimously agree to check paragraph (a), then skip (b) and (c), and sentence [defendant] to life imprisonment without parole on Form 4.)

"(b) ( ) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances.

"(If you do not unanimously agree to check paragraph (b), then skip (c), and sentence [defendant] to life imprisonment without parole on Form 4.)

"(c) ( ) The aggravating circumstances justify beyond a reasonable doubt a sentence of death.

"(If you do not unanimously agree to check paragraph (c), then sentence [defendant] to life imprisonment without parole on Form 4.)

"**If you have checked paragraphs (a), (b), and (c) then sentence [defendant] to death** by electrocution on Form 4. Otherwise, sentence [defendant] to life imprisonment without parole on Form 4." (Emphasis added).

Petitioners' proffered No. 43 would have changed the word "will" in the last paragraph of AMCI 1509 to the word "may". Petitioners' proffered instruction No. 44 would have changed the last paragraph of AMCI 1509–Form 3 by adding the words "you may" so that the last paragraph would have read: "If you have checked paragraphs (a), (b), and (c), then you may sentence [defendant] to death … on Form 4."

Petitioners argue that the use of the word "will" imposes a requirement upon the jury to render a death sentence upon the finding of the existence of the factors set forth in AMCI 1509 and AMCI 1509–Form 3. They contend that such mandatory language creates a presumption of death and violates the prohibition against mandatory death penalties, citing *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) and *Stanislaus Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). They also argue that these and other instructions as given, together with the verdict forms, violate the mandate of the United States Supreme Court that the sentencing jury not be precluded from considering any appropriate circumstances offered in mitigation. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

Petitioners contend that the jury instructions in this case were such that, if the jurors answered "yes" to AMCI 1509–Form 3, subsections (a), (b), and (c) they were required to impose the sentence of death in violation of the petitioners' right to have the sentencing jury give "independent mitigating weight to aspects of [the defendant's] character and record and to the circumstances of the offense proffered in mitigation." *Lockett,* supra. It has been established that a capital sentencing jury may impose a sentence less than death as an act of mercy or for any other reason under the circumstances of a particular case. Petitioners argue that to remove this discretion by mandatory instructions is to unconstitutionally invade the jury's province.

The respondent states that both of these contentions are meritless. First, they point out that the Arkansas Supreme Court has repeatedly held that the "will" instruction placed in proper context does not create a mandatory death sentence. It also cites the case of *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) in support of its argument.

Respondent additionally argues that, in any event, the *Mills v. Maryland,* argument is procedurally barred "because the petitioners did not raise this issue at the trial level nor did they pursue this argument on appeal." He points out that in order to preserve an allegation of error the defendant must make a contemporaneous objection at trial. He argues that no such objection was made by the petitioners. Finally he states, "In any event, this allegation is meritless," citing *Pickens v. State,* 301 Ark. 244, 249, 783 S.W.2d 341, 344, *cert. denied* 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 766 (1990).

■ Of course, petitioners did object to the failure of the trial court to give their proffered instructions numbered 43 and 44. But did they raise the *Mills v. Maryland* issue? Before answering that question it is necessary to spell out petitioners' *Mills* argument in more detail. Indeed, it is necessary to resolve the *Mills v. Maryland* contention before taking up the trial court's decisions on proffered instructions Nos. 43 and 44. This requires a review of the sentencing forms and the pertinent sentencing instructions.

Form No. 1 correctly advised the jury that the state had the burden of proving the existence of any aggravating circumstances beyond a reasonable doubt and that the jurors' finding as to the existence of an aggravating circumstance had to be by unanimous decision. (T. 1479, 1639). Form No. 2 deals with mitigating circumstances and is in four separate parts: parts A, B, C, and part D. On part A the jury is instructed to check those mitigating circumstances that it unanimously finds probably existed at the time of the murder. Part B instructs the jury to check those mitigating circumstances that one or more jurors believed probably existed, but upon which the jury did not unanimously agree. (T. 1641). Part C instructs the jury to indicate those mitigating circumstances for which evidence was presented but which "the jury unanimously agreed that they did not exist at the time of the murder." (T. 1642). Part D is to be checked if the jury unanimously determines that "there was no evidence of any mitigating circumstances." (T. 1643). Form 3 is entitled "Conclusions."

With respect to that form the jury was instructed:

In no event will you return a verdict imposing the death penalty unless you unanimously make three (3) particular written findings on Form 3. These are:

First: That one or more aggravating circumstances existed beyond a reasonable doubt.

Second: That such aggravating circumstances outweigh beyond a reasonable doubt **any mitigating circumstances found to exist.**

Third: That the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

(T. 1480, 1481) (emphasis supplied).

Form 3 itself in its entirety, states:

### FORM 3
### CONCLUSIONS

The Jury, having reached its final conclusions, will so indicate by having its Foreman place a check mark in the appropriate space in accordance with the Jury's findings. In order to check any space, your conclusions must be unanimous. The Foreman of the Jury will then sign at the end of this form.

WE THE JURY CONCLUDE:

(a) ( ) One or more aggravating circumstances *did* exist beyond a reasonable doubt, at the time of the commission of the capital murder. (If you do not unanimously agree to check paragraph (a) then skip (b) and (c), and sentence Paul Ruiz to life imprisonment without parole on Form 4.)

(b) ( ) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances. (If you do not unanimously agree to check paragraph (b) then skip (c) and sentence Paul Ruiz to life imprisonment without parole on Form 4.)

(c) ( ) The aggravating circumstances justify beyond a reasonable doubt a sentence of death. (If you do not unanimously agree to check paragraph (c) then sentence Paul Ruiz to life imprisonment without parole on Form 4.)

If you have checked paragraphs (a), (b), and (c) then sentence Paul Ruiz to death

on Form 4. Otherwise, sentence Paul Ruiz to life imprisonment without parole on Form 4.

So, when weighing the aggravating circumstances against "any mitigating circumstances found to exist," what mitigating circumstances would the jurors understand they were to consider? Petitioners argue that the only mitigating circumstances with respect to which the jury was called upon to make *findings as to their existence* were those unanimously found on Part A of form 2. They make the point that "the jury was not instructed that each individual juror shall weigh the aggravating circumstances found unanimously to exist against any mitigating circumstances found to exist, **as well as any mitigating circumstance or evidence found by that individual juror to exist.**" Petitioners' Joint Brief to Supplement Petition for Habeas Corpus (Filed May 16, 1994) p. 29.

Under *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), petitioners contend that the jury should have been specifically instructed that their separate, individual beliefs in the existence of one or more mitigating factors could be considered both when the jury made its required unanimous determination whether the aggravating circumstances out-weighed the mitigating circumstances that the jury found to exist and also when the jury was making its required unanimous determination that the aggravating circumstances justified beyond a reasonable doubt the sentence of death.

In petitioner Ruiz's case the jury unanimously found only one mitigating circumstance to exist. Nevertheless, one or more jurors believed six other mitigating circumstances probably existed and the jury indicated that there was evidence of three other mitigating circumstances. (T. 1554–1555). In petitioner Denton's case the jury did not unanimously find any mitigating circumstance to exist. Nevertheless, one or more jurors believed two mitigating circumstances probably existed and the jury indicated that there was evidence of six other mitigating circumstances. (T. 1557–1559).

■ Petitioners argue that there is a substantial likelihood that these mitigating circumstances were not considered in the

weighing process or the justification process contemplated by the jury forms. Again citing *Mills v. Maryland,* petitioners argue that their death sentence should be vacated if this court cannot on this record rule out the substantial probability that petitioners' interpretation of their obligation under the verdict forms is one that a reasonable jury could not have drawn from the instructions given by the trial court and the verdict forms employed. So it is necessary to compare the situation here with that obtaining in *Mills v. Maryland.* But before doing that we should determine as precisely as possible the test to be applied. What is that test? As stated in *Mills v. Maryland:*

> The critical question, then, is whether petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions given by the trial judge and from the verdict from employed in this case. See *Francis v. Franklin,* 471 U.S. 307, 315–316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985) ("The question ... is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning"), citing *Sandstrom v. Montana,* 442 U.S. 510, 516–517, 99 S.Ct. 2450, 2455–2456, 61 L.Ed.2d 39 (1979).

\* \* \* \* \* \*

With respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict.

\* \* \* \* \* \*

Unless we can rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, we must remand for resentencing.

\* \* \* \* \* \*

We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the

verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence.

486 U.S. at 384, 108 S.Ct. at 1866–1870. But in *Boyde v. California,* 494 U.S. 370, 378–80, 110 S.Ct. 1190, 1197, 108 L.Ed.2d 316 (1990), the majority opinion notes the confusion in earlier cases, including *Mills,* as to the proper standard for reviewing jury instructions in this area:

> The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is less than clear from our cases. In *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), we said that "[t]he question ... is ... what a reasonable juror *could have understood* the charge as meaning." *Id.,* at 315–316, 105 S.Ct., at 1972 (emphasis added). See also *[Sandstrom] v. Montana,* 442 U.S. 510, 516–517, 99 S.Ct. 2450, 2455–2466, 61 L.Ed.2d 39 (1979). But our subsequent decisions, while sometimes purporting to apply the *Francis* standard, have not adhered strictly to that formulation. In *California v. Brown,* 479 U.S. [538], 541–542, 107 S.Ct. 837, 839–840, 93 L.Ed.2d 934 (1987), we made reference both to what a reasonable juror *"could"* have done and what he *"would"* have done. And two Terms ago in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), we alluded to at least three different inquiries for evaluating such a challenge: whether reasonable jurors *"could have"* drawn an impermissible interpretation from the trial court's instructions, *id.,* at 375–376, 108 S.Ct., at 1866 (emphasis added); whether there is *"substantial possibility"* that the jury may have rested its verdict on the 'improper' ground," *id.,* at 377, 108 S.Ct., at 1867 (emphasis added); and how reasonable jurors *"would have"* applied and understood the instructions. *Id.,* at 389, 108 S.Ct., at 1872 (WHITE, J., concurring) (emphasis added). Other opinions in the area likewise have produced a variety of tests and standards.

See, *e.g., Penry v. Lynaugh,* 492 U.S., at [326], 109 S.Ct., at [2951] ("[A] reasonable juror *could well have believed* that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence") (emphasis added); *Franklin v. Lynaugh,* 487 U.S. [164], at 192, 108 S.Ct. [2320] at 2337 [101 L.Ed.2d 155] [(1988)] (STEVENS, J., dissenting) ("[N]either of the Special Issues as they *would have been understood by reasonable jurors* gave the jury the opportunity to consider petitioner's mitigating evidence") (emphasis added); see also *Andres v. United States,* 333 U.S. 740, 752, 68 S.Ct. 880, 885, 92 L.Ed. 1055 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning ... *is probable "*) (emphasis added).

Although there may not be great differences among these various phrasings, it is important to settle upon a single formulation for this Court and other courts to employ in deciding this kind of federal question. Our cases, understandably, do not provide a single standard for determining whether various claimed errors in instructing a jury require reversal of a conviction. In some instances, to be sure, we have held that "when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside. See, *e.g., Stromberg v. California,* 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] (1931)." *Leary v. United States,* 395 U.S. 6, 31–32, 89 S.Ct. 1532, 1545–1546, 23 L.Ed.2d 57 (1969); see also *Bachellar v. Maryland,* 397 U.S. 564, 571, 90 S.Ct. 1312, 1316, 25 L.Ed.2d 570 (1970). In those cases a jury is clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories. Although it is possible that the guilty verdict may have had a proper basis, "it is equally likely that the verdict ... rested on an unconstitutional ground." *Bachellar, supra,* at 571, 90 S.Ct., at 1316, and we have declined to choose between two such likely possibilities.

In this case we are presented with a single jury instruction. The instruction is not concededly erroneous, nor found so by a court, as was the case in *Stromberg, supra.* The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde,* 494 U.S. at 381, 110 S.Ct. at 1197–98.

With the proper test in mind we can now turn to a comparison of this case with the situation that obtained in *Mills v. Maryland.* The forms employed in *Mills* are set out verbatim in an appendix to Justice Blackmun's opinion. There, the introductory portion of Section I stated:

Based upon the evidence we unanimously find that each of the following aggravating circumstances which is marked 'yes' has been proven BEYOND A REASONABLE DOUBT and each aggravating circumstance which is marked 'no' has not been proven BEYOND A REASONABLE DOUBT:

There followed ten aggravating circumstances each with its own 'yes' or 'no' finding. For instance the first two such aggravating circumstances are stated as follows:

1. The victim was a law enforcement officer who was murdered while in the performance of his duties.

___ __X__
Yes No

2. The defendant committed the murder at a time when he was confined in a correctional institution.

__X__ ___
Yes No

[Note: In *Mills* the jury answered 'no' to the remaining eight aggravating circumstances.] Section II dealt with mitigating circumstances. The introductory portion reads:

Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by A PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked 'no' has not been proven by A PREPONDERANCE OF THE EVIDENCE.

There followed eight mitigating circumstances with the jury being called upon to answer 'yes' or 'no' as to each. Examples are:

5. The youthful age of the defendant at the time of the crime.

___ __X__
Yes No

\* \* \* \* \* \*

7. It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

___ __X__
Yes No

The eighth is: "8. Other mitigating circumstances exist as set forth below:" The jury answered all eight with 'No' or 'None'. At

the close of Section II we find the following instruction:

"(If one or more of the above in Section II have been marked 'yes', complete Section III. If all of the above in Section II are marked 'no', you do not complete Section III.)

Since the jury had answered 'No' with respect to all mitigating circumstances it did not have to complete Section III. Nevertheless, to understand *Mills* we must consider that form. It states:

Based on the evidence we unanimously find that it has been proven by A PRE-PONDERANCE OF THE EVIDENCE that the mitigating circumstances marked 'yes' in Section II outweigh the aggravating circumstances marked 'yes' in Section I.

Finally we come to the form for the "Determination of Sentence." It reads:

## DETERMINATION OF SENTENCE

Enter the determination of sentence either 'Life Imprisonment' or 'Death' according to the following instructions:

1. If all of the answers in Section I are marked 'no' enter 'Life Imprisonment.'

2. If Section III was completed and was marked 'yes' enter 'Life Imprisonment.'

3. If Section II was completed and all of the answers were marked 'no' then enter 'Death.'

4. If Section III was completed and was marked 'no' enter 'Death.'

"We unanimously determine the sentence to be Death."

Mills challenged his sentence of death on the ground that:

[t]he Maryland capital-punishment statute, Md.Ann.Code., Art. 27, § 413 (1987), as applied to him was unconstitutionally mandatory. Petitioner construed the statute, as explained to the jury by the court's instructions and as implemented by the verdict form, to require the imposition of the death sentence if the jury unanimously found an aggravating circumstance, but could not agree unanimously as to the existence of any particular mitigating circumstance. According to petitioner's view,

even if some or all of the jurors were to believe *some* mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the *same* mitigating factor, the sentence necessarily would be death.

What are the differences in the Arkansas and the Maryland sentencing forms? First, the Arkansas forms do not call for either a "yes" or a "no" answer. Rather, if a positive finding is made it is checked. If not, that finding or circumstance is left blank. This is important particularly with respect to Section II of the Maryland forms when compared with Arkansas Form 2 and its 4 subparts: A, B, C and D.

Section II of the Maryland forms required the jury to identify those mitigating circumstances that it *unanimously* finds have been proven to exist by a preponderance of the evidence. And this is also true of Arkansas Form 2A. But Maryland Section II instructions also requires a "No" entry if the jury finds that any one or more of the listed mitigating circumstances has (have) not been proven by a preponderance of the evidence. In *Mills,* for instance, the jury entered "No" with respect to each of the seven listed mitigating circumstances and also "none" in response to number 8, dealing with "other mitigating circumstances".

One of the bases of the *Mills* decision is that Section II did not make it clear that the "no" finding, like the "yes" finding had to be unanimous. Even though the Maryland Supreme Court had construed the instructions to require unanimity for both "yes" and "no" answers, Justice Blackmun, speaking for the majority, concluded that the jury may not have arrived at this "saving" construction. Note his language:

Petitioner challenged his conviction and sentence on various grounds, including an argument that the Maryland capital-punishment statute, Md.Ann.Code, Art. 27, § 413 (1987), as applied to him, was unconstitutionally mandatory. Petitioner construed the statute, as explained to the jury by the court's instructions and as implemented by the verdict form, to require the imposition of the death sentence if the jury

unanimously found an aggravating circumstance, but could not agree unanimously as to the existence of any particular mitigating circumstance. According to petitioner's view, even if some or all of the jurors were to believe *some* mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the *same* mitigating factor, the sentence necessarily would be death.

The Maryland Court of Appeals concluded that the imposition of petitioner's death sentence was constitutionally sound. The court did not dispute that if the statute and form were read as petitioner suggested, jurors *would be* improperly prevented from giving due consideration to mitigating evidence. The court, however, interpreted the statute differently and held that the requirement of unanimity applied to jury determinations of all critical issues including the acceptance *or rejection* of mitigating circumstances, observing that the verdict form was to be regarded as requiring the jury to agree unanimously in order to mark "no" with respect to the existence of each mitigating circumstance, and that the trial judge's instructions stressed the need for unanimity on all issues presented.

486 U.S. at 372, 108 S.Ct. at 1863–64 (emphasis added). Of course, if unanimity is required for the "no" vote there would be no problem because the "no" would show that *each and every* juror agreed that that mitigating circumstance had not been proven. And since all were marked "No" or "None" it could be concluded that no individual juror believed *any* mitigating circumstance to exist. But, if unanimity is not required, the argument in *Mills* would be obvious. Note Justice Blackmun's language:

> Petitioner's argument is straightforward, and well illustrated by a hypothetical situation he contends is possible under the Maryland capital sentencing scheme.
>
>> "If eleven jurors agree that there are six mitigating circumstances, the result is that no mitigating circumstance is found. Consequently, there is nothing to weigh against any aggravating circumstance found and the judgment is death even though eleven jurors think the death

penalty wholly inappropriate." Brief for Petitioner 11.
>
> The dissent below postulated a situation just as intuitively disturbing: All 12 jurors might agree that some mitigating circumstances were present, and even that those mitigating circumstances were significant enough to outweigh any aggravating circumstance found to exist. But unless all 12 could agree that the same mitigating circumstance was present, they would never be permitted to engage in the weighing process or any deliberation on the appropriateness of the death penalty. [*Mills v. State*], 310 Md. [33], at 79–81, 527 A.2d [3], at 25–26 [(1987)].

486 U.S. at 374, 108 S.Ct. at 1865.

The Arkansas forms avoid this problem. Part A of Form 2 requires the jury to check those mitigating circumstances which it *unanimously* finds probably existed at the time of the murders. Part B requires the checking of any mitigating circumstances that "one or more members of the jury believed ... probably existed, but the jury did not unanimously agree." And Part C requires the listing of mitigating circumstances as to which there was evidence "but the jury unanimously agreed that they did not exist at the time of the murder." And Part D states, "There was no evidence of any mitigating circumstances." So the Arkansas forms "cover the waterfront" with respect to mitigating circumstances. We know which mitigating circumstances *all* of the jurors agreed existed (Part A); we know which such circumstances *all* of the jurors agreed did not exist (Part C); and we know which such circumstances one or more jurors, but not all, believed existed (Part B). Section II of Maryland forms, as interpreted by the majority for the court in *Mills*, simply did not provide this information. And this created another problem when jurors were called upon to deal with Section III. It stated:

> Based on the evidence we unanimously find that it has been proven by A PREPONDERANCE OF THE EVIDENCE that the mitigating circumstances marked 'yes' in Section II outweigh the aggravating circumstances marked 'yes' in Section I.
>
> ___ ___
> yes no

Justice Blackmun comments:

> Under Maryland's sentencing scheme, if the sentencer finds that any mitigating circumstance or circumstances have been proved to exist, it then proceeds to decide whether those mitigating circumstances outweigh the aggravating circumstances and sentences the defendant accordingly. § 413(h). But if petitioner is correct, a jury that does not unanimously agree on the existence of any mitigating circumstance may not give mitigating evidence any effect whatsoever, and must impose the sentence of death.

486 U.S. at 375, 108 S.Ct. at 1865. So this brought the court back to a further discussion of the Maryland forms:

> If the jury understood the verdict form as the Court of Appeals asserted it should have, then every time it marked "no" beside a mitigating circumstance it indicated its unanimous conclusion that petitioner had not proved the relevant facts by a preponderance of the evidence, and thus the court properly upheld the judgment. On the other hand, if the jury understood that it should mark "no" when it failed to agree unanimously that a mitigating circumstance existed, then some jurors were prevented from considering "factors which may call for a less severe penalty." *Lockett v. Ohio*, 438 U.S., at 605, 98 S.Ct., at 2965, and petitioner's sentence cannot stand.

> \* \* \* \* \* \*

> The Judge then moved on to Section II of the form, which addresses the jury's determination of which, if any, mitigating circumstances exist.

> \* \* \* \* \* \*

> The jury was instructed to mark each answer "yes" or "no." Although it was clear that the jury could not mark "yes" in any box without unanimity, nothing the judge said dispelled the probable inference that "no" is the opposite of "yes," and therefore the appropriate answer to reflect an inability to answer a question in the affirmative. Nothing in the verdict form or the judge's instructions even arguably is construable

as suggesting the jury could leave answer blank and proceed to the next stage in its deliberations.

> The only place on the form where the jury had an opportunity to write anything more than "yes" or "no" was with respect to mitigating circumstance number eight, see Appendix to this opinion, [486 U.S. at 388–90, 108 S.Ct.], at 1872, which permits the jury to recognize as mitigating anything, in addition to the enumerated mitigating factors, that petitioner offered as a basis for a sentence less than death. The judge explained to the jury that if it found any such "other" mitigating circumstances, it must list them in the space provided, and "[i]f you find no other mitigating circumstance then you make no entry upon those lines under number eight." App. 73. No instruction was given indicating what the jury should do if some but not all of the jurors were willing to recognize something about petitioner, his background, or the circumstances of the crime, as a mitigating factor.

486 U.S. at 379, 108 S.Ct. at 1867–68. This interpretation in turn created problems when the jury took up Section III. As stated in *Mills*:

> Had the jurors that sentenced petitioner reached Section III, they would have found that even if they had read the verdict form as the Court of Appeals suggests they could have, and marked "yes" or "no" only on the basis of unanimity as to either, they were not free at this point to consider *all* relevant evidence in mitigation as they balanced aggravating and mitigating circumstances. Section III instructed the jury to weigh only those mitigating circumstances marked "yes" in Section II. Any mitigating circumstance not so marked, even if not unanimously rejected, could not be considered by any juror. A jury following the instructions set out in the verdict form could be "precluded from considering, *as a mitigating factor*, [an] aspect of a defendant's character or record [or a] circumstanc[e] of the offense that the defendant proffer[ed] as a basis for a sentence less than death," *Skipper v. South Carolina*, 476 U.S., [1] at 4, 106 S.Ct., [1669] at 1671,

[90 L.Ed.2d 1] if even a single juror adhered to the view that such a factor should not be so considered.

486 U.S. at 380, 108 S.Ct. at 1868 (emphasis in original).

Petitioners here argue that under the court's instructions and the Arkansas forms used, the jury in conducting the weighing function would believe it was confined to the consideration of those mitigating circumstances that it unanimously found to exist (Form 2, Part A). But the jury was instructed that in no event would it return a verdict imposing death unless it "unanimously make three particular written findings on Form 3" among which is:

"Second: That such aggravating circumstances outweigh beyond a reasonable doubt *any* mitigating circumstances found to exist." (Emphasis supplied).

And Form 3, "Conclusions," states *inter alia:*

"(b) ( ) the aggravating circumstances outweigh beyond a reasonable doubt *any* mitigating circumstances. (If you do not unanimously agree to check paragraph (b) then skip (c) and sentence [Ruiz/Denton] to life imprisonment without parole on Form 4." (Emphasis supplied)).

The pertinent instructions given by the state trial court must be read, side by side, with the pertinent Forms. Those instructions are as follows [Note: The trial court repeated all instructions separately for each defendant]:

Earl Van Denton has been found guilty of Capital Murder. After hearing arguments of counsel you will retire to deliberate and decide separately as to each defendant, whether he is to be sentenced to death or to life imprisonment without parole. In determining which sentence shall be imposed, you may be required to make specific written findings as to the existence or absence of aggravating or mitigating circumstances.

\*　　\*　　\*　　\*　　\*　　\*

As to each defendant there are three forms for you to use in reaching your decision, and a verdict form for you to use when your verdict has been reached. Form 1,

which will be handed to you later, deals with aggravating circumstances.

\*　　\*　　\*　　\*　　\*　　\*

If you do unanimously find one or more aggravating circumstances, you should then complete Form 2, which deals with mitigating circumstances. Form 2 lists some factors that you may consider as mitigating circumstances. However, you are not limited to this list. You may in your discretion find other mitigating circumstances.

Unlike an aggravating circumstance you are not required to be convinced of the existence of a mitigating circumstance beyond a reasonable doubt. A mitigating circumstance is shown if you believe from the evidence that it probably existed. Form 2 is made up of four parts, Part A is a list of mitigating circumstances to be checked only *if you unanimously agree that a particular circumstance existed.* Part B is a list to be checked *where some of you think a circumstance existed, but all do not agree.* Par C is a list to reflect circumstances of which there may have been some evidence, but no member of the jury feels that the circumstances existed. (Emphasis supplied.)

The last part, Form D, is to be checked only if the jury concludes that there is no evidence of mitigating circumstances.

After making the determinations required to complete Form 1 and Form 2, if applicable, you will then complete Form 3. In no event will you return a verdict imposing the death penalty unless you unanimously make three (3) particular written findings on Form 3. These are:

First: That one or more aggravating circumstances existed beyond a reasonable doubt.

Second: That such aggravating circumstances outweigh beyond a reasonable doubt *any mitigating circumstances found to exist.* (Emphasis added.)

Third: That the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

*If you make those findings* you will impose the death penalty, otherwise you will sen-

tence the particular defendant to life imprisonment without parole.

After you have made your determinations on Form 1 and 2 and have reflected your conclusions on Form 3, then you must check the appropriate verdict on Form 4. Each of you must sign each verdict form. I am going to read the Forms.

Form 1, Aggravating Circumstances.

\* \* \* \* \* \*

Form 2, Mitigating Circumstances:

*We unanimously find that the following mitigating circumstances probably existed at the time of the murder:* [eight listed] (Emphasis supplied).

\* \* \* \* \* \*

9. Other—specify in writing *any other circumstances* arising from the evidence *or other mitigating circumstances which you find to exist.* (Emphasis supplied).

Part B of Form 2, I will read.

If one or more members of the jury *believe that the following mitigating circumstances probably existed, but the jury did not unanimously agree:* [same eight listed] (Emphasis supplied).

\* \* \* \* \* \*

9. Other—specify in writing *any other circumstances* arising from the evidence *or other mitigating circumstances which you find to exist.* (Emphasis supplied).

Part C of Form 2.

There was evidence of the following mitigating circumstances, but the jury unanimously agreed that they did not exist at the time of the murder. These are the same, which I will read again. [eight listed]

\* \* \* \* \* \*

9. Other—specify in writing any *other circumstances* arising from the evidence *or other mitigating circumstances which you find to exist.* (Emphasis supplied).

B, part B:

There was no evidence of mitigating circumstances.

I want to add while I am here, now this has a place for the foreman, but all of you should sign these as I understand it.

Mr. CAMBIANO: That is correct, your Honor.

BY THE COURT: Everything has to be unanimous. Some forms have lines for all of you to sign.

BY THE COURT: (Cont.)

Form 3:

The jury, having reached it's final conclusion, will so indicate it by having it's foreman place a mark in the appropriate space in accordance with the jury's findings. In order to check any space your conclusions must be unanimous, that is, all twelve of you must agree. The foreman of the jury will then sign at the end of the form.

We, the jury, conclude.

A. One or more aggravating circumstances did exist beyond a reasonable doubt at the time of the commission of the Capital Murder.

If you do not unanimously agree to check Paragraph A, then skip to B and C, and sentence Earl Van Denton to life imprisonment without parole on Form 4.

B. *The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances.* If you do not unanimously agree to check Paragraph B, then skip to C and sentence Earl Van Denton to life imprisonment without parole on Form 4. (Emphasis supplied).

C. The aggravating circumstances justify beyond a reasonable doubt a sentence of death. If you do not unanimously agree to check Paragraph C, then sentence Earl Van Denton to life imprisonment without parole on Form 4.

If you have checked Paragraphs A, B and C, then sentence Earl Van Denton to death on Form 4, otherwise sentence Earl Van Denton to life imprisonment without parole on Form 4. That would be signed only by the Foreman, but your verdict still must be unanimous. I might have confused you awhile ago, I said all of you have to sign. Now, on this one you all will sign, which— that is—yes, you all will sign this one, Form 4. We, the jury, after careful deliberation have determined that Earl Van Denton shall be sentenced to:

A. Life imprisonment without parole.

B. Death.

Each juror must sign that form.

I will read now the same instructions as they pertain to Paul Ruiz. (Tr. 1479–1486) (emphasis added).

The same instructions were repeated with respect to the defendant Paul Ruiz, except ten specified mitigating circumstances were listed with No. 11 being the "catchall".

It should be pointed out that with respect to the catchall provisions on Forms A, B and C, the *instructions* were the same, to wit:

"Other—specify in writing any other circumstances arising from the evidence or other mitigating circumstances which you *find to exist*." (Emphasis supplied).

This instruction relates to Form 2 .Part A which starts off with the following language:

"We unanimously *find* that the following mitigating circumstances probably *existed* at the time of the murder" (Emphasis supplied).

and also to Form 2 Part B which starts off with the following language:

"One or more members of the jury *believed* that the following mitigating circumstances probably *existed* but the jury did not unanimously agree." (Emphasis supplied).

So the *instructions* with regard to each Part of Form 2 uniformly used the phrase "which you find to exit" even though Form 2 Part A uses the phrase "find ... existed" while Form 2, Part B uses the phrase "believed existed." This weakens petitioners attempted distinction which emphasizes the use of the term "find ... existed" in Form 2 Part A and suggests that the jurors would have felt compelled, when weighing the aggravating circumstances against the mitigating circumstances, to use only those mitigating circumstances which the jury unanimously found to exist. But, the language of Form 3(b) does not support that contention. It states:

"The aggravating circumstances outweigh beyond a reasonable doubt *any mitigating circumstances*." (Emphasis supplied).

The Arkansas Supreme Court dealt with the *Mills* argument in *Pickens v. State*, 301 Ark. 244, 783 S.W.2d 341 (1990) as follows:

The second argument concerning AMCI 1509 is based on the recent United States Supreme Court case of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The court held there was a defect in the language of Maryland's sentence determination forms. Section II of the forms reads as follows:

Based upon the evidence, we unanimously find that each of the following mitigating circumstances which is marked "yes" has been proved to exist.

There follows a list of seven mitigating circumstances with blanks beside each marked "yes" or "no." Then in the determination of sentence section, the instruction reads as follows:

If Section II was completed and all of the answers were marked "no" then enter death.

The Court found this language implied that if the jury did not unanimously agree on the existence of any single mitigating circumstance, it must impose the death sentence. There was a substantial probability that the jurors did not consider all mitigating evidence.

■ The appellant claims there is no meaningful difference between the Maryland and Arkansas sentencing forms, but they are, in fact, very different. Our Form 2, which accompanies AMCI 1509, expressly allows the jury to list mitigating circumstances which were found by some, though not all, of its members. Form 3 then allows the jury to determine if the aggravating circumstances outweigh *any* mitigating circumstances. Nothing in the forms indicates to the jury that a mitigating circumstance must be found unanimously before it may be considered in the weighing process. The potential for misunderstanding is not present in the Arkansas forms as it is in the Maryland forms. Therefore, we reject the appellant's argument.

This Court agrees with the Arkansas Supreme Court. Petitioners in their argument make too much of the words "find" and

"found to exist." The forms and the instructions do not, fairly and reasonably read, limit the jury in its consideration during the "weighing" or "justification" process to those mitigating circumstances unanimously found to exist. Form 2, Part B, particularly emphasizes that each individual juror should list any mitigating circumstances he or she believed probably existed, even if no other juror agreed. Then at the balancing or weighing stage the jurors are to consider "any mitigating circumstances." [Form 3]

The petitioners' argument is certainly not frivolous. Indeed, the Court agrees with petitioners that it would be better if the instructions with respect to Form 3 included something like the following:

"The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances [Note: In this weighing process each juror may take into consideration any mitigating circumstances that that juror believes to have existed even though some or all of the remaining jurors disagree with him or her. So if one or more of the jurors believe that the aggravating circumstances do *not* outweigh beyond a reasonable doubt any mitigating circumstances then skip to Form 4 and sentence [the defendant] to life without parole.]"

This may be "gilding the lily" but where would such gilding be more justified?

The question here under *Boyde* is whether there is a reasonable likelihood that the jury applied the challenged instructions and forms in a way that prevented it from considering any constitutionally relevant evidence. The court concludes that there is no such reasonable likelihood under the facts and circumstances of this case. Was there the possibility that one or more of the jurors might have so misconstrued the instructions and the forms? The answer is "yes", but this is not the test.

If this Court is wrong on the petitioners' *Mills v. Maryland* argument, is that argument procedurally barred? Although the Court views it as a close question, it concludes that this issue was "fully and fairly" presented at trial and that on appeal a decision was rendered on the merits without an assertion by the state of a procedural bar or any reliance on such a bar. In the state trial court, the argument was intertwined with petitioners' contentions with respect to proffered instructions Nos. 43 and 44. *See supra.* During counsel's objections to the trial court's refusal to give those instructions, he stated:

These decisions say that mercy is a factor that the jury is to use in its deliberations, and we would ask for a jury instruction on this. (T. 1461)

The next one is AMCI 1509, Form 3 on Conclusions. We have changed the last paragraph in there that if you check A, B, and C, you may sentence Paul Ruiz to death. And these, by the way, should be proffered for both Ruiz and Van Denton . . .

It has the explanation at the bottom that you are never required to give the death penalty. We feel that is important, because a jury, as the State has—as the AMCI is now, if they check all three of those items, they must give the death penalty according to Arkansas law, apparently, as the Court reads it, and this is a mandatory death penalty.

We feel that the jury may misinterpret what the law is and feel if they sign those they have to give the death penalty, even though they have—for mercy reasons they do not want to do so. I see no prejudice whatsoever in putting 'may' in there instead of 'shall' give the death penalty, because if a person does not want to give the death penalty, he does not have to and I think that is important and should be in there. I would cite *Woodson v. North Carolina,* 428 U.S. 280, [96 S.Ct. 2978, 49 L.Ed.2d 944] a (1976) case, and *[Francis] v. Franklin,* 471 U.S. 307 [105 S.Ct. 1965, 85 L.Ed.2d 344] (1985) which states that a jury instruction that creates a mandatory presumption whereby the jury must in further presumption, presume fact if the State proves certain predicate facts and violates the due process clause. (T. 1462, 1463)

Defense counsel, in addition to his "mandatory death penalty" and "due process" arguments, also argued the Eighth Amendment,

citing *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) T. 1463. *Sumner* held that the *Lockett* principle was violated by a statutory sentencing procedure which allowed imposition of the death penalty without requiring the jury to consider all mitigating evidence. The trial court cut off counsel, but it did recognize that if the jury checked "yes" on part C it would in effect be imposing the death penalty. The trial judge's answer was that if the jury did not want to impose the death penalty it could simply not mark "yes." In response, defense counsel stated:

> If they do not want to give the death penalty period, and they absolutely—they do not feel like they do want to give the death penalty it would—whether they filled out all three of them—if they did fill out all three, and they still didn't want to give the death penalty, this juror would feel like he has to give the death penalty even though he does not want to.
>
> I realize the Court is saying he doesn't have to check C if he didn't want to give the death penalty, but the jurors—these are complicated instructions and they may not always understand what is going on. I think it is misleading the jury into thinking that some juror may think that they have to give the death penalty in that instance, where you do not—under no circumstances do you have to give the death penalty. (T. 1463)

Although not as precise as one would hope, the issue was raised. Compare with the trial objections in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The Court has read those portions of petitioners' brief on direct appeal identified as points 14 and 15 and concludes that the issues were presented to, and necessarily rejected by, the state courts without any reliance on procedural bar. It is true that the Arkansas Supreme Court's opinion does not discuss the *Lockett–Mills* issue, but the issue was fully and fairly presented.

■■■ There is no contemporaneous objection rule in Arkansas with respect to the duty of the trial court to properly instruct the jury concerning sentencing in capital cases. See *Collins v. State,* 261 Ark. 195,

216, 548 S.W.2d 106 (1977) in which the Arkansas Supreme Court pointed out that errors in instructions in such cases would be recognized on appeal even though a proper instruction was not requested and even if the "objectionable action which might be reversible error was not argued on appeal in any way." *See also Gruzen v. State,* 267 Ark. 380, 389, 591 S.W.2d 342 (1979).

The Court agrees with petitioners that this issue is not procedurally barred. Nevertheless, as explained above, the Court agrees with respondent on the merits of that issue.

Having demonstrated how the Arkansas Sentencing Phase procedures work in practice, and having carefully observed the interrelationship between the Court's instructions and the sentencing forms used, we are now in a position to deal with petitioners' contention that the state trial court erred in denying proffered instructions Nos. 43 and 44. In its last decision in this case in 1989, the Arkansas Supreme Court dealt with this issue as follows:

> The trial court rejected appellants' proposed jury instructions which were altered versions of AMCI 1509, using instead the standard AMCI 1509 without modifications. The changes proposed by appellants substituted the word "may" for "will" in instructing the jury in choosing between death or a lesser penalty. Appellants contend that the wording of AMCI 1509 imposes a mandatory death penalty. We disagree.
>
> The wording of the instructions is such we believe, that a jury readily understands that it has the option of a lesser penalty. The instructions tell the jury that "in no event' will it return a verdict of death unless it unanimously makes three written findings which include a finding that "the aggravating circumstances justify beyond a reasonable doubt the sentence of death." Thus a jury is told that it may reject the death penalty simply by declining to make the essential finding. This same argument, in varying shades, has been rejected repeatedly in prior cases: *Starr v. State,* 297 Ark. 26, 759 S.W.2d 535 (1988); *Burnett v. State,* 295 Ark. 401, 749 S.W.2d 308 (1988); *Hill v. State,* 289 Ark. 387, 713

S.W.2d 233 (1986); *Clines, et al v. State,* 280 Ark. 77, 656 S.W.2d 684 (2983); *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106 (1977).

*Ruiz v. State,* 299 Ark. at 164, 772 S.W.2d 297. In 1990 the Arkansas Supreme Court dealt with similar arguments in *Pickens v. State,* 301 Ark. 244, 783 S.W.2d 341 (1990) as follows:

> The primary issue on appeal is whether AMCI 1509 is unconstitutional. The instruction and accompanying forms, which are used to determine the sentence in capital cases, tell the jury that in no event may a sentence of death be imposed unless three findings are unanimously made: 1) that one or more aggravating circumstances exist beyond a reasonable doubt; 2) that the aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found to exist; and 3) that the aggravating circumstances justify beyond a reasonable doubt the sentence of death. It is the third finding with which the appellant takes issue. He claims its language should have been altered so the jury might weigh the mitigating circumstances at all phases of deliberation. He proffered the following instruction:
>
> > That the aggravating circumstances *when weighed against the mitigating* justify beyond a reasonable doubt the sentence of death. (Emphasis added to show modification.)
>
> ▮ The judge rejected the proposed instruction, and rightfully so. There is no need to weigh the mitigating circumstances again in the third finding. AMCI 1509 takes the jury through a three-step process. The jury may not proceed to the third step unless it has already decided that the aggravating circumstances outweigh the mitigating. The third finding allows the jury to reject the death penalty *in spite of* the fact that the aggravating circumstances outweigh the mitigating. *See Ruiz v. State,* 299 Ark. 144, 772 S.W.2d 297 (1989); *Clines v. State,* 280 Ark. 77, 656 S.W.2d 684 (1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984).

▮ We also note that the judge agreed to instruct the jury "if you make those findings you may [rather than will] impose the death penalty." This modification was favorable to the defendant, but it was not legally necessary. *See Ruiz v. State, supra.*

The United States Supreme Court appears to have given sanction to these conclusions.

The Court agrees with respondent that *Boyde v. California,* 494 U.S. 370, 372–78, 110 S.Ct. 1190, 1194–1196, 108 L.Ed.2d 316 (1990) and *Blystone v. Pennsylvania,* 494 U.S. 299, 305–07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990) effectively disposes of petitioners' arguments with respect to their proposed instruction Nos. 43 and 44. In *Boyde,* Chief Justice Rehnquist, for the majority, discussed a very similar issue:

> At the penalty phase of the trial, the jury was instructed, *inter alia,* in accordance with instructions 8.84.1 and 8.84.2, 1 California Jury Instructions, Criminal (4th ed. 1979) (CALJIC), both of which have since been amended. The former lists 11 factors that the jury "shall consider, take into account and be guided by" in determining whether to impose a sentence of death or life imprisonment. The eleventh is a "catch-all," factor (k), which reads: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The court's concluding instruction, pursuant to CALJIC 8.84.2, again told the jury to consider all applicable aggravating and mitigating circumstances and followed with this direction: "if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall impose* a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you *shall impose* a sentence of confinement in the state prison for life without the possibility of parole." (emphasis added.)
>
> \* \* \* \* \* \*
>
> With regard to the "shall impose" language of CALJIC 8.84.2, the state court agreed with petitioner that the instruction could not permissibly require a juror to vote for the death penalty " 'unless, upon

completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances.'" *[People v. Boyde],* 46 Cal.3d [212], 253, 250 Cal.Rptr. [83], at 106, 758 P.2d [25], at 48 [(1988)] (quoting *People v. Brown,* 40 Cal.3d 512, 541, 230 Cal.Rptr. 834, 849, 726 P.2d 516, 531 (1985)). It concluded, however, that in this case "[t]he jury was adequately informed as to its discretion in determining whether death was the appropriate penalty." 46 Cal.3d, at 253, 250 Cal.Rptr., at 106, 758 P.2d, at 48. Three justices dissented from the court's affirmance of the death sentence. The dissenters argued that the mandatory feature of instruction 8.84.2 misled the jury into believing that it was required to impose the death penalty if the aggravating factors "outweighed" the mitigating factors, even though an individual juror might not have thought death was the appropriate penalty in this case. *Id.,* at 257–266, 250 Cal.Rptr., at 109–115, 758 P.2d, at 51–57. We granted certiorari, 490 U.S. [1097], 109 S.Ct. 2447, 104 L.Ed.2d 1002 (1989) and now affirm.

Petitioner reiterates in this Court his argument that the mandatory nature of former CALJIC 8.84.2 resulted in a sentencing proceeding that violated the Eighth Amendment, because the instruction prevented the jury from making an "individualized assessment of the appropriateness of the death penalty." See *Penry v. Lynaugh,* 492 U.S. [302] [318–20], 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989). Specifically, Boyde contends that the "shall impose" language of the jury instruction precluded the jury from evaluating the "absolute weight" of the aggravating circumstances and determining whether they justified the death penalty. He further asserts that the jury was prevented from deciding whether, in light of all the aggravating and mitigating evidence, death was the appropriate penalty. In response, the State argues that the sentencing proceeding was consistent with the Eighth Amendment, because a reasonable juror would interpret the instruction as allowing for the exercise of discretion and moral judgment about the appropriate penalty in the process of weighing the aggravating and mitigating circumstances.

We need not discuss petitioner's claim at length, because we conclude that it is foreclosed by our decision earlier this Term in *Blystone v. Pennsylvania,* 494 U.S. [299], 110 S.Ct. 1078, [108] L.Ed.2d [255] (1990). In *Blystone,* we rejected a challenge to an instruction with similar mandatory language, holding that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Id.,* at [307], 110 S.Ct. at 1083. Although Blystone, unlike Boyde, did not present any mitigating evidence at the penalty phase of his capital trial, the legal principle we expounded in *Blystone* clearly requires rejection of Boyde's claim as well, because the mandatory language of CALJIC 8.84.2 is not alleged to have interfered with the consideration of mitigating evidence. Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances "outweigh" the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion). Petitioner's claim that the "shall impose" language of CALJIC 8.84.2 unconstitutionally prevents "individualized assessment" by the jury is thus would merit.

494 U.S. at 377, 110 S.Ct. at 1194–1196. And we know from the discussion of the *Mills* issue, *supra,* that the instructions, as given, and the Forms used, did not interfere with the jury's, or any individual juror's, consideration of any of the mitigating evidence or any mitigating circumstances.

The Court concludes that the issues raised by the petitioners under Point XIV are without merit.

## XV.

### THE TRIAL COURT'S REFUSAL TO GIVE PETITIONERS' PROFFERED JURY INSTRUCTION NO. 41 REGARDING LINGERING DOUBT DENIED PETITIONERS THEIR EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

Petitioners contend that they were entitled to have the court issue the following instruction to the jury:

> You may consider as a mitigating circumstance any residual or lingering doubt you may have about Mr. Ruiz's guilt, if in fact you have such a doubt.
>
> Lingering or residual doubt differs from reasonable doubt. Mr. Ruiz has already been found guilty beyond a reasonable doubt. Yet, some lingering or residual doubt may still exist. It may reflect a mere possibility and may exist only in the mind of one juror or several. This residual or lingering doubt is the absence of absolute certainty about guilt, and can be a valid reason for not imposing the penalty of death.
>
> Unless each and every one of you can say with certainty that you do not possess a residual or lingering doubt as to the guilt of Paul Ruiz, then you must consider this residual doubt as a mitigating circumstance that is to be considered by you in determining the appropriate punishment in this case."

Tr. 1468. A similar instruction was offered for Mr. Denton. Tr. 1467. The Court denied the instructions. Tr. 1460. Arguing that the need for higher standards and a higher degree of reliability in capital cases, petitioners contend that this refusal was error.

This issue has been addressed by the United States Supreme Court:

> At the outset, we note that this Court has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation. Petitioner suggests that our discussion of the 'residual doubt' question in *Lockhart v. McCree*, 476 U.S. 162, 180–182, 106 S.Ct. 1758, 1768–1770, 90 L.Ed.2d 137

(1986), supports his position that he has such an entitlement ... *Lockhart* did not endorse capital sentencing schemes which permit such use of 'residual doubts,' let alone suggest that capital defendants have a *right* to demand jury consideration of 'residual doubts' in the sentencing phase.

*Franklin v. Lynaugh*, 487 U.S. 164, 173, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988). In light of that language, this Court concludes that there is no constitutional right to a "residual doubt" jury instruction. Petitioners' contention is without merit.

Under Arkansas procedures, the trial court has broad discretion in determining whether to grant a new trial and that decision is not reversed absent a clear showing of abuse of that discretion. *Chism v. State*, 312 Ark. 559, 572, 853 S.W.2d 255 (1993). The trial court's observations and reasoning are set forth in the record. Petitioners have failed to show an abuse of discretion in the trial court's denial of the motion for a new trial.

## XVI.

### THE TRIAL COURT'S FAILURE TO GRANT A NEW TRIAL IN THIS MATTER VIOLATED PETITIONERS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

Under this point petitioners argue that the state trial court's refusal to grant a new trial when presented with each of the arguments set forth separately in their amended petition constituted constitutional error.

Under Arkansas procedures, the trial court has broad discretion in determining whether to grant a new trial and that decision is not reversed absent a clear showing of abuse of that discretion. *Chism v. State*, 312 Ark. 559, 572, 853 S.W.2d 255 (1993). This Court has reviewed the trial court's observations and reasoning and concludes that there was not an abuse of discretion in denying the motion for a new trial. The Court also notes that this Circuit does not recognize cumulative error as a basis for federal habeas corpus relief. "Each claim of constitutional de-

privation ... must stand on its own." *Byrd v. Armontrout,* 880 F.2d 1, 11 (8th Cir.1989) (quoting *Lee v. Lockhart,* 754 F.2d 277, 279 (8th Cir.1985)).

There is no merit in this contention.

## XVII.

THE FAILURE OF THE TRIAL COURT TO DISMISS THE FELONY INFORMATION VIOLATED PETITIONERS' FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

 Petitioners argue that the information filed in this case was constitutionally defective because it was not presented to and approved by a grand jury. Claiming that the information thus violates the Fifth Amendment's requirement of indictment by a Grand Jury, Petitioners assert that the trial court erred in denying a motion to dismiss filed on this basis.

In *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 111, 116–17, 28 L.Ed. 232 (1884), the United States Supreme Court held that the Due Process Clause did not make applicable to the States the Fifth Amendment's requirement that all prosecutions for an infamous crime be instituted by the indictment of a grand jury. In the more than 100 years since *Hurtado,* the Court has concluded that a number of the procedural protections in the Bill of Rights were made applicable to the States by the Fourteenth Amendment, but the Fifth Amendment's grand jury requirement has never been so incorporated and *Hurtado* remains the law of the land. *See Albright v. Oliver,* —— U.S. ——, ——, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994). The trial court did not err in denying the motion to dismiss.

## XVIII.

THE TRIAL COURT'S EXCUSAL FOR CAUSE OF PROSPECTIVE PETIT JURORS FOR REASONS PERTAINING TO THEIR VIEWS ON THE DEATH PENALTY VIOLATED PETITIONERS' SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

 Petitioners argue that the trial court erred in excusing two venirepersons for cause, Ms. Grace Williams and Ms. Flo Hessenbein. In fact, only Ms. Grace Williams was excused by the trial court for cause. The state used one of its peremptory strikes to excuse Ms. Flo Hessenbein. For the reasons stated below, neither of these excusals was error.

With regard to Ms. Flo Hessenbein, Petitioners' own argument implicitly recognizes that there was no error in the state's use of a peremptory to strike her. Petitioners' argue in their original petition, believing erroneously that Ms. Hessenbein was stricken for cause, that "[a]lthough the prosecutor may have been uncomfortable with [Ms. Hessenbein's] hesitancy to impose the death penalty, the appropriate remedy was the exercise of a peremptory challenge." That is precisely what happened. Ms. Hessenbein, after initially stating that she could not vote for the death penalty (Tr. 476), was rehabilitated by defense counsel and finally stated that she could impose the death penalty "[i]f she thought it was the right thing to do." Tr. 483. At that point, the trial judge denied the state's motion to excuse her for cause and the state elected to exercise one of its peremptory challenges to strike Ms. Hessenbein. No error exists here.

 Ms. Grace Williams was excused by the trial court after she stated after extensive questioning, which included defense counsel's attempt to rehabilitate her: "I don't think I could sentence anybody to death." (Tr. at p. 494). This is not error. Petitioners' reliance on *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1986) is misplaced. The venire member in *Gray* who was improperly stricken for cause had clearly stated that she had no conscientious scruples against the death penalty and could vote for the death penalty in a given case. *Gray,* 481 U.S. at 653–54, 107 S.Ct. at 2049. Accordingly, the venire member in *Gray* qualified to be seated as a juror under the standard imposed by *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Under *Wainwright,* the relevant inquiry in determining whether a potential jury is properly excused for cause based on his or her views on capital punishment is "whether

the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct., at 852 (*quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). Under the standard enunciated in *Wainwright*, Ms. Williams did not qualify to serve on the jury panel as she stated that she could not impose a sentence of death. Accordingly, the trial judge properly excused Ms. Williams for cause. Further, although this case does not present a close issue, the Court notes that a trial judge's decision to excuse a potential juror for cause is a factual determination which is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Wainwright*, 469 U.S. at 428–29, 105 S.Ct. at 854–55.

## XIX.

THE TRIAL COURT'S REFUSAL TO ALLOW PETITIONERS' COUNSEL TO VOIR DIRE PROSPECTIVE PETIT JURORS ON THE PRESUMPTION OF LIFE WITHOUT PAROLE IN THIS CAPITAL MURDER RESENTENCING TRIAL VIOLATED PETITIONERS' SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS

■ During voir dire, petitioners' counsel sought to ask prospective jurors whether they could "presume that [petitioners] are to receive life without parole unless and until the State proves beyond a reasonable doubt that the death penalty is appropriate." (T.Tr. 825). The trial court refused to allow counsel to so inquire. Petitioners now contend that this refusal was error.

■ Respondent argues that this issue is procedurally barred. Respondent contends that because Ruiz and Denton failed to comply with Arkansas' requirement that issues be raised at the first opportunity, they are procedurally barred from obtaining relief from this Court pursuant to the holding of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and its numerous progeny.

It is true that petitioners did not raise this issue until well into the jury selection process. However, taken to its logical conclusion, criminal defendants would be procedurally barred from asking any prospective juror any question not asked of the very first prospective juror. Or, if a criminal defendant made a strategic choice not to raise a hearsay objection to the first witness's testimony, he would have waived his right to make objections as to hearsay for the remainder of the trial. This would be an absurd application of the "raise at the first opportunity" rule.

Alternatively, respondent notes that the Arkansas Supreme Court found that Ruiz and Denton *were* procedurally barred from obtaining relief on this issue because they did not make their request to ask this particular question until well after the voir dire of the veniremen had begun:

> "Appellants' final point is that they should have been allowed to ask the jury panel on voir dire whether they could obey a presumption that appellants were entitled to life without parole unless the state proved beyond a doubt that they deserved the death penalty ... In any case, the argument is waived. While ostensibly arguing that the issue was important enough that all jurors be voir dired on the matter, the request was not made until after the tenth juror was selected. Failing to make the request at the first opportunity, the argument is waived."

*Ruiz v. State*, 299 Ark. 144, 772 S.W.2d 297 (1989). Because the Arkansas Supreme Court explicitly stated that Ruiz and Denton failed to comply with Arkansas' requirement of bringing their request to the trial judge's attention in a timely manner, respondent asserts the Arkansas Supreme Court's procedural bar holding is an alternative rationale.

This Court must agree. Whether the Arkansas Supreme Court was mistaken in finding a waiver is immaterial. Its determination of a waiver satisfies the 'plain statement' requirement and forecloses federal habeas review of petitioners' claim. *Harris v. Reed*, 489 U.S. 255, 262–63, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).

**1552**

■ Even were the claim not procedurally barred, this Court would not grant relief on the merits.

Once the issue was raised, petitioners argued that

> ... in order for a person to get the death penalty there has to be aggravating circumstances, and they have to be proved beyond a reasonable doubt. Before they are proved beyond a reasonable doubt, there has to be some presumption that the defendants should receive life without parole. It's analogous to the presumption of innocence, and I think that's an important constitutional right that the defendants have. We want to know if the jury can follow that.

Tr. 825–26. The court refused to allow counsel to ask such a question of prospective jurors. Tr. 829. Ten jurors had been impaneled prior to the above discussion. After raising the issue, counsel for petitioner Ruiz asked the next prospective juror the following series of questions:

> Q. Okay, good. Now, we've got aggravating and mitigating circumstances. The State is going to ask for the death penalty. They are going that you consider some aggravating circumstances. Before you can consider those aggravating circumstances, they have to prove them to you beyond a reasonable doubt. Can you hold them to that burden and make them prove them to you beyond a reasonable doubt?
>
> A. Yes.
>
> Q. Do you understand that in no circumstances are you required to give a death penalty?
>
> A. Yeah.

Tr. 834. Some time later, after several more jurors had been questioned and excused, counsel for petitioner Ruiz again raised the issue of whether he could voir dire with respect to a presumption of life imprisonment without the possibility of parole:

> For the record I would like to ask these prospective jurors, 'Do you understand if there is a presumption in this case, that the appropriate sentence is life without parole, and that this presumption should continue and prevail in your minds unless

an until you become convinced beyond a reasonable doubt that the death penalty is appropriate.' I believe the appropriate sentence in this case is presumed to be life without parole, in that the burden of proof is on the State in the absence of any evidence, as is the case right now. A proper verdict would be life without parole. The death penalty can only be imposed if the jury finds that aggravating circumstances exist, that they outweigh any mitigating circumstances, and that death would be an appropriate punishment. This is an analogous (sic) to the presumption of innocence in the guilt/innocence phase of a trial. I believe that this is a correct statement of the law, and that I'm entitled to ask all the prospective jurors this question. Further I believe that the Court refuses to allow me to ask that question, and is holding that this presumption does not exist.

Tr. 856. The Court responded in a manner consistent with its earlier ruling:

> With a few modifications, I don't see why you couldn't. It's just that you are trying to implant in their mind that right now the sentence is life without parole, that's I (sic); and we are here to see if the State can prove they should get the death penalty. Now, that's the way I interpret your questions, and the intent of your questions.

Tr. 857. In other words, the Court thought it was perfectly acceptable to inquire whether a juror would hold the State to its burden of proof, but not to presume a life sentence.

With the remaining prospective jurors, counsel for petitioners often voir dired on whether the juror would hold the prosecution to their burden of proof and on whether they understood that the death penalty is never required:

> ... Now, the State will prove—will attempt to prove aggravating circumstances ... Now, do you understand that they must prove those beyond a reasonable doubt? Tr. 885.

\* \* \* \* \* \*

You also realize that under no circumstances are you required to give the death penalty? Tr. 885.

\*　　\*　　\*　　\*　　\*　　\*

... Also, I anticipate the Judge is going to tell you that in order for you even to consider their aggravating circumstances, they have to prove them to you beyond a reasonable doubt. Will you make the State prove them to you beyond a reasonable doubt? Tr. 943.

\*　　\*　　\*　　\*　　\*　　\*

And if they don't prove them beyond a reasonable doubt, will you go ahead give (sic) life without parole? Tr. 943.

\*　　\*　　\*　　\*　　\*　　\*

"Do you understand that you are never required to give the death penalty under any circumstances?" Tr. 943.

Indeed, in voir diring some jurors, counsel for petitioner asked the very questions that the Court had ruled impermissible:

All right. I anticipate that the instruction my (sic) be given to you—do you understand that there is a presumption in this case that the appropriate sentence is life without parole, and that presumption should continue and prevail in your mind until such time, or unless such time, you become convinced beyond a reasonable doubt that the State has met their burden and that death is the appropriate sentence. Tr. 866.

\*　　\*　　\*　　\*　　\*　　\*

Can you presume that these defendants are innocent—well, they are not innocent, but that their sentence should be life without parole until, and unless and until the State proves that they should be sentenced to death? Tr. 907.

\*　　\*　　\*　　\*　　\*　　\*

..."Do you realize that you are to presume that there is life without parole until such time that the State proves to you that it should be death, and not life without parole, if they prove that beyond a reasonable doubt? So if they don't prove it to you, it's life without parole." Tr. 975.

The jurors were allowed to answer all of these questions and no objections were made by the State.

Petitioners cite this Court to *Morgan v. Illinois,* —— U.S. ——, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), arguing that the voir dire sought in this case is equivalent to the voir dire sought in *Morgan.* This Court cannot agree. *Morgan* concerned "reverse *Withers* " or "life-qualifying" voir dire. Specifically, counsel in *Morgan* (after seven members of the first venire had been questioned) sought to ask all prospective jurors the following question: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" —— U.S. at ——, 112 S.Ct. at 2226. Finding that a "juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do", *Id.* —— U.S. at ——, 112 S.Ct. at 2229, the Court held that the refusal of the trial court to allow inquiry in this area violated the defendant's Fourteenth Amendment right to due process of law. *Id.* —— U.S. at ——, 112 S.Ct. at 2235.

In the instant case, counsel was allowed to "life-qualify" the jury. In fact, several prospective jurors were excused for cause because they stated, in response to questioning by counsel, that there were certain cases that they thought the death penalty should be mandatory. The questioning and discussion about the questioning of Juror Freeman consists of approximately twenty-seven pages of transcript. The following are examples of questions the trial court permitted:

Do you think there are certain types of murders, real bad murders that would require you to give—that do require the death penalty? Tr. 922.

\*　　\*　　\*　　\*　　\*　　\*

Do you think there are certain types of crimes that you think that you would have to give the death penalty on, certain types of murders, real bad murders? Well, let me ask you this. Think in your mind of the worst murder you can think of, say it involved small children or whatever, a brutal murder, do you think there are certain

types of murders that you think you would have to find the death penalty every time on? Tr. 922.

\* \* \* \* \* \*

Do you feel that you would be required to impose the death penalty in this case? Tr. 926.

\* \* \* \* \* \*

... If the Court instructs you that there— if there was an instruction, I'm not saying the Court will, but if the Court did instruct you that you are to set aside your beliefs and that some—that there is no murder for which there is a mandatory death penalty, could you still go along with that? Tr. 928.

Juror Freeman was eventually excused for cause because he stated that "he would disregard certain of the Court's instructions if they did not agree with his own interpretations." Tr. 937.

Later, Juror Malak was questioned in part as follows:

"Are there certain murders that you think are so heinous and so bad that you think the death penalty should be mandatory for them?" Tr. 976.

\* \* \* \* \* \*

"You can listen to any murder and listen to the case and then make up your mind, that's fine. But are there some murders that you just don't think there is any excuse for, that you would give the death penalty on?" Tr. 976–77.

After counsel for petitioners argued that this indicated an inability to follow the law in certain capital murder cases, the trial court ruled: "If I'm going to be consistent, I will have to excuse her. She will be excused." (T.Tr. 978).

Unlike *Morgan,* counsel in this case was permitted free reign to question the jury as to any feelings about a mandatory death penalty, even in abstract, hypothetical cases.

This Court has been able to find no authority for the proposition that a defendant found guilty of capital murder is "presumed" to have a life sentence. We know that there is such a thing as being "actually innocent" of the death penalty. *See, e.g., Sawyer v. Whit-*

*ley,* —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). We know that under Arkansas law, the prosecution must prove at least one statutory aggravating factor beyond a reasonable doubt before the jury may consider the death penalty. Ark.Code Ann. § 5–4–603. In some ways, the sentencing phase determination of life or death is analogous to the guilty phase determination of guilt or innocence. Analogous, but not identical. Aggravating and mitigating circumstances are *sentencing* factors. This Court is unwilling to declare that there is a presumption of a life sentence after a defendant is found guilty of capital murder in the same way that there is a presumption of innocence in a guilt/innocence trial.

Even if there were such a presumption, there would be no error in this case. There is simply no evidence before the Court that petitioners were prejudiced by the trial court's refusal to allow the questioning to use the phrase "presumption".

■ Under Arkansas law, the extent and scope of voir dire examination is "largely a matter lying within the sound judicial discretion of the trial judge and the latitude of that discretion is rather wide." *Finch v. State,* 262 Ark. 313, 556 S.W.2d 434, 436 (1977). The trial court's limitations or restrictions of voir dire will not be reversed on appeal, unless that discretion is clearly abused. *Id.*

■ It is clear that counsel in this case was allowed to "life-qualify" the jury. It is clear that counsel was allowed to question as to burdens of proof. The refusal to allow the word "presumption" was not a clear abuse of discretion, especially in light of the lack of any precedent establishing a "presumption" of life without parole. Furthermore, the jury was thoroughly instructed as to the burdens of proof at the close of the proceeding:

I'm going to define a term for you, and later on give you the burden of proof which each party has. The burden of proof on the State is reasonable doubt. They must prove beyond a reasonable doubt certain elements which I will go over with you later.

\* \* \* \* \* \*

Form 1, which will be handed to you later, deals with aggravating circumstances. The appearance of any particular aggravating circumstance on the form does not mean that it actually existed in this case. These are specified by law and are the only aggravating circumstance (sic) that you may consider. The State has the burden of proving beyond a reasonable doubt that one or more of the listed aggravating circumstance (sic) existed at the time of the commission of the Capital Murder. If you find unanimously and beyond a reasonable doubt that one or more of these aggravating circumstances existed, then you will indicate your findings by checking the appropriate spaces on Form 1. If you do not unanimously find beyond a reasonable doubt the existence of any aggravating circumstance, then you will cease deliberations and indicate on the verdict forma sentence of life imprisonment without parole.

\* \* \* \* \* \*

After making the determinations required to complete Form 1 and Form 2, if applicable, you will then complete Form 3. In no event will you return a verdict imposing the death penalty unless you unanimously make three (3) particular written findings on Form 3. These are:

First: That one or more aggravating circumstances existed beyond a reasonable doubt.

Second: that such aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found to exist.

Third: That the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

If you make those findings you will impose the death penalty, otherwise you will sentence the particular defendant to life imprisonment without parole.

Tr. 1478–81.

Counsel was allowed to question as to burdens of proof and mandatory imposition of the death penalty. The jury was thoroughly instructed as to the law. There is simply no demonstration of prejudice in the record be-

fore the Court, and thus this Court would not grant relief on this issue even if it did not believe the issue to be procedurally barred.

## XX.

THE PETITIONERS' CONVICTIONS AND DEATH SENTENCES WERE AFFIRMED AS A RESULT OF THE ARKANSAS SUPREME COURT'S FAILURE TO SEARCH THE RECORD FOR ERRORS NOT RAISED ON APPEAL AS MANDATED BY STATE PROCEDURE AND IN SAID COURT'S FAILURE TO CONDUCT A COMPARATIVE REVIEW OF THIS CAPITAL CASE AS AGAINST OTHER CAPITAL CASES IN ARKANSAS, IN VIOLATION OF PETITIONERS' RIGHTS UNDER THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS

 Petitioners point out that a death penalty must be imposed in a rational and consistent manner, and only in those cases where such extraordinary punishment is proportional to the circumstances and the severity of the crime. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Arkansas procedure requires the Arkansas Supreme Court to review the entire record on appeal in cases where either a sentence for life imprisonment or death was imposed. *See* A.R.Cr.P. Rule 36.24 ("The Supreme Court need only review those matters briefed and argued by the appellant provided that where either a sentence for life imprisonment or death was imposed, the Supreme Court shall review the entire record for errors prejudicial to the right of the appellant."); Ark. Code Ann. § 16–91–113(a) (1987) (formerly codified as Ark.Stat.Ann. § 43–2725) ("The Supreme Court need only review those matters briefed and argued by the appellant, except that, where either a sentence for life imprisonment or death has been imposed, the Supreme Court shall review all errors prejudicial to the rights of the appellant.") The Arkansas Supreme Court has repeatedly refused to interpret these provisions as absolving a party from making the appropriate contemporaneous objection at trial as a prerequisite to appellate review. *See, e.g., Friar v. State,* 313 Ark. 253, 854 S.W.2d 318 (1993); *Withers v. State,* 308 Ark. 507, 825 S.W.2d

819 (1992). Indeed, the Court has flatly held that the Arkansas procedures requiring review of the record for error in life and death cases presupposes that an objection was made at trial. *Withers,* 308 Ark. 507, 825 S.W.2d 819. This Court must defer to the Arkansas Supreme Court's interpretation of state law unless inconsistent with constitutional law. Petitioners have not pointed to any alleged errors occurring at their state sentencing trial that the Arkansas Supreme Court did not address on direct appeal.

■ Petitioners also claim that the Arkansas Supreme Court did not comparatively review their death sentences with other death sentences that the Arkansas Supreme Court has affirmed. The original petition states that petitioners could not find any death sentences which were reversed by the Arkansas Supreme Court on the premise that a comparative review of capital cases mandated such reversal. Petitioners argue that the failure of the state court to give meaningful consideration of the rules pertaining to comparative review of capital cases violates petitioners' rights to due process.

The Court first notes that the Arkansas Supreme Court has stated that "(a)lthough the words 'comparative review' may not appear in our opinion, such a review has been afforded in every capital case since the practice was made a part of our appellate review process in *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106, *cert. denied,* 434 U.S. 878 [98 S.Ct. 231, 54 L.Ed.2d 158] (1977)." *Ruiz & Denton v. State,* 280 Ark. 190, 655 S.W.2d 441 (1983). In that Arkansas Supreme Court case, reviewing the petitioners' second trial and death sentence, the Court explicitly set forth its reasoning in finding that the sentences of death were not disproportionate. The Supreme Court review at hand is a review of a different proceeding, but the underlying crime is the same. Petitioners present no argument as to why this Court should disbelieve the Arkansas Supreme Court's assertion that, whether stated or not, it conducts a comparative review of all death sentences. Petitioners also fail to present any argument as to why the sentence of death in their respective cases is dispropor-

tionate to other death sentences affirmed by the Arkansas Supreme Court.

Even if the Arkansas Supreme Court did not conduct a comparative review of the sentence of either petitioner, petitioners would have to demonstrate that this alleged failure constituted constitutional error. They cannot do so. Such a contention has been flatly rejected by the United States Supreme Court. In *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court noted that a federal court may not issue a writ of habeas corpus absent a violation of the Constitution or laws or treaties of the United States. The Court held that the comparative review of death sentences is not constitutionally required, but is a matter of state law. *Id.*

■ Petitioners also appear to contend that the failure of a state to comply with its own procedures can be sufficiently egregious to amount to a denial of federally required due process. While this is a true statement of the law, neither petitioner in this case has persuaded this court that the state has failed to comply with its own procedures, or that the alleged failure would be prejudicial in this case.

In sum, petitioners have failed to persuade the Court that their twentieth argument has merit.

## XXI.

PETITIONERS WERE DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THEIR SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

■ Petitioners' twenty-first and final point reads in full as follows:

"Petitioners assert that if any of the other issues raised herein are deemed by this court to have been waived or not properly raised, said failure on the part of the counsel involved therein constituted ineffective assistance of counsel in violation of their Sixth, Eighth, and Fourteenth Amendment rights."

It was noted in the "Background" section of this opinion that the Court found the notion

 

of trial counsel (Mr. Cambiano) asserting an ineffective assistance of counsel claim against himself in a habeas corpus proceeding to be problematic. It was for this reason that Mr. Herb Rule was appointed to represent Mr. Ruiz. Although both petitioners originally indicated that there was a possibility that supplemental briefing and perhaps evidentiary hearings would be necessary to develop this issue, no supplemental briefing has been submitted, and no requests for evidentiary hearings have been made. And the time for doing so has passed.

Petitioners have made a conclusory, unsubstantiated claim that trial counsel were ineffective. Claims of ineffective assistance of counsel must be scrutinized under the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must prove both that his counsel's representation was deficient and that the deficient performance prejudiced the defendant's case. *Id.* at 687, 104 S.Ct. at 2064. The first part of this test is met when the defendant shows that counsel failed to exercise the customary skills and diligence that a reasonably competent attorney would have exhibited under similar circumstances. The second part is met when the defendant shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reviewing court is to apply a "strong presumption" that counsel was reasonably effective, requiring a showing that "counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064.

Petitioners have presented this Court with no specific examples of incidents at trial where trial counsel failed to exercise the customary skill and diligence that a competent attorney would have exercised under similar conditions. Petitioner have presented this Court with no specific arguments that, but for trial counsel's ineffectiveness, the outcome of their trial would have been different.

This Court will not grant relief on unsupported claims, and thus finds the petitioners' argument on this claim to be without merit.

### CONCLUSION

After carefully studying the record, and after carefully reviewing each of petitioners' contentions, the Court concludes that same are without legal merit and that their Joint Petition for Writ of Habeas Corpus, as supplemented, must be dismissed.